1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
CONNIE M. FICKEL, SB# 210286
2    E-Mail: Connie.Fickel@lewisbrisbois.com
DAVID M. FLORENCE, SB# 242857
3    E-mail: David.Florence@lewisbrisbois.com
633 West 5th Street, Suite 4000
4  Los Angeles, California 90071
Telephone: 213.250.1800
5  Facsimile: 213.250.7900

6  Attorneys for Defendant Ward Damon,
erroneously sued as Ward Damon Posner
7  Pheterson and Bleau, P.L.

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 GREENWAY NUTRIENTS, INC., a          CASE NO.  2:22-cv-3322
   Colorado Corporation, and GUSTAVO
12 ESCAMILLA                            **DECLARATION OF CONNIE M.**
                                        **FICKEL IN SUPPORT OF**
13              Plaintiffs,             **DEFENDANT WARD DAMON'S**
                                        **NOTICE OF REMOVAL BASED**
14        vs.                           **ON DIVERSITY JURISDICTION**

15 JOHN MARK PIERCE, an individual;     [28 U.S.C. §§ 1332, 1441, 1446]
   PIERCE       BAINBRIDGE,    PC,   a
16 California professional corporation;
   WARD       DAMON       POSNER
17 PHETERSON AND BLEAU, P.L., a
   Florida limited liability company;
18 PRAVATI      CAPITAL,    LLC,     a
   Delaware limited liability company;
19 IAN ABAIE, an individual; ALEX
   CHUCRI, an individual; VIRAGE
20 MASTER LP, a Delaware limited
   partnership; VIRAGE SPV-I LLC, a
21 Delaware limited liability company; and
   DOES 1-25, inclusive,
22
                Defendants
23                                      Trial Date:     None Set

24         **DECLARATION OF CONNIE M. FICKEL**

25 I, Connie M. Fickel, declare as follows:

26        1.     I am an attorney duly admitted to practice in the United States District

27 Court, Central District of California, and I am a partner with Lewis Brisbois

28 Bisgaard & Smith LLP, attorneys of record for Defendant Ward Damon,

4883-5359-0304.1

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   erroneously sued as Ward Damon Posner Pheterson and Bleau, PL.  The facts set
2   forth herein are of my own personal knowledge, and if sworn I could and would
3   competently testify thereto.

4       2.      The case file in the above-referenced state court action with the Los
5   Angeles Superior Court includes:

6       a.      A Complaint dated March 21, 2022, and styled *Plaintiffs*
7   *Greenway Nutrients, Inc. and Gustavo Escamilla (collectively, "Plaintiffs") v.*
8   *Defendants, John Mark Pierce, an individual residing in California; Pierce*
9   *Bainbridge, P.C., a California professional corporation; Ward Damon Posner*
10  *Pheterson and Bleau, P.L., a Florida limited liability company; Pravati Capital,*
11  *LLC, a Delaware limited liability company; Ian Abaie, an individual residing in*
12  *Arizona; Alex Chucri, an individual residing in California; Virage Master, LP, a*
13  *Delaware limited partnership; and Virage SPV-1, LLC, a Delaware limited liability*
14  *company*, in the Superior Court of the State of California, County of Los Angeles,
15  Case No. 22STCV09854, a true and correct copy of which is attached hereto as
16  Exhibit A.

17      b.      A Summons dated March 21, 2022, a true and correct copy of
18  which is attached hereto as Exhibit B.

19      c.      A Civil Case Cover Sheet dated March 21, 2022, a true and
20  correct copy of which is attached hereto as Exhibit C.

21      d.      A Notice of Case Assignment dated March 21, 2022, a true and
22  correct copy of which is attached hereto as Exhibit D.

23      e.      An Alternate Dispute Resolution Packet dated March 21, 2022, a
24  true and correct copy of which is attached hereto as Exhibit E.

25      f.      A First Amended General Order Re: Mandatory Electronic Filing
26  dated March 21, 2022, a true and correct copy of which is attached hereto as Exhibit
27  F.

28  / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4883-5359-0304.1

2

DECLARATION OF CONNIE M. FICKEL IN SUPPORT OF DEFENDANT WARD DAMON'S NOTICE OF
REMOVAL BASED ON DIVERSITY JURISDICTION

g.    A Voluntary Efficient Litigation Stipulation Packet dated March 21, 2022, a true and correct copy of which is attached hereto as <u>Exhibit G</u>.

h.    A Notice of Case Management Conference dated March 25, 2022,  true and correct copy of which is attached hereto as <u>Exhibit H.</u>

i.    An Order to Show Cause Failure to File Proof of Service dated March 25, 2022, a true and correct copy of which is attached hereto as <u>Exhibit I.</u>

3.    To my knowledge, the documents attached to the Notice of Removal as Exhibits A through I constitute all process, pleadings, and orders filed in the state court action.

4.    None of the Defendants have answered Plaintiff's Complaint to date.

5.    I am informed and believe that none of the members of Ward and Damon, a Florida law firm, reside in the State of California.

6.    I am informed and believe that Ward and Damon received a copy of the Complaint in this action on April 26, 2022.  Ward and Damon submits that service was not complete or properly effectuated on Ward Damon.

7.    Ward and Damon will be filing a copy of the Notice of Removal with the clerk of the state court and serving a copy on all parties.

8.    On May 16, 2022, I spoke with Brandon Fernald, counsel for Pravati Capital, LLC, Alex Chucri, and Ian Abaie.  Mr. Fernald confirmed that Pravati has been served with the Complaint in this action, but that Abaie and Churcri, both Arizona residents, have not yet been served.  Mr. Fernald also confirmed that Pravati consents to this removal.

9.    On May 16, 20222, I also spoke with Ed Altabet, counsel for Defendants John Mark Pierce, Pierce Bainbridge, P.C., who confirmed that they have not been served with the Complaint in this action.

10.    On May 16, 2022, I communicated via email with Michael Taitelman, counsel for and Virage Master, LP, Virage SPV-1.  I am informed and believe that

DECLARATION OF CONNIE M. FICKEL IN SUPPORT OF DEFENDANT WARD DAMON'S NOTICE OF REMOVAL BASED ON DIVERSITY JURISDICTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  the Virage Defendants have been served.   Mr. Taitelman informed me that the

2  Virage Defendants both consent to removal.

3        I declare under penalty of perjury under the laws of the United States that the

4  foregoing is true and correct and that this declaration was executed on May 16,

5  2022, at Montecito, California.

6

7                            */s/ Connie M. Fickel*

8                            CONNIE M. FICKEL

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4

DECLARATION OF CONNIE M. FICKEL IN SUPPORT OF DEFENDANT WARD DAMON'S NOTICE OF
REMOVAL BASED ON DIVERSITY JURISDICTION

# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 03/21/2022 06:02 PM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Monroe,Deputy Clerk
22STCV09854

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
JOHN MARK PIERCE, an individual; PIERCE BAINBRIDGE, PC, a California professional corporation; WARD DAMON POSNER PHETERSON AND BLEAU, P.L., a Florida limited liability company; PRAVATI CAPITAL, LLC, a Delaware limited liability company; IAN ABAIE, an individual; ALEX CHUCRI, an individual; VIRAGE MASTER LP, Delaware limited partnership; VIRAGE SPV 1 LLC, a Delaware limited liability company; and DOES 1-25, inclusive.

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**
GREENWAY NUTRIENTS, INC., a Colorado Corporation, and GUSTAVO ESCAMILLA

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| The name and address of the court is: | CASE NUMBER: |
| (El nombre y dirección de la corte es): | (Número del Caso): |
| STANLEY MOSK COURTHOUSE 111 NORTH HILL STREET LOS ANGELES, CALIFORNIA 90012 | 22STCV09854 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
GERARD P. FOX, GERARD FOX LAW P.C., 1880 CENTURY PARK EAST, SUITE 1410, LOS ANGELES, CA 90067; (P) 310-441-0500

| DATE: (Fecha) | 03/21/2022 | Sherri R. Carter Executive Officer / Clerk of Court Clerk, by (Secretario) | C. Monroe | , Deputy (Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
☐ other (specify):
4. ☐ by personal delivery on (date):

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 www.courtinfo.ca.gov |

Exhibit A - Page 6

Electronically FILED by Superior Court of California, County of Los Angeles on 03/21/2022 06:02 PM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Monroe,Deputy Clerk
22STCV09854

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: William Fahey

1  Gerard P. Fox (SBN 151649)
   gfox@gerardfoxlaw.com
2  GERARD FOX LAW, P.C.
   1880 Century Park East, Suite 1410
3  Los Angeles, CA 90067
   310-441-0500
4
   Attorneys for Plaintiffs,
5  Greenway Nutrients, Inc. and Gustavo Escamilla

6              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

7                   **FOR THE COUNTY OF LOS ANGELES**

8
   GREENWAY NUTRIENTS, INC.,                Case No.:  22STCV09854
9  a Colorado Corporation, and GUSTAVO
   ESCAMILLA                                    COMPLAINT FOR DAMAGES
10                                          (1)  Constructive Fraud
              Plaintiffs,                    (2)  Breach of Fiduciary Duty
11                                          (3)  Conspiracy
              v.                            (4)  Aiding and Abetting Fraud
12                                          (5)  Aiding and Abetting Fraud
   JOHN MARK PIERCE, an individual;         (6)  Aiding and Abetting Breach of
13 PIERCE BAINBRIDGE, PC, a California            Fiduciary Duty
   professional corporation; WARD DAMON     (7)  Unfair Business Practices
14 POSNER PHETERSON AND BLEAU, P.L.,        (8)  Tom Bane Civil Rights Act
   a Florida limited liability company;     (9)  Aiding and Abetting Securities Fraud
15 PRAVATI CAPITAL, LLC, a Delaware         (10) Declaratory Judgment
   limited liability company; IAN ABAIE, an
16 individual; ALEX CHUCRI, an individual;
   VIRAGE MASTER LP, Delaware limited
17 partnership; VIRAGE SPV 1 LLC, a
   Delaware limited liability company; and
18 DOES 1-25, inclusive,
                                            **DEMAND FOR JURY TRIAL**
19            Defendants.

20

21

22

23

24

25

26

27

28

                                    1
                          COMPLAINT FOR DAMAGES

1  Plaintiffs, Greenway Nutrients, Inc. and Gustavo Escamilla, allege as follows:

2  **NATURE OF THE ACTION**

3      1.     This case is about a complicated and interwoven web of corruption, deception, and
4  high-stakes political influence.  It involves a high-profile lawyer with a history of corruption with
5  a firm built like of house of cards, reliant on unscrupulous litigation funding companies with a
6  history of runs ins with state lending regulators to keep up the charade.  This case also involves a
7  politically connected Serbian Oligarch federal law enforcement officials have represented was
8  responsible for conducting a massive multimillion dollar transnational counterfeit goods scam, and
9  allegedly a top-money maker for a transnational drug trafficking and criminal enterprise, Group
10  America.  The enterprise is a brutal yet low profile violent criminal entity, and its New York City
11  based Serbian mob-boss has powerful ties to Serbian President Aleksander Vucic, former New
12  York City Mayor, Rudy Giuliani who previously acted as a political advisor and consultant for the
13  Serbian Government and he also has ties to the Serbian Secret Police, and allegedly, U.S.
14  intelligence agencies.[1]  Finally, this case involves a Plaintiff (Greenway Nutrients, Inc.) whose
15  principal, Plaintiff Gustavo Escamilla, has found himself on the opposite end of this Serbian
16  Oligarch's powerful political and dangerous organized crime influence for the better part of a
17  decade.  Despite the constant threat of retaliation, and the unfair nature of pursuing legal remedies
18  against entities that refuses to play fair, Plaintiffs herein continue their attempts to seek justice and
19  restitution.

20      2.     Plaintiff Gustavo Escamilla is a Mexican-American small business owner. He is
21  the developer, formulator, and principal of Greenway Nutrients' ("Greenway") products.
22  Escamilla and Greenway were the victims of a massive, decade's long, multimillion dollar
23  transnational counterfeit goods scheme perpetrated by one of Group America's alleged top money
24  makers, David Dragan Selakovic.  Through his various alter ego entities, Selakovic interfered with
25  and stole several million dollars' worth of Greenway's valuable product and inventory, intellectual
26  property, trademarked materials, trade secrets, and business model.  The theft sought to enrich

27  ─────────────────

28  [1] *"The Hardest-Working Drug Game You've Never Heard Of"* – Stevan Dojcinovic and Pavla Holcova. *See* https://www.occrp.org/en/group-america/the-hardest-working-drug-gang-youve-never-heard-of

1  Selakovic, Greenway's former lawyers, and Group America's vast criminal enterprise, at the
2  expense of Escamilla and Greenway.  Selakovic's actions devastated Greenway's plans to take its
3  companies business model public, leading to decades of legal battles and conflict with Selakovic,
4  and Greenway's former lawyers Mike Ryan and James Ryan.  In one brazen move, Selakovic,
5  acting through one of his alter-ego entities, improperly interfered with an existing business
6  relationship and invested a purported $30 million to purchase a majority interest equity stake and
7  convinced Greenway's former raw product supplier named Ecowin Co. LTD ("Ecowin"), to
8  breach its exclusive distribution agreement with Greenway.  Selakovic, and entities controlled by
9  Selakovic, mercilessly ransacked Greenway's business model, creating multiple competing
10  websites improperly selling untold millions of dollars of Greenway's products bearing Greenway's
11  trademark back to Greenway's customer base and copious amounts of subsequent knock-off and
12  competing versions of Greenway's products for years.

13       3.      Plaintiffs Escamilla and Greenway would have some success in their decades long
14  struggle.  Escamilla and his business partner are principally responsible for uncovering Selakovic's
15  massive decades long multimillion dollar transnational counterfeit goods scam involving copious
16  amounts of illicit versions of software from Adobe and Microsoft.  Greenway was identified as
17  federal crime victim whose participation and cooperation with authorities from The United States
18  Department of Homeland Security ("DHS") and the United States Department of Justice ("DOJ")
19  lead to the successful seizure of millions of dollars of counterfeit goods including counterfeit
20  software from Adobe and Microsoft. The government's criminal investigation, "Operation
21  Software Slashers." resulted in six guilty pleas and was hailed as "one of the largest software
22  piracy schemes ever prosecuted by the U.S. Department of Justice."[2] On information and belief,
23  Selakovic, and his longtime business partner named Steven Blackburn, the alleged ringleaders
24  responsible for the counterfeit scheme, may have potentially reached a deferred prosecution or
25  plea agreement with the DOJ in connection with Selakovic's, and Blackburn's allegedly being

26

27  [2] "Operation Software Slashers: Six Defendants Plead Guilty to $100 Million Software Piracy
28  Scheme." *See*: https://www.justice.gov/opa/pr/operation-software-slashers-six-defendants-plead-guilty-100-million-software-piracy-scheme
[3] "*Gustavo Escamilla et al v. United States of America*, civil case #2:21-cv-01910, [DE-1]

-2-

COMPLAINT FOR DAMAGES

1  prosecuted and indicted under seal by the government in connection with Operation Software
2  Slashers. [3]

3      4.      Group America's substantial transnational drug trafficking organization is headed
4  by New York City based Serbian mobster, Mileta Miljanic, the former personal bodyguard to
5  former Serbian President Slobodan Milosevic.  At the same time, current Serbian President
6  Alexander Vucic served as Serbian Minister of Information under former Serbian President
7  Slobodan Milosevic.[4]  David Selakovic's younger brother, Nikola Selakovic, served as the
8  Presidency Secretary of the President of Serbia Aleksandar Vučić, and was the former Serbian
9  Prime Minister of Justice under Serbian President Aleksander Vucic for years.

10      5.      Group America has ties to powerful entities all over the world, including
11  government intelligence agencies.[5]  The gang is indeed violent, and members are accused of
12  engaging in the most heinous acts of violence, including torture, dismembering enemies with
13  chainsaws, and potentially responsible for multiple assignations around the world.  Their brazen
14  and well documented corruption scheme of influence usually includes a mix of financial pressure
15  and threats of violence against parties that refuse to bend to their will.  Group America's former
16  ringleader was indicted for tampering with a juror to help fix the first federal racketeering trial of
17  John J. Gotti, the boss of the Gambino crime family. Miljanic is currently incarcerated after being
18  indicted in connection with alleged weapons charges in New York.

19      6.      Up against this vast criminal network, Escamilla knew he needed a high-profile
20  litigator to help Greenway exercise its rights.  The company had been informed by DHS that a
21  favorable civil verdict would lead to criminal charges against Selakovic, Blackburn, and their
22  related entities. It was then when Escamilla and Greenway decided to pursue civil rights violations,
23  and other civil remedies, and eventually hired a high-profile Ivy league big-name lawyer to take
24  on Selakovic, Greenway's former lawyers, and Selakovic's powerful Serbian criminal enterprise.

25
26  [4] "Operation Software Slashers: Six Defendants Plead Guilty to $100 Million Software Piracy
Scheme." *See*: https://www.justice.gov/opa/pr/operation-software-slashers-six-defendants-plead-
27  guilty-100-million-software-piracy-scheme
28  [5] *See* https://www.occrp.org/en/group-america/

[6] *See* https://www.courthousenews.com/powerful-serbian-american-drug-traffickers-may-have-
ties-to-intelligence-agencies/

7.      Enter John Pierce, a lawyer whose firm, Pierce Bainbridge Beck Price & Hecht, LLP (hereinafter "Pierce Bainbridge") was once hailed as the one of the fastest growing high-stakes litigation firms in the world.  Pierce Bainbridge represented high-profile clients including former New York City Mayor Rudy Giuliani, Tulsi Gabbard, George Papadopoulos, Carter Page, and Michael Avenatti.

8.      The foundation of Peirce's firm was built upon sand, basing the entire operating budget of the firm on litigation loans from powerful and unethical litigation financing firms.  At one point during his representation of Greenway, Pierce was in debt to Defendant Pravati for millions of dollars. In an effort to get out from under the influence of Pravati, Pierce turned to Virage Master, LP and Virage SPV-1, LLC (hereinafter collective referred to as "Virage"). Eventually, Pierce would be indebted to Virage to the tune of an estimated $59 million.  These loans were collateralized by Pierce Bainbridge's portfolio of contingency fee and other cases. Pierce Bainbridge was so indebted to Virage that Pierce was beholden to their every whim, least they take away his livelihood by calling his debt.  Escamilla and Greenway were originally unaware of Pierces propensity to engage in dishonest conduct.  Had Plaintiffs known, Greenway would not have retained Pierce Bainbridge in any capacity.

9.      Pierce Bainbridge represented Greenway in its case against Selakovic and his various alter ego entities as well as Greenway's former attorneys Michael Ryan and James Ryan (herein referred to as the Ryan Brothers).  Greenway's former exclusive raw product supplier Ecowin was also a defendant.  Ecowin defaulted after being properly served.  After obtaining a default judgment against Ecowin, Greenway would be able to obtain a judgment for damages in the tens of millions of dollars.  Despite successfully opposing a 12(b)(6) motion to dismiss filed by the Ryan Brothers, Pierce suddenly concocted a false dispute between Pierce Bainbridge and Greenway in order to withdraw from the case.  Pierce and his lawyers claimed that there was no evidence against the Ryan Brothers to support Greenways claims.  Not only was that not true, Greenway through Escamilla, had provided Pierce with ample evidence to show that the Ryan Brothers were indeed viable defendants.  Pierce did not conduct any discovery to help prove Greenway's case. His firm did not even bother to serve a set of written discovery seeking

1 | documents or communications that would have been relevant to Greenway's claims, let alone take
2 | the necessary depositions.

3 |   10.   Pierce, Peirce Bainbridge, and local counsel Defendant Ward Damon, ultimately
4 | filed a false and materially misleading motion to withdraw as counsel, leaving Greenway without
5 | a way to pursue damages against Ecowin or the Ryan Brothers and ultimately resulting in
6 | Greenway suffering tens of millions of dollars as Ecowin was in default and all Pierce, his firm,
7 | and Ward Damon needed to do was prove its damages.

8 |   11.   Pierce's actions were greatly influenced by the two defendant litigation funds,
9 | Pravati and Virage.  Without their influence, Pierce and Peirce Bainbridge would likely have
10 | methodically moved through to obtain a default judgment against Ecowin, litigate the case against
11 | the Ryan Brothers, as they were retained to do in the first place.  However, due to the efforts of
12 | Defendants Pravati and Virage, Greenway and Escamilla were greatly harmed.

## JURISDICTION AND VENUE

14 |   12.   Venue is proper in this judicial district, pursuant to California Code of Civil
15 | Procedure §§ 395(a) and 395.5. The defendants represented Greenway as its attorneys and required
16 | local Florida co-counsel while the company resided and operated in the County of Los Angeles,
17 | State of California, who either reside, maintained an office, and transacted business on behalf of
18 | the Plaintiff's, in connection with Defendants' representation of the Plaintiff's Florida suit, while
19 | acting as its attorneys in the County of Los Angeles, and are within the jurisdiction of this Court
20 | for purposes of service of process.

21 |   13.   This Court has jurisdiction of this matter because Defendants have committed the
22 | acts complained of herein either entirely or substantially within the state of California.

## THE PARTIES

24 |   14.   Plaintiff GREENWAY NUTRIENTS, INC. is a Colorado corporation with its
25 | primary place of business in the County of Los Angeles, State of California.

26 |   15.   Plaintiff GUSTAVO ESCAMILLA is the primary owner, developer, formulator,
27 | and creator of Greenway Nutrients, Inc's products, with his primary place of residence in County
28 | of Los Angeles, State of California.

-5-

COMPLAINT FOR DAMAGES

16.     Defendant JOHN MARK PIERCE is an individual and resident residing in the County of Los Angeles, State of California.  Pierce was the principal shareholder of now defunct law firm of Pierce Bainbridge Beck Price & Hecht, LLP, and the attorney retained to represent Plaintiff Greenway Nutrients for the relevant period for this complaint.

17.     Defendant PIERCE BAINBRIDGE P.C. is California professional corporation and law firm duly organized under the laws of the State of California with its principal place of business in the City of Los Angeles, County of Los Angeles, State of California. Pierce Bainbridge is the successor in interest to the now defunct law firm of Pierce Bainbridge Beck Price & Hecht, LLP, the attorney retained to represent Plaintiff Greenway Nutrients for the relevant period for this complaint.  John Pierce is the principal shareholder of Defendant Pierce Bainbridge, P.C.

18.     Defendant WARD DAMON POSNER PHETERSON, AND BLEAU, LP ("Ward Damon") is a Florida limited liability company with its primary place of business in West Palm Beach Florida. Defendant Ward Damon had substantial contacts with the State of California by and through its representation of Plaintiff Greenway Nutrients during the relevant period for this complaint.

19.     Defendant PRAVATI CAPITAL, LLC, is a Delaware limited liability company, with principal offices and a place of in Scottsdale, AZ. Pravati is licensed by the California Department of Financial Innovation and Protection to engage in lending activities in the state of California. Pravati is a third-party litigation funding company and had substantial contacts with the State of California by and through its contractual litigation funding relationship with Pierce Bainbridge at the relevant time.

20.     Defendant ALEXANDER CHUCRI is an individual and resident residing in the County of Los Angeles, State of California. Chucri is the principal and Chief Executive Officer of Pravati Capital, LLC.

21.     Defendant IAN ABAIE is an individual and resident residing in the County of Maricopa, Arizona. Abaie Senior Legal Counsel, and an Investment Analyst for Pravati Capital, LLC.

COMPLAINT FOR DAMAGES
Exhibit A - Page 13

22.     Defendant VIRAGE MASTER, LP. Is Delaware limited partnership with a principal place of business in Houston, Texas. Virage Master, LP is a third-party litigation funding company and had substantial contacts with the State of California by and through its contractual litigation funding relationship with Pierce Bainbridge at the relevant time. Virage Master, LP, is licensed by the California Department of Financial Protection and Innovation to engage in lending activities in the state of California and registered with the California Secretary of State as a corporation which will do business in California.

23.     Defendant VIRAGE SPV-1, LLC, is a Delaware limited liability company, with a principal place of business in Houston, Texas. Virage SPV-1, LLC had substantial contacts with the State of California by and through its contractual litigation funding relationship with Pierce Bainbridge at the relevant time. Virage SPV-1, LLC is <u>not</u> licensed by the California Department of Financial Protection and Innovation and is <u>not</u> registered with the California Secretary of State as a corporation which will do business in California.

24.     Plaintiff if is unaware of the true names and capacities, whether individual, associate or otherwise of Defendants DOES 1 through 25, inclusive, and therefore sues them by such fictitious names. Plaintiff is informed and believes, and on this basis alleges, that each of the Defendants designated herein as DOE is legally responsible in some manner for the events and happenings herein referred to and/or legally caused injury and damage proximately thereby to Plaintiff, as herein alleged.  Plaintiff reserves the right to amend this Complaint when the true names, identifies and/or capacities of the DOES are ascertained.

### FACTS COMMON TO ALL CLAIMS

#### The Players

25.     Greenway Nutrients, Inc. (hereinafter "Greenway") is an organic nutrient, fungicide, and pesticide company. Gustavo Escamilla (hereinafter "Escamilla") is the primary owner, developer, formulator, and creator of Greenway Nutrients, Inc's brand name line of products. In 2010, Greenway was a unique and innovative brand that was an early mover in the Hydroponic and Home lawn and Garden markets.  The company's products were considered the one of the best and most well recognized in the industry. Greenway's initial market share and

-7-

1   growth were explosive, with products that were well-established in the marketplace and distributed
2   nationally to well over 1,600 hydroponic stores throughout the entire U.S. Greenway's products
3   had also recently crossed over into the lucrative home lawn and garden markets and distributed to
4   over 23,000 independent retailers at the time.

5       26.    Greenway University, Inc. was an initial educational facility for educational and
6   regulatory compliance that included hydroponic growing. That served as the springboard for
7   Greenway Nutrients, Inc. formation which immediately became Escamilla's and his business
8   partners primary and sole forward growth strategy and focus for taking Greenway Nutrients, Inc's
9   business model public through a proposed reverse merger deal with a company named HPC,
10   Acquisitions, Inc. ("HPC"), which is now named Vegalab, Inc.  The products were extremely
11   popular, and the growth of the company accelerated to the point where the potential profitability
12   of the company was in the range of $100 million if Greenway was able to grow unmolested by
13   Selakovic and his outside agitators.

14       27.    Tom Ryan, Michael Ryan, and James Ryan are brothers who are all attorneys Tom
15   Ryan ultimately became general counsel for Greenway. Mike Ryan was hired to help Greenway
16   with various legal matters. James Ryan was also involved with Greenway's attempts to seek new
17   investments.  James Ryan would later serve as litigation counsel on behalf of Selakovic and his
18   various alter ego entities working against his former client, Greenway Nutrients.

19       28.    Steve Blackburn and David Selakovic were introduced to Escamilla and Greenway
20   in 2011 through the Ryan Brothers.  Ostensibly, Blackburn and Selakovic were businessmen who
21   could help Greenway grow their online footprint through their website development and media
22   company, New Epic Media, LLC.  Tom and Mike Ryan assisted Greenway Nutrients, Inc. draft
23   and prepare the company's website development agreement with Selakovic's company New Epic
24   Media, LLC.  Selakovic and Blackburn were also running a fulfillment center. Tom Ryan assisted
25   in creating Fulfillment Solutions Services, LLC, allegedly to assist in fulfilling Greenway's online
26   sales orders and distribute Greenway products on the east coast. Tom and Mike Ryan assisted
27   Escamilla's company Greenway Nutrients, Inc. draft its fulfillment agreement with Selakovic's
28   company Fulfillment Solutions Services, LLC.

29.     Unbeknownst to Escamilla at the time, Selakovic was a member of the Serbian mafia responsible for conducting a massive multimillion dollar transnational counterfeit software manufacturing and distribution scam.  Selakovic has substantial ties to Serbian President Alexander Vucic and New-York based Serbian mob boss Mileta Miljanic, ringleader of "Group America" a violent yet low profile Serbian American transnational drug trafficking organization. Miljanic is currently incarcerated after a federal indictment in connection with alleged weapons charges and an alleged person of interest public corruption scandal in New York.

30.     Selakovic controls Vegalab, LLC, Vegalab, Inc (formerly HPC)., and Vegalab, SA. Fulfillment Solutions Services, LLC, and New Epic Media, LLC, who were all deemed alter-ego companies for Selakovic by a Court.  All have been implicated in the Adobe and Microsoft counterfeit scandal detailed below (hereinafter "Selakovic Entities").

31.     Ecowin CO. LTD, (hereinafter "Ecowin") is a South Korean government subsidized entity and one of South Korea's most successful manufacturers of highly concentrated raw materials used in formulating Greenway's products.  Greenway first discovered and introduced Ecowin products to the U.S. market and entered into an exclusive distribution agreement for the entire United States. Ecowin was contractually obligated to sell its products only to Greenway, and they would be resold under Greenway's brand name and line of products. The agreement was drafted and negotiated by Tom and Mike Ryan.  Within months, Ecowin breached its exclusive distribution agreement with Greenway after the Ryan Brothers violated their fiduciary duties and provided Selakovic with Greenway's confidential insider business information regarding Greenway's exclusive distribution agreement with Ecowin.  Unbeknownst to Escamilla or Greenway, Selakovic and Ecowin executed a secret and secondary exclusive distribution agreement with Selakovic's newly formed and controlled entities. Subsequently, one of Selakovic's alter-ego entities invested a purported $30 million to acquire a majority interest stake in Greenway's former raw product supplier Ecowin.

32.     HPC Acquisitions, Inc. is a company with whom Escamilla and Greenway held confidential reverse merger discussions regarding completing a reverse merger deal to take Greenway's business model public.  Tom and Mike Ryan were involved in Greenway's

1    confidential reverse merger discussions with HPC. Tom Ryan drafted, and prepared Greenway

2    Nutrients, Inc' Non-Disclosure Non-Compete Agreement (hereinafter "HPC NDNCA") related to

3    Greenway Nutrients, Inc's reverse merger discussions with HPC.  Greenway's proposed reverse

4    merger deal with HPC never happened, because unbeknownst to Escamilla or Greenway at the

5    time, Selakovic, and Ecowin, in connivance with Mike Ryan, and HPC, went around Escamilla

6    and Greenway's back and jointly agreed that HPC was a suitable corporate vehicle for Ecowin,

7    Selakovic, and Selakovic controlled entities to take Selakovic's newly formed and competing

8    organic pesticide and fungicide business model public later. In March 2017, Escamilla discovered

9    Greenway's former attorney Mike Ryan had taken a role as a managing member at Vegalab

10   (formerly HPC).   It was clear that he flagrantly breached his fiduciary obligations to keep

11   Greenway's proprietary information and reverse merger plans with HPC confidential. Mike Ryan

12   assisted Selakovic to essentially steal this deal from Greenway.  According to United States

13   Securities and Exchange Commission filings, Mike Ryan became a managing member and took

14   stock ownership of Vegalab, Inc.

15        33.     John Pierce is the principal and founder of the now defunct law firm, Pierce

16   Bainbridge Beck Price & Hecht LLP (hereinafter "Pierce Bainbridge").  Escamilla's company

17   Greenway retained Pierce Bainbridge to file and litigate a civil lawsuit against the Selakovic

18   Entities, Vegalab, Inc., James and Mike Ryan, Supreme Growers, LLC, and Ecowin. John Pierce

19   suddenly and seemingly inexplicably manufactured an attorney-client conflict with Escamilla by

20   refusing to prosecute the Ryan Brothers, leading to Pierce sending clients threatening email

21   communications days before Pierce Bainbridge's withdrawal as counsel. The same day Pierce

22   Bainbridge received a purported $28.5 million "loan agreement" from one of the defendant

23   litigation funders and party to this action. John Pierce's new law firm, Pierce Bainbridge, P.C. is

24   simply the natural extension of Pierce Bainbridge Beck Price & Hecht LLP.  John Pierce was the

25   principal of his prior entity and continues to be the principal of his current entity.  Most of the

26   clients and infrastructure from Pierce Bainbridge Beck Price & Hecht LLP were simply transferred

27   to Pierce Bainbridge.  As such, they are the same entity for the purposes of this litigation.

28

34.   Ward Damon Peterson Posner & Bleau, LLP served as local counsel for Pierce Bainbridge during Greenway's litigation.

35.   Pravati Capital, LLC is a litigation fund that provided capital loans to Pierce Bainbridge during the time when Greenway was a client. Escamilla's company Greenway applied for litigation funding from Pravati.  Shortly after Escamilla provided Pravati with substantial evidence regarding Selakovic, Selakovic's entities, Ecowin, Vegalab, Inc., the Ryan Brothers and Greenway's meritorious claims, Pravati pressured Pierce Bainbridge into abandoning Greenway as a client.  Around the same time, Pierce Bainbridge defaulted on an undisclosed funding note worth over $9 million. Pravati, and its CEO Aleksander Chucri, have a history of violating California law with respect to California Financing Law.[6]

36.   Virage Master LP is a litigation funder that provided capital loans to Pierce Bainbridge through Virage Master, LP's alleged member or subsidiary Virage SPV-1, LLC, who in turn, provided millions of dollars in funding to Pierce Bainbridge to allegedly cover the undisclosed $9.1 million defaulted funding loan from Pravati.  Virage Master, LP, and or other Virage entities, have been accused of improperly influencing litigation at Pierce Bainbridge.

37.   On information and belief, Selakovic or others affiliated with the politically and New York City Serbian mob boss connected Selakovic, conspired with Virage Master, LP, and or Virage SPV-1, LLC, and or other Virage entities, as a pay-off or bribe to induce Pierce, and his firm's lawyers, to undermine and abandon Greenway's meritorious Florida lawsuit. Under the phony cover and guise of Virage Master, LP, and or Virage SPV-1, LLC, and or other Virage entities providing Pierce Bainbridge with up to $100 million in a proposed multi-tranche litigation funding deal to legitimize otherwise illegitimate and fraudulent misconduct.

A.   **The Ryan Brothers Involvement with Greenway Includes Actions as Legal Counsel for Greenway Nutrients**

1.   The Ryan Brothers

38.   Greenway's interactions with The Ryan Brothers are important to this litigation because their involvement with Greenway – and Pierce Bainbridge' contrived attempt to get

---

[6] See Exhibit A – Consent Order from California Commissioner of Business oversight.

-11-

1    themselves fired as counsel – are the basis for the actions at issue in this case. The Ryan Brothers

2    and their connections to Group America are central players, even today.

3        39.    Escamilla met Tom Ryan in May of 2010, after Tom attended a one-on-one training

4    session related to compliance with industry regulations in Colorado through Greenway University.

5    Shortly thereafter, in June 2010, Greenway Nutrients, Inc. was formed in Colorado. Tom was an

6    attorney who represented that he was interested in learning about compliance issues in the state of

7    Colorado and attended one-on-one seminars with Escamilla through Greenway University.

8        40.    Tom and Escamilla immediately hit it off and Tom worked to cultivate a friendship

9    with Escamilla. Tom attended further sessions at Greenway University and began to advocate for

10   an active role in the company including a role as general counsel. He learned that Escamilla was

11   considering seeking to take Greenway's overall business model public by first completing a Private

12   Placement Memorandum (hereinafter "PPM"). That would later be converted to a publicly traded

13   company through a proposed reverse merger deal with another corporation.

14       41.    Tom introduced Escamilla to his brother Michael Ryan, who also happened to be

15   an attorney. Tom and Mike represented that Mike specialized in SEC registrations and could help

16   draft and prepare a PPM for Greenway's overall business model and attract outside investors. Prior

17   to performing any work on behalf of Greenway, Tom and Mike Ryan were required to execute

18   Greenway's NDA, which they did.

19       42.    In November of 2010, Tom Ryan became an employee of both Greenway Nutrients

20   and Greenway University, where Tom served as general counsel for both companies. As part of

21   his compensation, Tom was living in Greenway's corporate housing in Denver, Colorado. He later

22   lived in Greenway's housing in California until November 18, 2012. Tom was also issued stock

23   in Greenway Nutrients. There was no other formal retainer agreement for his services. Tom Ryan

24   never disclosed that he was an equal partner in an entity formed to engage in the practice of law

25   with his brother James Ryan.

26       43.    James and Tom Ryan were business partners during the time Tom Ryan as general

27   counsel for Greenway Nutrients and Greenway University. The Ryan Brothers never disclosed

28   this information to Escamilla or Greenway. However, records show that Tom and James were

1    indeed operating a legal entity formed to engage in the practice of law registered in the State of

2    Florida for years.  James Ryan and Tom Ryan formed Ryan & Ryan Attorneys, an Association of

3    P.A.'s in 1996.[7]  The corporation was in good standing in the State of Florida at least through April

4    26, 2011.[8]  At the same time Tom Ryan drafted and prepared multiple agreements by and between

5    Greenway Nutrients, Inc, and Selakovic's controlled entities. It was not uncommon for Tom Ryan

6    to discuss Greenway Nutrients, and Greenway University's, day to day business operations and

7    happenings with his brothers James and Mike Ryan during countless telephone conversations with

8    Escamilla's present. These conversations included explanations of Greenway's forward growth

9    plans to conduct a reverse merger strategy to take Greenway's business model public.

10       44.    The Ryan Brothers – particularly Mike and Tom – often used the same email

11   address, ryanlaw@aol.com, to communicate with Greenway, its staff, and Escamilla. Both men

12   had access to confidential information and attorney-client communications related to Greenway.

13       45.    On information and belief, James Ryan also had access to the ryanlaw@aol.com

14   email address.  As a partner with Tom in Ryan & Ryan Attorneys, P.A., James was certainly

15   privileged to the information shared with Tom and Mike Ryan through the email address.

16       46.    Also, during the time period in question, Mike Ryan and James Ryan were partners

17   in a business entity formed to engage in the practice of law in the State of Florida called Ryan and

18   Ryan Attorneys, LLC.[9]

19       47.    The Ryan Brothers each worked on a funding push on behalf of one of Escamilla's

20   businesses.   While the investment solicitation (PPM) was.   initially drafted in the name of

21   Greenway University, the PPM materials contained entire pages related to Greenway Nutrients

22   including the products, copyrighted materials, and business models.  The information regarding

23   Greenway Nutrients Inc's products was significant. Materials reviewed by the Ryan Brothers

24   included rebranding and distribution agreements for Greenway's organic pesticide products and a

25   Letter of Intent to develop and manufacture products for Greenway Nutrients brand name line of

26   products. The Letter of Intent was drafted by Tom and Mike Ryan, for the manufacturing,

27   _____
     [7] See Exhibit B – Articles of Incorporation of Ryan & Ryan Attorneys, Association of P.A.

28   [8] See Exhibit C – Ryan & Ryan Attorney Corporate Filing
     [9] See Exhibit D – Articles of Organization Ryan and Ryan Attorneys, LLC

1  distribution, and sales of Greenway products. All the information included references to
2  Greenway's intellectual property, products logos, forward sales strategies, and business model,
3  and Greenway Nutrients was the primary driving factor in the valuation of the PPM.

4       48.    The Ryan brothers were generously compensated for their work on the PPM. The
5  compensation was acknowledged by Tom Ryan via an email wherein he stated, "I received the
6  first $50,000.00 wire deposit and the $5,000.00 to *us*."[10] Indeed, the Ryan Brothers were working
7  as a team and accepted substantial compensation for their legal work on the PPM.

8       49.    Any attorney working on the PPM would necessarily have reviewed confidential,
9  privileged, and trade secret information related to Greenway Nutrients. As attorneys retained to
10  assist with the PPM, Tom and Mike Ryan executed Greenway's NDA, offered legal advice, drafted
11  and prepared contracts demonstrating each had an attorney-client relationship with Greenway and
12  a fiduciary duty to safeguard confidential trade secrets of the company. They were all privy to the
13  confidential information.

14       50.    The Ryan Brothers helped value of Greenway's overall business model in the PPM
15  at $25 million at the time of the attempted investor solicitation. Mike and Tom Ryan were
16  specifically working on behalf of Greenway Nutrients, Inc. when evaluating the company. In order
17  to do so, they would have had access to confidential information when preparing PPM documents,
18  valuing the company, and otherwise working on the deal. Greenway's proprietary information
19  was absolutely involved.

20       51.    James Ryan sent stock solicitation letters to clients offering a 17.5% equity stake
21  for a $4.5 million investment in overall business model included in Greenway's PPM. James
22  Ryan's efforts to promote and help the PPM included access to Greenway University and
23  Greenway Nutrients confidential information, including Greenway Nutrients products,
24  copyrighted materials, and business models. James Ryan's actions as an attorney working in
25  concert with his brothers – both of whom were James Ryan's business partners at the time – created
26  a fiduciary duty from James Ryan to Greenway, a duty he would later violate repeatedly.

27       52.    In addition to their compensation for their work on the PPM, the Ryan Brothers
28

---

[10] Exhibit E – Email from Tom Ryan to Gustavo Escamilla dated July 26, 2010. (*emphasis added*)

-14-

COMPLAINT FOR DAMAGES

Exhibit A - Page 21

1  would be paid a percentage of the total investment as evidenced in their draft PPM solicitation
2  letter to be signed by James Ryan.[11]

3            2.     The Ryan Brothers Introduce Greenway to Selakovic and Blackburn

4       53.     After preparing the PPM, in or around January of 2011, Tom Ryan introduced
5  Escamilla and Greenway to Steve Blackburn and David Selakovic. None of the men, Blackburn,
6  Selakovic, or the Ryan Brothers, had any prior experience in the organic fertilizer, pesticide, or
7  fungicide industry prior to their involvement with Greenway and Escamilla. Unbeknownst to
8  Escamilla, Selakovic and Blackburn were involved in a multitude of highly complex criminal
9  enterprises.

10      54.     Selakovic and Blackburn's criminal ties include connections to the Serbian
11 American mob, also known as Group America. The enterprise has close ties with the Serbian
12 government and Group America's ringleader is Mileta Mijanic. Where Selakovic, in turn, through
13 his younger brother Nikola Selakovic's high standing in the Serbian Government and close
14 personal and professional working relationship Serbian President Alexander Vucic has afforded
15 David Selakovic's powerful political influence, and dangerous organized crime protection through
16 Group America's vast transnational drug trafficking enterprise. That affords Group America's
17 elite members with immense political power with alleged Serbian Secret Police and U.S.
18 Intelligence agency connections. These connections would repeatedly come in to play later for
19 Selakovic and Blackburn with respect to Greenway.

20      55.     Due to Greenway's stellar growth and rapidly expanding sales, Escamilla sought
21 ways to reduce the company's logistics by seeking an order fulfillment center on the east coast.
22 The plan included allowing an outside fulfillment center to package and distribute products.

23      56.     Tom Ryan told Escamilla that Blackburn and Selakovic could assist Greenway.
24 Blackburn and Selakovic allegedly operated a successful multimillion dollar software distribution
25 business and were looking to diversify their portfolio. The match seemed like a good fit for all
26 parties. Blackburn and Selakovic's company, New Epic Media LLC even created a new website
27 for Greenway with the goal of growing Greenway's sales.

28

---

[11] See Exhibit F – Email dated January 21, 2011.

COMPLAINT FOR DAMAGES

57.     Tom and Mike Ryan also assisted Escamilla and Greenway in drafting and preparing Greenway's fulfillment agreement and, in creating Fulfillment Solutions Services LLC, for the purpose of filling Greenway's online sales and distribute Greenway's products on the east coast. Tom Ryan assisted Blackburn in creating Fulfillment Solutions Services, LLC – in order to provide fulfillment and distributions services to Greenway.  As planned, Fulfillment Solution Services was provided with Greenway's proprietary trade secret formulation and dilution ratios, several million dollars' worth of raw product inventory, including bottles, labels bearing Greenway's registered trademark, caps, and sales information. That included and bottling equipment used to fill Greenway's online, retail, and wholesale sales orders.

58.     During the process of negotiating with Fulfillment Solutions, Tom Ryan, Escamilla and his business partner toured the fulfillment center as part of Greenway's due diligence.  There were no red flags during the walkthrough.  Escamilla and his business partner noticed large quantities of software on pallets emblazoned with the logos of seemingly reputable software companies like Adobe and Microsoft.  The existence of these seemingly legitimate products gave Escamilla the faith that the fulfillment center was a legitimate operation.  Unfortunately, the products were not legitimate and the pallets of software were counterfeit goods, part of a massive transnational multimillion-dollar illicit software manufacturing and distribution scheme that would lead to one of the country's largest ever criminal prosecutions.

59.     Obviously, the partnership with these outright criminals did not result in increased revenue for Greenway.  In fact, Greenway's robust online sales substantially decreased.  The business relationship with Blackburn and Selakovic soured quickly.

60.     Selakovic and Blackburn stole Greenway's confidential wholesale, retail, and online customer lists, several million dollars' worth of Greenway's raw product inventories, bottle caps, bottles, labels bearing Greenway's trademark, and Greenway's bottling equipment. Selakovic and Blackburn undertook these actions under the guise of an illegitimate $77,000 billing dispute.  The dispute that was a part of a calculated ruse and con job by Selakovic and Blackburn to steal several million dollars' worth of Greenway's raw products and bottling inventory.

61.     Subsequently, Selakovic hatched his scheme of taking customers and profits away

-16-

1 | from, and directly competing against, Greenway in the market unlawfully.

2 |      62.    According to a signed affidavit by one of Selakovic's first employees of Vegalab,
3 | LLC the only products Selakovic's Vegalab entities, and another entity named Supreme Growers,
4 | LLC ("Supreme") had to sell during his employment with Vegalab, LLC were Greenway's organic
5 | pesticide and fungicide products bearing Greenway's trademark.[12] Mr. Heller also stated he found
6 | Greenway's products were easy to sell and already well established in the marketplace and that
7 | when Selakovic and Blackburn ran out of Greenway's labels bearing Greenway's registered
8 | trademark, Selakovic and Blackburn simply printed more.

9 |      63.    At around the same time, after months of negotiations, Greenway entered into an
10 | exclusive distribution agreement for the entire U.S. market with Ecowin. Greenway now had
11 | exclusive supply of Ecowin's entire line of its highly concentrated products to Greenway to be
12 | reconstituted, repackaged, and resold under the Greenway Nutrients brand name line of products.
13 | Both Mike and Tom Ryan were involved in the drafting and preparation of the exclusive
14 | distribution agreement between Greenway Nutrients, Inc. and Ecowin.[13] Escamilla executed the
15 | agreement, which bound Ecowin to sell their entire line of products in the United States only to
16 | Greenway exclusively, and the company began to do business with Ecowin. During their months
17 | long negotiations, Ecowin's CEO, and several of Ecowin's executives flew to the United States to
18 | meet with Escamilla, his business partner, and Greenway. Subsequently Ecowin's CEO even sent
19 | a photo of them all having dinner together and signed a formal letter of appreciation on Ecowin's
20 | letterhead thanking Escamilla and his business partner for Ecowin's opportunity to enter the U.S.
21 | market through its newly formed relationship with Greenway.

22 |      64.    Within months, Ecowin inexplicably breached its exclusive distribution agreement
23 | and cut Greenway off from their abilities to place any future orders raw product orders.  Econwin
24 | declining to sell any of their products to Greenway even though they were contractually obligated
25 | to supply products to Greenway exclusively.

26 |      65.    After Escamilla's multiple attempts to contact Ecowin executives demanding an
27 |
28 | [12] Exhibit G – Heller declaration
   | [13] Exhibit H – Email from Tom Ryan to Gustavo Escamilla dated September 11, 2011.

-17-

COMPLAINT FOR DAMAGES

explanation, Greenway's principals conducted a brief private investigation, it was then that Ecowin then cited their new exclusive distribution agreement with Selakovic's newly formed Vegalab entities and disavowed the previous agreement with Greenway. This maneuver was shocking. Selakovic had not previously been in the natural pesticide business and suddenly he was able to identify proprietary products and scoop them off the market.

66.    Clearly, the Ryan Brothers had gone around Greenway's, and given Selakovic Greenway's confidential insider business information related to Greenway's exclusive relationship with Ecowin and Selakovic used his alter ego corporate entities to undercut, out maneuver, and outright cheat Greenway and Escamilla.

67.    Selakovic's merciless ransacking and hijacking of Greenway's business model was far from over. Because simultaneously, in June 2012, Selakovic's website development company New Epic Media, LLC, flagrantly violated Greenway's NDA and improperly converted Greenway Nutrients confidential and proprietary website development information, stole Greenway's customer lists for their self-dealing gain unlawfully, created multiple knock off and competing websites and online storefronts for Selakovic's newly formed Vegalab entities, and another company called Supreme Growers, LLC, that Selakovic also previously controlled and Growers Trust, LLC to compete against Greenway in the market unlawfully.[14]

68.    The Selakovic entities began selling untold millions of dollars of counterfeit, unauthorized, competing, and knock-off versions of Greenway products, and copious amounts of products bearing Greenway's trademark. These products were being unlawfully sold to Greenway's customer base and others for years. Selakovic's fraud and corruption cost Greenway up to $100 million in lost profits and market share.

69.    Around January 2012, Greenway began discussions with Eric Hanson of US Strategies Inc. regarding a potential reverse merger with Greenway Nutrients, Inc. and HPC, now named Vegalab, Inc. ("VEGL"). During the negotiations, Greenway proposed buying the shell of

---

[14] Adobe software also successfully sued and obtained permanent federal injunctions against the principals of Supreme Growers LLC, named Anthony Kornrumpf, and Growers Trust, LLC, named David Thompson, who were allegedly several of Selakovic's and Blackburn's top money makers of illicit online software resellers of counterfeit software products.

-18-

COMPLAINT FOR DAMAGES

1    HPC with the intention of executing a reverse merger later.  Tom Ryan drafted the non-disclosure

2    for US Strategies and Eric Hanson. All of the negotiations and communication with Tom Ryan

3    were completed through the email address he shared with his brother Mike Ryan.  As such, Mike

4    Ryan had unfettered access to the privileged details of the deal and as a fiduciary to Greenway he

5    had a duty to protect that information from other actors and to refrain from self-dealing at the

6    expense of his client Greenway.

7        70.    The merger with HPC Acquisitions failed to materialize due to complications

8    caused by Selakovic and Blackburn's malfeasance both related to the Ecowin debacle and the fact

9    that Selakovic's entities were counterfeiting copious amounts of Greenway's products and

10    undercutting Greenway with its own materials.  The products flooded the market and eventually

11    raised Escamilla's and his business partners further raised their suspicions that something more

12    sinister was occurring.

13        71.    Mike Ryan eventually drafted a PPM for Selakovic's company Vegalab, S.A., with

14    similar if not identical plans for a reverse merger with HPC that he undoubtably obtained from his

15    representation of Greenway.  Vegalab, SA essentially stepped into the shoes of Greenway, using

16    Greenway's lawyers, to complete Greenway's public entity formation strategy, for their own gain.

17    That company is now known as Vegalab, Inc. Mike Ryan obtained an executive-level position at

18    Vegalab, Inc., providing the company with untold amounts of insider and proprietary information

19    he obtained through his work with Greenway.

20    **B.**    **Escamilla and His Business Partner Expose Adobe and Microsoft Fraud**

21            **Software Fraud**

22        72.    In an attempt to discover what was happening to Greenway's ever shrinking market

23    share, Escamilla, and his business partner, took it upon themselves to hire a private investigator to

24    dig into Selakovic's and Blackburn operations and fulfillment center, seeking evidence of illicit

25    sales of Greenway counterfeit goods.

26        73.    Escamilla, his business partner, and their team staked out Fulfillment Solutions

27    Services, LLC and Supreme Growers, LLC's joint warehouse facility, obtaining substantial

28    material evidence and information for months.  They observed the comings and goings

1   surrounding the facility and sifted through the company's trash looking for evidence of
2   counterfeiting of Greenway's products.

3       74.     Not only did they discovered evidence of substantial manufacturing, distribution,
4   and sales millions of dollars' worth of counterfeit, unauthorized, knock off, or competing versions
5   of Greenway products, they also learned entities ultimately controlled by Selakovic and Blackburn,
6   were also illegally manufacturing, distributing, and reselling untold millions of dollars' worth of
7   illicit versions of Adobe and Microsoft products as well.  Selakovic's and Blackburn's Fulfillment
8   Solutions Services, LLC, and Supreme Growers, LLC's joint warehouse, and its fulfillment center,
9   turned out to be the central hub of Selakovic's and Blackburn's massive transnational counterfeit
10  goods racket in the U.S. Market.

11      75.     Due to the brazen nature of Selakovic and Blackburn's malicious actions, Escamilla
12  met with a Special Agent with the Los Angeles field office of the United States Federal Bureau of
13  Investigation (hereinafter "FBI") to show what they found.  Escamilla provided evidence of how
14  Selakovic's company Vegalab and other entities ultimately controlled by Selakovic, had created
15  competing websites to take market share away from, and were distributing copious amounts of
16  counterfeit versions of Greenway's products bearing Greenway's trademark, and back to
17  Greenway's customer base, and others illegally.  The FBI declined to prosecute the case.

18      76.     Undeterred, in July of 2014, Escamilla took Greenway's evidence and information
19  regarding Selakovic, Blackburn's, and entities manufacturing, distribution, and sales of substantial
20  volumes of counterfeit software products to counsel for Adobe and Microsoft.

21      77.     Microsoft is very well acquainted with and had successfully sued Blackburn several
22  times in the past.  James Ryan defended Blackburn, and entitles controlled by Blackburn, against
23  multiple lawsuits filed by Microsoft related to unlawful manufacturing, distribution, and
24  unauthorized sales of millions of dollars in illicit versions Microsoft Software company's products.

25      78.     After reviewing Greenway's evidence, Adobe immediately filed suit against
26  Selakovic and Blackburn (as well as their corporate entities).  Adobe successfully obtained a
27  federal injunction against Blackburn, Selakovic's entities, including Supreme Growers, LLC, New
28  Epic Media, LLC, Vegalab, LLC and Vegalab, SA, and also sued Vegalab, Inc. James Ryan also

-20-

COMPLAINT FOR DAMAGES

1   defended Blackburn and Selakovic against the lawsuit. the Court in Adobe's case determined these
2   entities were alter ego corporate entities of Selakovic because Selakovic had extensively
3   intertwined and commingled their assets.

4       **C.**    **DHS Officials Advise Escamilla That Greenway Would Be Identified as The**
5       **Lead Victim's in Conjunction with Microsoft, Adobe, in Connection With**
6       **DHS and DOJ's "Operation Software Slashers"**

7       79.    In March 2015, after speaking with counsel for Adobe, Escamilla and his business
8   partner were contacted by officials from DHS. Escamilla met in person and conducted an
9   exhaustive interview recorded under penalty of perjury, with multiple DHS agents, including the
10   acting DHS agent in charge Operation Software Slashers criminal investigation.

11       80.    Escamilla became part and parcel of Operation Software Slashers when he was
12   informed by DHS officials, that the Federal prosecutor in the Western District of Missouri
13   (hereinafter "USAO-MO") agreed to prosecute Greenway's federal criminal trademark
14   infringement complaint Escamilla and Greenway filed against Selakovic, Blackburn, other
15   unmanned suspects and corporate entities operated or controlled by Selakovic.

16       81.    On or about June 16, 2015, Escamilla emailed DHS officials advising them that a
17   2013 Colorado federal civil lawsuit that included allegations of civil trademark infringement filed
18   by Greenway against Selakovic, Blackburn, other individuals, and corporate entities operated and
19   controlled by Selakovic, was in jeopardy of being dismissed.

20       82.    Plaintiff Escamilla advised DHS officials that he was financially devastated by the
21   ongoing and illegal sales of Greenway's products, illegally bearing Plaintiff's Greenway's
22   registered trademark, unlawfully being sold back to Greenway's customers for years by Selakovic,
23   Blackburn, and entities ultimately controlled by Selakovic. This caused Escamilla and his family
24   severe financial hardship where he was no longer able to afford to pay for a private civil attorney
25   to pursue damages during a Colorado federal civil case.

26       83.    Later, Escamilla went from being told that Greenway would be the Lead Victim in
27   the Government's massive criminal case related to Operation Software Slashers to being informed

28

that he would have to file a very costly federal civil lawsuit to justify any further Federal involvement. The email dated October 28, 2016, came as a shock, and stated in relevant part:

> "We have researched your claims and consulted with the United States Attorney's Office, Western District of Missouri and while we sympathize with your situation, we have been advised that on August 17, 2015 a District Court found in favor of Selakovic against Greenway Nutrients in regards to the assertion of the Greenway trademark. While we understand that you may disagree with this judgement, our agency is bound by decision of the court and therefor are restricted on what we can do in regard to your claims that they continue to sell your products illegally... Regardless, we continue to investigate the alleged criminal activities in regard to his alleged distribution of counterfeit software."

84. The same day, Escamilla responded stating that the court in Greenway's 2013 Colorado lawsuit had never issued a purported negative ruling against Greenway in favor of Selakovic. Rather, the court dismissed the claims without prejudice after Greenway was unable to fund the litigation against the deep pockets of Selakovic. In fact, the Colorado court had exclusive ruled in favor of Greenway on the merits of the case.

85. On November 21, 2016, DHS investigators sent an email to Escamilla, stating that if Greenway prevailed against Selakovic regarding Greenway's civil trademark infringement claims the agency would reconsider opening criminal proceedings against Selakovic. This email stated in part:

> "While I understand your frustration and concerns, our agency cannot move forward with any investigation involving your trademark until you resolved this issue with the District Court in Colorado that issued the decision. " ...

> "We have, and continue too, since the day we met with you to seek charges against Selakovic in Singapore for his alleged sale of illicit software..."

> "Additionally, we have made attempts to look into the alleged misuse of the Greenway Nutrients logo, but because of the court decision, in a case you were a party to in Colorado, would not be able to file charges at this time,"...

> "We would be happy to take a second look if that decision is reversed." ...[15]

86. DHS's investigation and subsequent prosecution lead to the successful arrest and prosecution of six other criminal Defendants for their participation in the unlawful manufacturing, sales, and distribution of 170,000 units of illicit versions of Microsoft and Adobe software products worth over $100 million. However, according to Blackburn's deposition transcripts obtained

---

[15] Exhibit I – Email from Shawn Gibson to Gustavo Escamilla dated October 28, 2016.

-22-

1  during Adobe's massive civil lawsuit against Selakovic, Blackburn, and entities ultimately
2  controlled by Selakovic, DHS and DOJ's purported 170,000 illicit sales units sales figure and $100
3  million in losses figure pales in comparison to Blackburn's admissions under oath. Thus, the
4  depths of the crimes committed by Selakovic and Blackburn dwarf the accusations currently at
5  issue here. The Adobe and Microsoft scandal show the lengths and magnitude of corruption

6      87.     During Escamilla's meeting with Adobe's lead counsel and Manager of Adobe's
7  Software Piracy investigations they informed Escamilla that before he identified Selakovic,
8  Adobe's team of private investigators had unsuccessfully attempted to pinpoint precisely who was
9  supplying Blackburn with an endless stream of hundreds and thousands of illicit versions of
10 Microsoft's and Adobe's software products for years. And, that Selakovic's and Blackburn's
11 massive transnational counterfeit goods scam was allegedly responsible for illegally controlling as
12 much as 90% of all Adobe's online retail sales for years.

13      **D.     Escamilla and Greenway's Subsequent Attempts to Obtain Monetary Relief**
14      88.     As successful as the DHS criminal investigation was for the government, Greenway
15 has thus far been unable to obtain restitution for the wrongdoing by Selakovic, Blackburn, and
16 Selakovic's entities, due to Selakovic's powerful political and dangerous Group America
17 connections. Thus far, they have been able to thwart Escamilla's and Greenway's efforts at every
18 turn, often with highly complex and complicated bribery and intimidation.

19      89.     During DHS's criminal investigation, Escamilla emailed DHS officials advising
20 them he was in fear for his personal safety because multiple bald males, with what appeared to be
21 gang affiliated tattoos, were lurking outside Greenway's office and warehouse, pointing their
22 flashlights inside Greenway's windows and office space attempting to see if anyone was inside.
23 These actions scared and intimated Escamilla who was alone and the only person in Greenway's
24 warehouse and office at the time. This harassment was no isolated incident, and before retaining
25 Pierce and his firm, Escamilla advised Pierce of Selakovic's thugs were allegedly also staking out
26 and harassing Escamilla's mother, sister, and family members, in an ongoing effort to intimidate
27 the victims and his family members repeatedly over the years.

28

90.     Selakovic, who is allegedly one of Group America's top money makers, has good reason to go to great lengths to stop Greenway from a favorable civil verdict because Selakovic and Group America are aware that a favorable civil verdict would lead to criminal prosecution of Selakovic In this context, it makes sense as to why Selakovic and his counterparts would go to great lengths to stop Escamilla and Greenway, their literal freedom is potentially at stake.

91.     In 2013, Plaintiff Greenway filed its 2013 federal civil lawsuit in Colorado for allegations related to the illegal manufacturing, distribution, and sales of copious amounts Greenway's products bearing Greenway's trademark by Selakovic, Blackburn, and their related entities.[16]   At the time, Escamilla and Greenway were unaware that Mike or James Ryan were heavily involved in the fraud committed against the company.

92.     Moreover, during Greenway's 2013 Colorado civil lawsuit's discovery process, Selakovic and Blackburn were compelled to present evidence to Greenway proving that Greenway owed zero monies to Selakovic, Blackburn, or entities controlled by Selakovic.

93.     Selakovic's entities filed retaliatory lawsuits in Florida state court related to Selakovic's purported $77,000 fraudulent billing dispute created by Selakovic's entities.   This fraudulent billing dispute is, in part, how Selakovic and Blackburn justified stealing, manufacturing, distributing, and subsequently reselling millions of dollars' worth of illicit versions of Greenway's products to subordinate employees (i.e., "they owe us money).   They were able to obtain default judgments against Greenway related to the fraudulent Florida state claims. Even though Selakovic and Blackburn were sued for these same issues where Greenway prevailed and maintained substantial material evidence to the contrary.

94.     The only reason why Greenway's 2013 Colorado federal civil lawsuit was dismissed without prejudice was due to Plaintiff Escamilla and his company Greenway's inabilities to obtain or afford to pay for substitute private legal counsel at that time.

/ / /

/ / /

/ / /

---

[16] *Greenway Nutrients, Inc. v. Blackburn, et al.* #1:13-CV-01088.

**E.      Greenway Files Florida Federal Civil Lawsuit in June 2017**

95.      In January 2017, Plaintiff Escamilla began contacting and interviewing several Florida-based law firms to initiate another federal civil lawsuit against Selakovic, Blackburn, and entities ultimately controlled by Selakovic, in the Southern District of Florida.

96.      In February 2017, Escamilla and his business partner, decided to engage the law firm named Boyes, Farina, Matwiczyk (hereinafter "BFM") located in Palm Beach Florida.

97.      One of BFM's named partners John Farina (hereinafter "Farina"), served as lead counsel. While most Escamilla's interactions with BFM, were conducted through another BFM Partner named Kenni Judd, Esq. (hereinafter "Judd"), and BFM associate named Joshua Plager, Esq (hereinafter "Plager").

98.      Before engaging Farina and BFM, Escamilla supplied substantial material evidence of Selakovic, Blackburn, and Selakovic's entities unlawful manufacturing, distribution, and sales of millions of dollars' worth of Greenway's products bearing Greenway's trademark, being unlawfully sold back to Greenway's customer base for years.

99.      Greenway's claims were supported by a critical email Escamilla received from the former President of Selakovic's website development and online media company New Epic Media, LLC, who advised Escamilla and Greenway that she immediately resigned from her position as President of New Epic Media, LLC after she discovered Selakovic and Blackburn *fully* intended on defrauding Greenway to unlawfully control Greenway's online sales via Greenway's relationship New Epic Media, LLC.

100.     Moreover, Escamilla supplied Farina and BFM lawyers with material evidence demonstrating DHS officials advised Plaintiff Escamilla that Greenway would need to obtain a favorable court ruling over Selakovic regarding Greenway's civil trademark infringement claims before DHS and USAO-MO officials would consider filing criminal charges against Selakovic, Blackburn, and others, as part of Greenway's involvement in Operation Software Slashers.

101.     In March 2017, while updating Greenway's records for its upcoming Florida civil lawsuit, Escamilla was shocked to discover Mike Ryan, in conjunction with Vegalab, Inc.

-25-
COMPLAINT FOR DAMAGES
Exhibit A - Page 32

(formerly HPC Acquisitions, Inc.), Ecowin, and Selakovic entities Vegalab, SA, and Vegalab, LLC, had taken Vegalab, Inc' business model public in place of Greenway.

102.   It was clear that Mike Ryan had flagrantly violated Greenway's NDA and his fiduciary obligations owed to his former clients and went around Escamilla's and Greenway's back to assist Selakovic to take Vegalab, Inc.'s (HPC's) business model public through an over-the-counter reverse merger deal with the same OTCB shell corporation Vegalab, Inc. that Escamilla and Greenway previously held confidential reverse merger discussions with.

103.   Mike Ryan's business partner and brother drafted and prepared the HPC documents related to the potential merger. Mike Ryan was also privy to these discussions related to the reverse merger.  That contractually obligated Greenway's former attorneys, to keep Greenway reverse merger plans confidential.

104.   Escamilla requested Farina, Plager, Judd, and BFM aggressively pursue civil damage claims against Greenway's former attorney Mike Ryan for legal malpractice, breach of fiduciary duty, breach of contract, amongst other proposed civil causes of action. BFM declined to bring these causes of action.

105.   Instead, the unfortunate series of events that occurred immediately thereafter, further heightened the victims concerns of Selakovic utilizing that Ryan brothers and his powerful political and dangerous organized crime connections to thwart Escamilla's and Greenway's efforts from pursuing damages against them.

106.   After Escamilla's multiple requests to pursue damages against Greenway's former attorney Mike Ryan went ignored, Escamilla grew increasingly frustrated and concerned and proceeded to request to review a copy of the proposed draft of Greenway's Florida civil complaint Farina and BFM intended on presenting to the Court.

107.   In mid-May 2017, Escamilla advised BFM lawyers that the acting DHS agent in charge of Operation Software Slashers contacted Escamilla via email indicating DHS's General Counsel located in Washington D.C., would like to speak with Greenway's attorneys Farina, Judd, or Plager at that time. That Farina and BFM lawyers also willfully ignored, failed to investigate,

1    and failed to follow up on. This would be a theme in Greenway's attempts to finally get restitution
2    from Selakovic, attorneys refusing to represent Greenway's best interests.

3       108.    Things only got progressively worse and declined from there. All throughout May
4    of 2017, Escamilla continued to email BFM lawyers requesting to review a proposed draft copy
5    of Greenway's 2017 Florida civil complaint that Farina and BFM intended on presenting the court.
6    That BFM lawyers willfully ignored and failed provide to Escamilla a copy before Farina and
7    BFM improperly filed Greenway's 2017 Florida civil lawsuit. BFM improperly filed Greenway's
8    2017 civil lawsuit, that Farina and BFM failed provide to Escamilla and his company Greenway
9    until almost a week after it was filed.

10      109.    On June 15, 2017, immediately after BFM filed suit and served Selakovic's website
11    development company New Epic Media, LLC, James Ryan sent Farina and BFM a fraudulent,
12    misleading, and deceptive email, threatening BFM if they did not immediately agree to dismiss
13    Greenway's 2017 Florida complaint. James Ryan stated that he would file a Rule 11 motion for
14    sanctions, seeking attorneys' fees and costs. In other words, he was representing Selakovic and
15    Blackburn in litigation against Greenway, his former client.

16      110.    As alleged above, James Ryan that had previously been involved with Greenway's
17    PPM, and evaluated Greenway' overall business model at approximately $25 million. James Ryan
18    drafted a stock solicitation letter offering his connections a 17.5% equity stake in exchange for a
19    $4.5 million dollar investment in Greenway's PPM. James Ryan had access to proprietary and
20    confidential information. The Ryan Brothers never revealed they were partners in law firms Ryan
21    and Ryan Attorney's P.A. or Ryan and Ryan Lawyers, LLC together. The email – filled with lies
22    and threats – revealed that James Ryan represented all the organizations that were accused stealing
23    Greenway's business plans, products, and intellectual property. Suddenly, it was clear that the
24    Ryan Brothers with the assistance, of Selakovic and his powerful political and dangerous
25    organized crime connections, were intimately involved in the scheme to defraud Greenway.

26      111.    James Ryan besmirched and discredited his former client, claiming Greenway's
27    suit was baseless and without merit and then proceeded to raise Selakovic entities $77,000
28

1    manufactured and fraudulent billing dispute and default judgment, as the phony underlying legal

2    basis BFM would be sanctioned for if they proceeded forward with Greenway's 2017 Florida suit.

3        112.    Escamilla was utterly astounded because, prior to James Ryan's emails, Escamilla

4    and Greenway were unaware of his substantial involvement in the scheme to defraud Greenway.

5        113.    Immediately thereafter, on or about June 26, 2017, and without ever once speaking

6    with Escamilla the entire time Escamilla and Greenway were clients of BFM, Farina sent Escamilla

7    a letter via email advising him that Farina and BFM intended to file a motion to withdraw as

8    counsel of record, which BFM did.

9        114.    Before the Florida court granted Farina's motion to withdraw, Escamilla advised

10    Farina, and BFM lawyers that a California based attorney agreed to amend and prosecute

11    Greenway's 2017 Florida civil lawsuit. Requesting Farina and BFM to sponsor Greenway's

12    purposed attorneys Pro Hac Vice application and remain on Greenway's case as required local

13    Florida counsel. And without providing any explanation, Farina and BFM declined to assist or

14    sponsor Greenway's California based attorney to prosecute Greenway's claims.

15        115.    In other words, on information and belief, BFM appears to have conspired with

16    James Ryan to abuse the judicial process to the severe detriment of Escamilla and Greenway.

17    James Ryan appeared to be hell bent on ensuring Greenway's claims were not decided on their

18    merits, or adequately fleshed out. BFM lawyers did not even serve Selakovic, Blackburn, and all

19    other remaining Selakovic's entities, failed to investigate any of Greenway's claims, propounded

20    no discovery, took no depositions, before blindsiding Escamilla, and abruptly withdrawing from

21    Greenway 2017 Florida lawsuit.

22        116.    James Ryan also filed a motion to stay discovery in the action, presumably to

23    prevent Escamilla and Greenway from further discovering the depth of the corruption.

24        117.    In late October 2017, the Florida court dismissed Greenway's 2017 Florida civil

25    lawsuit due to Greenway's inabilities and failure to obtain substitute counsel in a timely manner.

26    / / /

27    / / /

28

**F.     Greenway Engages John Pierce of Pierce Bainbridge Beck Price & Hecht LLP as Legal Counsel Against the Ryan Brothers, Selakovic, and Others**

118.    Before Greenways 2017 Florida civil lawsuit was dismissed, in October 2017, Escamilla read a press release that John Pierce and Pravati Capital LLC (hereinafter "Pravati') had jointly released. That publicly advertised Pierce and his law firm' innovative and exclusive multimillion dollar litigation funding deal with Pravati at the time, stating in relevant part,

> "John Pierce was equally excited about the deal: This is a huge step forward for
> our firm. Pravati's backing ensures that we will be able to take even the largest
> commercial litigations to trial against any firm in the world and win." Pierce
> continued, "Pravati is at the absolute forefront of the emerging market for
> litigation funding. When it comes to creative funding solutions for law firms and
> claimants alike in the high-stakes commercial litigation space, there is no better
> choice than going to Alex Chucri and the team he has assembled at Pravati
> Capital."

119.    Defendants Pierce and Pravati's press release advertised Pierce' firm was seeking to represent parties who possessed meritorious multimillion civil claims with significant upside potential, which appeared to be a perfect fit for Escamilla's and Greenway's needs at the time. That served as the sole reason that induced Escamilla to initially contact Pierce, his firm, and eventually Pravati.

120.    In an attempt to revive Greenway's meritorious civil claims, Greenway engaged John Pierce, the principal of Pierce Bainbridge Beck Price & Hecht, LLP (hereinafter "Pierce Bainbridge") to bring another lawsuit against Selakovic, et al.

121.    Attorney Ronald Nisonson (hereinafter "Nisonson"), of Ward, Damon, Peterson and Bleau, PL., (hereinafter "Ward Damon") served as local Florida counsel.

122.    Before engaging Pierce Bainbridge and Ward Damon, Escamilla presented substantial evidence to Pierce that contained a detailed description of James Ryan's egregious attorney misconduct that occurred during Greenway's 2017 Florida civil lawsuit. The evidence also described in great detail Escamilla's recent discovery of Mike Ryan's and James Ryan's involvement in the overall scheme to defraud Greenway.

123.    Escamilla and Greenway respectfully requested Pierce, Pierce Bainbridge, and eventually Ward Damon, aggressively pursue civil damages for legal malpractice, breach of

-29-

contract, and breach of fiduciary duty, amongst other potential civil causes of action against Farina and BFM. That Pierce, and Pierce Bainbridge declined to follow through on, failed to investigate, or prosecute. Instead, falsely claimed Pierce and his firm's lawyers would have a difficult time locating Florida counsel willing to act as co-counsel as required by the Southern District of Florida local rules of procedure. If Greenway were to pursue civil legal malpractice damage claims against Farina and BFM as well, which was a false, materially misleading, and untrue.

124.   Escamilla provided substantial material evidence to Pierce and his firm demonstrating the high-profile nature of Greenway's claims due to Selakovic's well-documented and powerful political and dangerous organized crime connections. Escamilla also advised Pierce and his lawyers that Selakovic, and or others affiliated with Selakovic, allegedly paid or bribed Farina and BFM to undermine and abandon Greenway's 2017 Florida civil lawsuit.

125.   At the time, John Pierce was a rising star in the legal world. Pierce boasted he had a fast-growing firm of elite lawyers. The firm eventually represented other high-profile clients such as former Senator and aspiring Presidential Candidate Tulsi Gabbard, George Papadopoulos, Carter Page, and Michael Avenatti, and the former New York City Mayor Rudy Giuliani, amongst others. Pierce had a massive public persona. He was well connected in political circles on both sides of the isle. As it would turn out, John Pierce was a snake oil salesman. His firm obtained only a single jury verdict for a little over a mere $500,000. This was far from the superstar, high-powered, legal representation he promised.

126.   Within months of Greenway retaining John Pierce and Pierce Bainbridge John Pierce allegedly struck a new friendship up with former New York Mayor Rudy Giuliani. As has recently been reported in various news outlets, Giuliani had substantial ties to the Serbian government and Selakovic's political ally President Aleksander Vucic and thus Group America.[17] Pierce Bainbridge's connections with former New York City Mayor Rudy Giuliani and Rudy Giuliani's connections to the Serbian Government, and Serbian President Aleksander Vucic, would bring connections to Group America into the fold.

---

[17] Mr. Giuliani's connections to Serbia have been consistently reported since 2012 in various publications such as the Wall Street Journal, CNN, and the New Republic. The associations are often described as problematic or controversial.

127.    Pierce represented that his firm could litigate difficult cases and obtain results that evaded other lawyers, such as had been the case Greenway's prior litigation. They promised thorough, aggressive, and focused litigation on behalf of their clients. Finally, they promised they would not back down from a fight. As it turned out, none of these representations were accurate.

128.    Greenway and Pierce Bainbridge entered into an Attorney Client Agreement (hereinafter "Agreement") related to legal services on March 2, 2018.[18]   Escamilla signed the Agreement on behalf of Greenway. John Pierce signed the Agreement on behalf of the law firm.

129.    The Agreement does contain an arbitration clause. However, the clause is void. The clause, 15.1.6, states that the arbitration clause must be specifically initialed by the client, which Escamilla deliberately refused to initial, and Pierce and his firm did not raise any concerns, protest, or dispute Escamilla's refusal to initial or acknowledge the arbitration clause. Further, applicable state law renders the clause void based on Greenways' decision not to execute the portion of the contract related to the arbitration clause.

130.    According to *Business & Professions Code* section 6147(a)(b), which states, in pertinent part: (a) An attorney who contracts to represent a client on a contingency fee basis shall, at the time the contract is entered into, provide a duplicate copy of the contract, signed by both the attorney and the client, or the client's guardian or representative, to the plaintiff, or to the client's guardian or representative. The contract shall be in writing and shall include, but is not limited to, all of the following: and (b) Failure to comply with any provision of this section renders the agreement voidable at the option of the plaintiff." Greenway wishes to void the arbitration clause.

131.    Additionally, *in Marcus & Millichap Real Estate Investment Brokerage Co. v. Hock Investment Co. (1998) 68 Cal.App.4th 83, 88-89.* relying on standard rules of contract interpretation, the court of appeal determined that the contract, itself, "contemplated that the arbitration of disputes provision would be effective only if both buyers and sellers assented to that provision by initialing it. Since the sellers did not initial that provision, it did not become effective." (Id. at 92, emphasis added.) Here, Greenway did not initial the provision and thus the clause is void.

---

[18] Exhibit J – Engagement Letter

132. During their representation, lawyers from Pierce Bainbridge had access to all of the documentation available to Plaintiffs and also any publicly available information. Escamilla, and thus Greenway, was an extremely responsive client who provided detailed outlines to counsel which related the facts of the case. If Escamilla's documents were not sufficient, counsel was able to seek additional information or documents or the native sourcing of documents for more information. In fact, lawyers from Pierce Bainbridge had a contractual and fiduciary obligation to seek out these documents and information in order to best represent Greenway. Their reputations as lawyers demanded that they seek as much information as possible from the client to pursue the litigation and achieve the best possible result for Greenway. John Pierce, Pierce Bainbridge, and Ward Damon's lawyers failed to uphold that duty.

133. On August 17, 2018, Pierce Bainbridge filed suit on behalf of Greenway against Greenway's former attorneys Michael Ryan and James Ryan, The Ryan Law Group, LLC, Selakovic, Blackburn, Greenway's former supplier named Ecowin, Supreme Growers, LLC, VEGL, and other entities operated and ultimately controlled by Selakovic, in the Southern District of Florida. *See Greenway Nutrients, Inc. v. Selakovic et al,* Case # 9:18-cv-81104.

134. Greenway's Florida suit centered around the Plaintiff's discovery that James Ryan, had flagrantly violated Greenway's NDA, abused confidential information, and breached his fiduciary duty, in connivance with his brother Michael Ryan, Selakovic, Ecowin, and representatives of Vegalab, Inc., who went around the Plaintiff's back and execute Greenway's confidential reverse-merger and publicly traded entity formation strategy. The suit further alleged they intentionally interfered with Greenway's exclusive distribution agreement with Ecowin, and Supreme Growers, LLC, selling copious amounts of Greenway's products bearing Greenway's trademark causing Escamilla and Greenway, millions of dollars in financial losses, devastating Greenway's opportunity to take its business model public.

135. Pierce's eventual capitulation to outside forces began slowly and even before the court's favorable ruling for Greenway.

136. On or about September 5, 2018, after being served with Greenway's suit, James Ryan, sent a nasty and ill-tempered email, providing false and materially misleading information

1    by denying the fact that James Ryan, his brother Mike Ryan, or the Ryan Firm, had ever received

2    or reviewed any confidential information from Escamilla, and never represented Greenway or any

3    entity owned by Escamilla, stating in relevant part:

> "I am in receipt of your complaint and I want to be clear I am going to be very short on curtesy I extend before I begin pursuing sanctions." …

> "Your allegation that my brother Michael, my firm or I ever represented Greenway Nutrients, Inc. (Greenway) is false. That never happened. Nor did we receive any confidential information from Greenway, or any other entity operated by Mr. Escamilla." …

> "My brother Tom has never been a member or associate of my firm." …

9      137.    The email was obviously untrue. It is important to note that the correspondence

10    states that James Ryan is intimately aware of Escamilla and Greenway. As such, claims that the

11    Ryan Brothers *never* received confidential information from any entity operated by Mr. Escamilla

12    is a bald-faced lie, because Escamilla and Greenway repeatedly presented substantial material

13    evidence to Pierce, Pierce Bainbridge, Ward Damon lawyers to the contrary.

14      138.    Escamilla provided Pierce, Pierce Bainbridge, and Ward Damon lawyers, with

15    evidence in the form of email communications, distribution agreements, and various contracts that

16    were drafted on behalf of Greenway by Mike and Tom Ryan.

17      139.    The lawsuit Pierce Bainbridge filed was feeble in its attempt at taking on Selakovic

18    and the Ryan Brothers head on and the additional warning sign that John Pierce was not advocating

19    on behalf of Greenway and being pulled in a different direction. Instead of filing a motion to take

20    judicial notice as requested, proving Blackburn, Selakovic, and James Ryan previously defended

21    multiple massive trademark infringement lawsuits filed by Microsoft and Adobe Systems, or

22    pointing out that numerous permanent federal injunctions Microsoft and Adobe had successfully

23    obtained against Blackburn, Selakovic, or that James Ryan had defended against since 2000, Pierce

24    Bainbridge and Ward Damon's  claims made it seem like the litigation was a basic business

25    transaction gone wrong.[19]

---

27 [19] See *Microsoft Corporation v. MBC Enterprises, Steven Blackburn* Case #2:00-CV-00217,

28 *Microsoft Corp. v. Big Boy Distribution LLC, Steven Blackburn,* Case #07-80296-CIV, and *Adobe Systems Incorporated v. Bea's Hive LLC, Selacorp, David Selakovic, Steve Blackburn* Case #9:14-cv-81102

-33-

COMPLAINT FOR DAMAGES

140.    On October 1, 2018, James Ryan filed a motion to dismiss on behalf of himself, Mike Ryan, their law firm, and Selakovic's entities Vegalab, Inc, and Vegalab, LLC.  The motion included dozens of misleading or outright false representations from James Ryan, including arguments related to *res judicata* and *collateral estoppel* for all defendants regarding Greenway's June 2017 Florida civil lawsuit Farina and BFM improperly filed on behalf of Greenway. Where the Court granted James Ryan's request to stay discovery.

141.    On October 15, 2018, Pierce Bainbridge and Ward Damon's opposition to James Ryan's motion was pitiful.  Pierce and Nisonson signed the pleading, which dedicated less than a page to the most salient issue with respect to Selakovic and his associated entities, *res judicata*, stating in relevant part,

> "Specifically, when Greenway's counsel moved to withdraw in the 2017 Action, Judge Kenneth A. Marra issued an Order on July 21, 2017, granting that motion and stating that failure to secure new counsel within thirty days would "result in this action being dismissed **without prejudice**." *See* Decl. of Jonathan A. Sorkowitz ("Sorkowitz Decl.") at Ex. 1 (DE 31 in the 2017 Action) (emphasis added). In response to subsequent filings by Greenway and HPC Acquisitions, Inc. (now known as Vegalab, Inc. and a Defendant here), the Court issued another order citing its July 21, 2017 Order, and again commanding Plaintiff to obtain counsel, no later than October 27, 2017, or else suffer dismissal of its case. *See* Sorkowitz Decl., at Ex. 2 (DE 41 in the 2017 Action). Finally, when Greenway was unable to retain counsel by October 27, 2017, the case was dismissed. *See* Sorkowitz Decl., at Ex. 3 (DE 44 in the 2017 Action). Although the ultimate dismissal order did not specify that the dismissal was without prejudice, that was unnecessary. Judge Marra had already expressed his intent that an eventual dismissal for failure to find counsel would be without prejudice. *Res judicata* cannot apply on this basis.

142.    Even before they decided to litigate Greenway's civil case, Plaintiffs repeatedly supplied Pierce Bainbridge and Ward Damon with substantial evidence demonstrating the Ryan Brothers had access to confidential, attorney-client, and trade secret information.

143.    Pierce Bainbridge and Ward Damon deliberately concealed and failed to mention or disclose the existence of Greenway's of this information in Greenway's opposition. Peirce and his lawyers had plenty of information that contradicted James Ryan's motion to dismiss.

144.    On October 5, 2018, a partner from Peirce Bainbridge, John Sorkowitz, sent an email to Escamilla updating him on the Greenway litigation.  The email seemingly acknowledges

-34-

COMPLAINT FOR DAMAGES

that merits of Greenway's case. The email notes several facts which could been shown through additional discovery and states that there is a "colorable" claim against the Ryan Brothers. Sorkowitz noted that $50,000 had been paid to the Ryan Brothers for services performed and that James Ryan indeed had access to the confidential information related to Greenway and that "discovery might turn up more." Sorkowitz never completed any discovery.  In fact, Pierce Bainbridge never served any written discovery and never attempted to take any depositions during their representation of Greenway.

145.   On February 14, 2019, the Florida court ruled in Greenway's favor with respect to the claims against the Ryan Brothers on the motion to dismiss, finding that Greenway's former attorneys James and Mike Ryan and their law firm could be held accountable to Greenway for breach of fiduciary duty and tortious interference claims, further noting that James Ryan "*had flagrantly misquoted the law.*"[20]   The Court also ruled that Greenway's civil trademark infringement and unjust enrichment claims were viable.

146.   Greenway was also able to continue its case against former supplier Ecowin, now majority owned by an entity solely owned by Selakovic, which defaulted after being properly served.  During the period Ecowin was contractually obligated to supply its products to Greenway, Ecowin had unlawfully shipped thousands of gallons of Ecowin's highly concentrated products to an entity operated by Blackburn and controlled by Selakovic in violation of Greenway's NDA.

147.   Ecowin's unlawful shipments were worth tens of millions of dollars in estimated retail value that Selakovic, Supreme Growers, LLC, and Selakovic's entities unlawfully benefitted from without any compensation Escamilla's company Greenway.

148.   The motion to dismiss, however, did rule in favor of the Selakovic entities primarily because Peirce and his lawyers failed to adequately oppose the motion on grounds related to *res judicata* and *collateral estopple*.  On February 19, 2019, Pierce Bainbridge Ward Damon made matters worse by failing to oppose James Ryan's motion for clarification regarding Vegalab, Inc. inclusion in the viable claims moving forward.

---

[20] *See Greenway Nutrients, Inc. vs. Selakovic et al.*, case no. 9:18-cv-9 81104 [DE-81].

149.    Lawyers at Pierce Bainbridge and Ward Damon knew that the Ryan Brothers were intimately involved with the HPC reverse merger talks and knew that Vegalab, Inc. was the new name for the HPC, with the name change occurring after Selakovic copied Greenway's reverse merge plans.  By failing to oppose the motion for clarification, Defendants effectively allowed Vegalab Inc. and thus Selakovic to talk away from the litigation almost unscathed.  There remained only one entity related to Selakovic and Group America remaining in the litigation: Ecowin.

150.    The lawsuit nevertheless had substantial merit with respect to Ecowin and the Ryan Brothers. The court's strong admonishment should have been a warning to lawyers for Pierce Bainbridge and Ward Damon regarding the relative honestly and trustworthiness of James Ryan.

151.    Vegalab, SA, an alter-ego entity of Selakovic is the sole shareholder of and purportedly invested $30 million to purchase a majority interest stake in Ecowin, which was in default after failing to respond to Greenway's Complaint. This meant that Greenway could pursue damages against Selakovic's company Ecowin without the need for the trial related to liability and *finally* achieve some restitution for the years upon years of damages caused by Selakovic, Blackburn, Ecowin and the Ryan Brothers.  While there may have been more work to do, Greenway was on the path toward a significant recovery against Ecowin.

152.    On March 4, 2019, Escamilla and his business partner were present for a confidential settlement conference with Pierce Bainbridge Partner Jonathan Sorkowitz and Ward Damon Partner Ronald Nisosnson.  James and Mike Ryan were in attendance for the defendants.

153.    Escamilla prepared an evidence package for Sorkowitz and Nisonson to present to the Court during Greenway's settlement conference, demonstrating that attorney-client relationships existed between the Ryan brothers and Greenway Nutrients, Inc.   The settlement conference was a complete waste of time and farce that lasted less than two hours. James Ryan stood before the Court, claiming to have never received any confidential business information or represented Greenway Nutrients, Inc. in any capacity.

154.    And even though Escamilla provided Nisonson and Sorkowitz with material evidence to the contrary, demonstrating that attorney-client relationships existed between the Ryan

-36-
COMPLAINT FOR DAMAGES
Exhibit A - Page 43

1  brothers and Greenway Nutrients, Inc. both Nisonson and Sorkowitz deliberately concealed and

2  failed to present the evidence to the Court.

3      155.    On March 5, 2019, Escamilla emailed Nisonson to schedule a face-to-face meeting

4  alone to express his dissatisfaction with how things were deliberately mishandled during

5  Greenway's settlement conference the previous day. Nisonson responded, stating he was

6  unavailable. Nisonson and Ward Damon never made any additional efforts to assist Greenway or

7  Escamilla in their litigation.

8      156.    The idea that the Ryan Brothers never represented Greenway, or any entity

9  controlled by Escamilla, is laughable. Mike Ryan assisted Escamilla and Greenway Nutrients, Inc

10 draft a Letter of Intent to manufacture organic fertilizer products for Greenway Nutrients and a

11 rebranding and distribution agreement for Greenway Nutrients organic pesticide products. The

12 Ryan Brothers all had access to and helped shape the investment documents related to the PPM.

13 Those documents Greenway's business plans, marketing strategies, and future label designs for

14 Greenway's entire line of products.  Tom, Mike and James Ryan acted in concert to review

15 confidential information from Greenway, knew the inner workings of the company, and owed

16 fiduciary duties to Greenway by way of that representation.

17      157.    Nevertheless, James Ryan threatened to file a Rule 11 motion seeking attorney's

18 fees and costs if Greenway did not immediately consent to dismiss the lawsuit just like he did to

19 Farina and BFM did during Greenway's 2017 Florida civil lawsuit.

20      158.    Despite claiming to be hard-nosed litigators, some of the best in the world, Pierce

21 Bainbridge ignored the substantial evidence provided by Escamilla and seemed to be working with

22 James Ryan instead of attempting to put up a fight.

23      159.    Lawyers at Pierce Bainbridge and Ward Damon knew James Ryan's

24 representations were materially false and misleading.  The court had previously noted that James

25 Ryan was not afraid of materially misrepresenting the facts and the law. They were repeatedly

26 provided with evidence demonstrating James Ryan's fraudulent misrepresentations and denials

27 included in the untrue September 5, 2018, email correspondence. Nevertheless, Pierce and his firm

28 failed to investigate, callously disregarding and ignoring the evidence provided by their own client.

160.    Shockingly, after the court ruled that Greenway's claims against the James and Mike Ryan for breach of fiduciary duty and tortious inference could continue, Pierce and his lawyers started a campaign against Greenway and Escamilla to convince them to dismiss the Ryan Brothers from the litigation.  Despite Sorkowitz's written acknowledgement that Greenway's claims against the Ryan Brothers were colorable – and a ruling by the court finding the same – Pierce Bainbridge was attempting to *force* Greenway to drop the allegations without conducting any discovery on the issue.

161.    The following months resulted in a letter writing campaign between Pierce and Escamilla.  In each letter, it became more and more clear that Pierce never reviewed any of the documents provided by Escamilla. He never sought any clarification related to Greenways claims. The correspondence from Pierce and his lawyers does not reveal any attempt by the law firm to ascertain the facts or gather additional information. Rather, the lawyers simply belittle, demean, and threaten Escamilla. Further, Pierce Bainbridge and Ward Damon did not undertake any efforts to build evidence in support of Greenway through the discovery process.  No depositions were taken. No discovery was propounded. Nothing was done to advance Greenway's case.

162.    In February 2019, prior to the court ruling in Greenway's favor, Escamilla requested permission from Pierce Bainbridge to apply for litigation financing with Pierce Bainbridge's exclusive litigation funder who maintained a contractual senior lien position and financial vested interested on Pierce Bainbridge's entire caseload, Defendant Pravati. Requesting their assistance and introduction to Pravati.

163.    Surprisingly, Pierce, Sorkowitz, Pierce Bainbridge advised Escamilla and Greenway that they would be unable to assist Escamilla with Greenway's litigation funding application with Pravati due to a purported "conflict of interest."

164.    According to Pravati's litigation funding agreement with Pierce Bainbridge, Pravati maintained a vested interest in, as well as acted as Pierce Bainbridge's exclusive litigation funder who maintained an equal 50/50 share in the successful outcome of any monetary recoveries Pierce Bainbridge achieved through any of Pierce Bainbridge's legal proceedings based on the potential damage award value of Pierce Bainbridge's overall caseload.

165.    That contractually obligated Pierce Bainbridge to provide Pravati with a monthly status report of all Pierce Bainbridge's cases, their valuations, and other relevant Pierce Bainbridge client file information, that also included Greenway's 2018 Florida civil lawsuit.

166.    During the application process, Escamilla disclosed Farina and BFM's malfeasances, and Ryan Brothers had embezzling Greenway's confidential insider business information for their self-dealing gain, after preparing and later evaluating Greenway's PPM and public formation entity strategy during their representation of Greenway. Escamilla further provided Defendants Pravati and Abaie with a detailed timeline of events, evidence of an attorney client relationship existing between Greenway Nutrients Inc, Tom, Mike, and James Ryan, Greenway's and HPC's agreement, and the distribution agreements for New Epic Media, LLC's and Fulfillment Solutions Services, LLC's that were drafted by the Ryan brothers. Escamilla also provided affidavit from Selakovic's employee, David Heller, and former New Epic Media, LLC's President's email.

167.    Escamilla further advised Pravati that DHS officials had informed Escamilla that his company Greenway would be eligible to receive compensatory damages from the more than $20,000,000 that DHS and DOJ officials had successfully seized during civil asset forfeiture proceedings in connection with "Operation Software Slashers," if Greenway were to obtain a favorable court ruling over Selakovic.

168.    Pravati's representative, Ian Abaie advised Escamilla that Pravati would also be speaking with Pierce, Sorkowitz, and other lawyers at Pierce Bainbridge to acquire their evaluation or opinions of the value of Greenway's case against the Ryan brothers and Ecowin.[21]

169.    On February 14, 2019, despite ample evidence related to the potential recovery of substantial damages, Pravati declined to provide funding for Greenway's litigation stating in relevant part:

> "Thanks, Gustavo. Unfortunately, the case metrics put it outside the parameters of our current fund. Therefore, at this time, we are unable to provide funding. We would encourage you to keep us apprised of developments in the case, as we

---

[21] To date, despite repeated requests, Pravati and Abaie have refused to provide Escamilla and Greenway with copies of the documentation provided be Pierce Bainbridge related to Greenway's litigation.

-39-

regularly start new investment funds, each of which has its own investment parameters. We greatly appreciate your time and efforts throughout this process"

...

170.   Escamilla cordially thanked Abaie and Pravati and justifiably relied on their representations of Greenway's case metrics falling outside of Pravati's current funds parameters, amicably parting ways.

171.   On March 6, 2019, the clerk issued an entry of default as to Ecowin. This would allow Pierce Bainbridge Ward Damon to file a motion for default final judgment as to Ecowin.

172.   On the same day, lawyers from Pierce Bainbridge sent Escamilla an email demanding that Escamilla consent to release the James and Mike Ryan from Greenway's Florida suit. Otherwise, according to the lawyers, Pierce Bainbridge and Ward Damon would be notifying the court of their intentions to withdraw as counsel of record on behalf of Greenway. Pierce Bainbridge's correspondence was a complete 180-degree transition from prior communications where Sorkowitz stated Greenway had colorable claims that simply needed exploration through discovery. The change in position by Pierce Bainbridge was completely unforeseen, particularly after the court ruled that Greenway could continue its litigation against the Ryan Brothers.

173.   In their correspondence, Sorkowitz, Pierce, and Pierce Bainbridge went so far as to deny ever receiving any material evidence from Escamilla or Greenway demonstrating that an attorney-client relationship existed, despite having ample evidence to the contrary and prior acknowledgment of the same. Even if it were true that the lawyers had not received substantial evidence related to Greenway's claims, they never sought clarification or requested additional support for Greenway's claims after Escamilla contacted Pravati. It was as if Pierce Bainbridge was no longer interested in pursuing the case.

174.   On or about March 7, 2019, Escamilla met with Pierce at Pierce Bainbridge's corporate offices located in Los Angeles, California. During that meeting, John Pierce promised to provide Greenway with an expert witness to evaluate Ecowin's liability to Greenway and testify in a damages hearing related to Ecowin. In exchange, Escamilla was to potentially agree to execute a mutual consent to release the Ryan Brothers from Greenway's Florida suit.

175.    John Pierce failed to follow through on the promise to provide Greenway with an expert witness to adequately assess Ecowin's liability. Pierce and his firm never intended to provide Greenway with an expert witness and was attempting to fraudulently induce and trick Escamilla under duress, who was acting on behalf of Greenway, to agree to enter into a mutual consent to release agreement with the Ryan Brothers.

176.    On March 11, 2019, Pierce Bainbridge Partner Sorkowitz advised Escamilla Pierce Bainbridge would not have ample time to provide Greenway with an expert witness due to the limited time before their March 20, 2019, expert witness report was due to be presented to the court. Escamilla supplied Pierce Bainbridge with evidence proving Ecowin had unlawfully shipped thousands of gallons of Ecowin's highly concentrated products to an entity operated by Blackburn and controlled by Selakovic in violation of Greenway's NDA. Ecowin's unlawful shipments were worth tens of millions of dollars in lost retail value to Greenway from which Ecowin, Vegalab, Inc, Selakovic, and Selakovic's entities unlawfully benefitted.

177.    Pierce Bainbridge and Ward Damon knew that Ecowin was actively involved in participating with Mike Ryan, Selakovic, and Selakovic's entities to embezzle Greenway's confidential insider business information to take Vegalab, Inc, (then named HPC, Acquisitions, Inc), public instead of Greenway.

178.    What followed was an embarrassment to the legal profession. Escamilla, rightfully, continued to seek clarification regarding the status of Greenway's case and attempts to prove damages against Ecowin.

179.    On March 25, 2019, a few days before receiving a $28.5 million "loan agreement" from Virage Master LP and or Virage SPV-1, LLC, Pierce belittled, demeaned, and threatened Escamilla in an email stating, "I am closing a massive deal this week," "I assure you further threats will not receive such a warm response," and "I am not in the mood for your ten thousand word emails with multiple fonts bolded with underlines and italics. It is juvenile." These words were in in response to Escamilla's attempts to seek the status of an estimated damage figure regarding Ecowin's default judgment. Pierce had repeatedly failed to provide Escamilla with any update on the status of the promised expert.

180. On March 27, 2019, Pierce used unwarranted, abusive, intimidating, and violent language during his representation immediately before withdrawing as counsel for Greenway, and threatened Escamilla stating in relevant part, "Now leave me alone until you force me to be deposed and testify at trial. Otherwise, I do want to see you, or hear your name even. This will not be a pleasant experience for you."

181. None of this language is becoming of an "elite" lawyer and none of the language was warranted. Pierce's responses were an indication that something had changed, and he appeared to be under a lot of stress. Despite having a slam-dunk default judgment, Pierce was chastising and insulting his own client, almost daring Escamilla to fire him. Presumably, Pierce realized that if Escamilla fired his firm, he would not run afoul of the signed retainer agreement or the California State Bar Rule of Professional Conduct 1.16(b).

182. On March 28, 2019, Pierce Bainbridge and Ward Damon failed to file a motion for default judgment as to Ecowin, or a notice of joint liability as to James Ryan, Mike Ryan, and the Ryan brother's law firm potential joint liability. Instead, Pierce Bainbridge and Ward Damon filed a false and materially motion to withdraw as counsel.

183. The same day Virage Master, LP, and or Virage SPV-1, LLC, sent Pierce Bainbridge a $28.5 million "loan agreement" on information and belief used to cure Pravati's $9.1 million litigation funding default within days of Pierce Bainbridge's withdrawal.

184. The motion filed by Pierce Bainbridge and Ward Damon included false and materially misleading information. The entire motion to withdraw as counsel of record on behalf of Greenway was orchestrated because Escamilla refused to consent to agree to release the Ryan Brothers from Greenway's Florida lawsuit. The motion argued in relevant part,

> "It In the course of those communications, it has become clear that professional considerations require termination of Plaintiff's Counsel's representation of Plaintiff. " …

> "In the course of those communications it also became clear that Plaintiff and Plaintiff's Counsel are in fundamental disagreement about the conduct of this case. " …

> "Plaintiff's Counsel avoids further detail in this publicly-filed Motion out of an abundance of caution to avoid prejudice to Plaintiff. However, Plaintiff's Counsel stands ready to provide further information to the court in camera if the Court wishes. " …

-42-

COMPLAINT FOR DAMAGES

"Separately from the professional considerations requiring termination of Plaintiff's Counsel's representation of Plaintiff and their fundamental disagreement about the conduct of the case, Pierce Bainbridge has repeatedly advised Plaintiff that it cannot proceed without receiving certain necessary information and documents from Plaintiff relating to a potential **default judgment, but has not received such information and documents to date**.

185.    Pierce Bainbridge and Ward Damon's sham motion to withdraw went so far as to falsely claim Escamilla and Greenway were requesting counsel violate their professional duties, falsely accused Escamilla and Greenway of refusing to provide counsel with material evidence in to support its claims against Ecowin, who defaulted. Counsel knew that was untrue as it was Pierce who failed to provide an expert for proving the damages in for default judgment.

186.    The only explanation for Pierce's decision to manufacture this dispute is that he and his "top" lawyers at Pierce Bainbridge desperately needed money to cure Pravati's March 8, 2019, $9.1 million dollar litigation funding default, and wanted to take the easy road against the defaulted Ecowin.  Escamilla and Greenway had provided substantial documentation that was sufficient to move forward with claims against the Ryan Brothers.

187.    Pierce knew that the Retainer Agreement Paragraph 12 (Discharge or Withdrawal) did not allow the firm to quit on Greenway's case just because proving the claims against the Ryan Brothers would be more work.  Pierce also knew that the California State Bar Rules of Professional Conduct does not provide for withdrawal simply because the law firm does not want to work up a case. The only way Pierce could lawfully resign is by orchestrating a situation wherein it appeared that Escamilla was being unreasonably difficult.

188.    Escamilla emailed Pierce Bainbridge and Ward Damon lawyers on well over a dozen separate occasions accusing Greenway's former attorneys of jointly engaging in egregious attorney misconduct during Greenway's 2018 Florida suit. Escamilla repeatedly requested an estimated damages figure for Greenway's case.  Pierce Bainbridge lawyers were contractually obligated to report and provide Pravati during Piece Bainbridge's representation of Greenway. To date, Pierce Bainbridge has never provided Greenway with any evaluation of damages related to the case and never retained an expert to determine the same.

189.    Pierce Bainbridge and Ward Damon deliberately concealed critical material evidence and information central to Greenway's civil claims of redress repeatedly.  Most of

-43-

Pierce's actions described above are in direct violation of numerous Rules of Professional Conduct according to the State Bar of California, including but not limited to,

A. Rule 1.3 Diligence
B. Rule 1.4 Communication with Clients
C. Rule 1.7 Conflict of Interest: Current Clients
D. Rule 1.9 Duties to Former Clients
E. Rule 1.16 Declining or Terminating Representation
F. Rule 3.3 Candor Toward the Tribunal*
G. Rule 4.1 Truthfulness in Statements to Others
H. Rule 5.4 Financial and Similar Arrangements with Nonlawyers
I. Rule 8.4 Misconduct
J. Rule 8.4.1 Prohibited Discrimination, Harassment, and Retaliation

190. Demonstrating Escamilla also copied Pierce, Piece Bainbridge's, and Ward Damon's lawyers on numerous occasions during Escamilla's numerous interactions and communications with State Bar of California officials. That Greenway's former attorneys have also callously ignored and failed to respond to for years.

191. Notwithstanding their clients multiple and rightful requests seeking information included in Greenway's clients' files, Piece Bainbridge and Ward Damon's lawyers have willfully ignored and failed to respond to Escamilla's numerous email requests seeking an attorney opinion or estimated damages award valuation of Greenway's overall case value. That failure also illustrates that Selakovic, and or other affiliated with Selakovic likely paid off or bribed Pierce, Pierce Bainbridge's, and Ward Damon's lawyers to undermine and abandon Greenway's 2018 Florida civil lawsuit.

192. On April 18, 2019, in a desperate attempt to notify the court of the egregious attorney misconduct taking place between Pierce Bainbridge, Ward Damon, and Selakovic's longtime attorney James Ryan's behind the scenes, Escamilla filed a motion to strike defendants pleadings for fraud on the Court.

193. Greenway's motion described Escamilla's substantial interactions with DHS and USAO-MO officials who had identified Greenway as the Lead Victims in "Operation Software Slashers," in conjunction with Microsoft and Adobe. The motion explained that DHS advised Escamilla that his company Greenway would need to obtain a favorable civil court ruling over Selakovic before officials would consider filing criminal charges against Selakovic, Blackburn,

1    and Selakovic's entities in connection with Greenway's trademark infringement allegations. The

2    motion also included the evidence and allegations related to the underlying lawsuit.

3        194.    Escamilla also sent the motion to strike Defendant's pleadings for fraud on the court

4    to Pierce, Pierce Bainbridge, and Ward Damon, as well as Selakovic's attorney James Ryan, and

5    his law firm, who all failed to respond to their former client's email, failed to oppose, and instead,

6    ignored the motion altogether.

7        195.    The Florida court ruled that Escamilla could not represent Greenway as a pro se

8    litigant, and again, Escamilla and Greenway were left without counsel or a way to pursue the

9    claims against the Ryan Brothers or Ecowin. The case was ultimately dismissed without prejudice

10   for failure to prosecute on May 1, 2019.

11       196.    All of this damage was done to Greenway under the phony guise of a multimillion-

12   dollar litigation funding deal worth up to a purported $100 million, through Virage Master LP, and

13   or Virage SPV-1, LLC. Virage's deal makes no sense because Pierce Bainbridge had no major

14   multimillion dollar favorable court decisions under the firm's belt, who had thus far, achieved only

15   a single court victory for a total recovery of a little over $500,000. The only explanation is

16   nefarious behavior on the part of Defendants.

17       **G.    The Defendant Litigation Funds Have a History of Shady Dealings and**

18           **Malfeasance and Improperly Influenced Pierce Bainbridge During the Firm's**

19           **Representation of Greenway**

20       197.    After Pierce, Pierce Bainbridge, Ward Damon, and James Ryan failed to respond

21   to or acknowledge Escamilla's April 18, 2019, motion to strike defendants pleadings for fraud on

22   the court during Greenways 2018 Florida civil lawsuit, Escamilla has since embarked a multi-year

23   campaign to investigate and uncover why Pierce, Pierce Bainbridge, and Ward Damon engaged in

24   negligent and reckless attorney misconduct.

25       198.    Escamilla was at a loss as to what just happened. Why would a supposedly top-

26   rate law firm repeatedly refuse to provide Escamilla and Greenway with an estimated damages

27   award figure regarding Ecowin's default, then turn around and falsely discredit and accused their

28   clients of failing to provide counsel with any evidence or information relating to Ecowin's default.

-45-
COMPLAINT FOR DAMAGES
Exhibit A - Page 52

1   Why would they suddenly refuse to litigate the matter and then proceed to demean, discredit,
2   intimidate, and threaten Escamilla. Pursuing a multimillion-dollar default judgment seemed like
3   a worthwhile endeavor, especially for a firm so indebted to litigation finance firms.

4        199.    It is well established that Pierce Bainbridge collapsed due to a massive failure in
5   management, extremely burdensome debt from litigation funding companies including Defendant
6   Pravati, and influence by outside actors including criminal conspirators.[22]

7        200.    According to multiple news articles, Pierce took a leave of absence in March 2020,
8   amid allegations he'd taken out a personal loan using the firm's assets as collateral. In a statement
9   to The American Lawyer a firm spokesperson said a "preliminary investigation" had corroborated
10  that he took out a personal loan, but Pierce himself has not publicly commented on the matter.

11       201.    At the time Greenway retained Pierce Bainbridge, Pierce Bainbridge maintained a
12  multimillion-dollar exclusive litigation funding deal with Pravati. Yet in late January 2019,
13  unbeknownst to Plaintiffs, Pierce and Pierce Bainbridge engaged Jonathan Katz, and his New Yok
14  City based firm Katz, Kane & Co., LLC (hereinafter "KKC") to act as financial advisors and to
15  provide investment banking services. For the express purpose in assisting Pierce and Pierce
16  Bainbridge negotiate, raise, and/or refinance approximately $59 million from Virage Master LP's,
17  through Virage SPV-1, LLC, and Virage SPV-2, LLC, in a series of financings, leveraging Pierce
18  Bainbridge's portfolio of contingency-fee cases as collateral.

19       202.    According to civil court filings, the request required Pierce Bainbridge to provide
20  Jonathan Katz and KKC with Pierce Bainbridge's client file information to conduct due diligence
21  of Pierce Bainbridge's entire portfolio of cases and client files that would be used as collateral for
22  the fund Pierce Bainbridge's entire portfolio of contingency-fee cases would used as collateral to
23  fund Pierce Bainbridge's massive multi-tranche litigation funding deal with Virage Master LP,
24  and or Virage SPV-1, LLC, and Virage SPV-2, LLC, worth up to a purported $100 million. Those

---

[22] John Pierce has a history of shady associations and funding scams. More recently, John Pierce has associated himself with Lin Wood – yes, that Lin Wood – and was accused by Kyle Rittenhouse of scamming doners for a legal defense fund in excess of $2 million. *See*: https://www.businessinsider.com/rittenhouse-said-lin-wood-john-pierce-defense-fund-was-scam-2021-11

1    cases necessarily included Greenway's meritorious 2018 Florida civil lawsuit against Selakovic et
2    al, that the Court had not yet ruled on and was still ongoing at that time.

3        203.    On March 7, 2019, according to its S.E.C filings, the same day Pierce attempted to
4    trick Escamilla to agree to consent to release James and Mike Ryan from Greenway's meritorious
5    2018 Florida civil lawsuit, Virage Capital Partners LP, raised $73.8 million from a handful of
6    undisclosed private investors. That, upon information and belief, is an alleged tit for tat good faith
7    gesture on behalf of Virage controlled entities demonstrating their abilities to raise and have
8    substantial cash on hand to fund Virage SPV-1, LLC, and Pierce Bainbridge's subsequent
9    multimillion dollar litigation finding deal through Virage Master, LP.

10       204.    Pierce Bainbridge and Pravati's exclusive litigation funding relationship appears to
11   have soured, because shortly thereafter, on or about March 8, 2019, Pravati filed a UCC-1 lien
12   against Pierce Bainbridge to secure a $9,100,000 litigation funding default against Pierce
13   Bainbridge, just within days of Pravati inexplicably declining Greenway's meritorious multi-
14   million-dollar Florida suit from obtaining litigation funding from Pravati.

15       205.    On or about April 1, 2019, and according to Pravati's UCC-1 filings with the
16   California Secretary of State, Pierce Bainbridge cured Pravati's $9,100,000 litigation funding
17   default. This was within days of the Defendants filing a false and materially misleading motion to
18   withdraw as counsel, and abandoned Greenway's Florida suit.

19       206.    Pierce Bainbridge's sudden financial windfall and the eerie timing of Pierce
20   Bainbridge curing Pravati's $9,100,000 litigation funding default, within days of the Defendants
21   abandoning Greenway's Florida suit, against parties who were potentially facing severe federal
22   criminal charges, lends credibility to the Plaintiff's concerns of substantial foul-play occurring and
23   why the egregious attorney misconduct occurred.

24       207.    On information and belief, Pierce Bainbridge and John Pierce were influenced by
25   Selakovic, and or Selakovic's powerful political and dangerous drug trafficking Group America
26   connections to manufacture a conflict between Pierce Bainbridge and Greenway in attempt to
27   (once again) leave Greenway without counsel in pursuit of its claims against the Selakovic and his
28   various companies. The coordinated effort was intentional, corrupt, and intended to protect

1  Selakovic and his criminal enterprise.  Defendants were aware that a successful civil judgment

2  against Selakovic and his various corporations would kick-start criminal prosecution by DHS.

3      208.  On information and belief, Selakovic, and or other affiliated with Selakovic and

4  Pierce Bainbridge and Ward Damon conspired to act against the interests of Greenway and

5  sabotage its meritorious litigation against Vegalab, Inc, the Ryan Brothers and Ecowin.

6      209.  According to civil court records and during series of the more than half a dozen

7  UCC-1 filings initially memorializing Virage Master, LP's alleged subsidiary Virage SPV-1,

8  LLC's purported March 29, 2019, $28.5 million and subsequent "loan agreements" filed with the

9  California secretary of state. The first of which, coincidentally occurred the same day Pierce,

10  Pierce Bainbridge, and Ward Damon lawyers filed their false and materially misleading March 29,

11  2019, motion to withdraw as counsel during Greenway's 2018 Florida suit.

12  **H.**    **Virage Master, LP Has a History of Nefarious Connections and Violations of**

13         **California Law**

14      210.  With the assistance of their private investigator, Escamilla uncovered Selakovic's

15  substantial connections to Group America and its New-York city-based mob-boss and ringleader

16  Mileta Miljanic.

17      211.  Moreover, Escamilla uncovered substantial material evidence and information

18  regarding Virage Master, LP's consent order filed by the California Department of Financial

19  Protection and Innovation (hereinafter "DFPI", and formerly named California Department of

20  Business Oversight).

21      212.  According to DFPI's public records, Virage Master, LP. California Finance Law

22  license number 603L286, agreed to the terms of a consent order with the DFPI for its alleged

23  failure to file Virage Master, LP's annual report in violation of Financial Code section 22159,

24  demonstrating that Virage Master, LP was allegedly providing the DFPI officials with inaccurate,

25  false, and materially misleading information.  Regarding Virage Master, LP, and its alleged

26  members or subsidiaries March 29, 2019, Virage SPV-1, LLC, "loan agreement" and Virage SPV-

27  2, LLC's numerous other "loan agreements" and UCC-1 filings that allegedly occurred through

28  November of 2019, where Virage Master, LP asserted in relevant part,

"On April 16, 2020, Respondent submitted its Annual Report, which was due on March 15, 2020, 23 business days late. Pursuant to Financial Code Section 22715, the maximum penalty that may be imposed for filing 23 business days late is $9,500.00 ($100 per business day for the first five business days and $500 per business day thereafter up to a maximum of $25,000).

"M. In connection with these proceedings, **Respondent represented to the Commissioner that it had taken no new applications under its license.**"…

213.    Virage's statements are false materially misleading and untrue, and contradicted by civil court records, and Virage SPV-1, LLC's March 29, 2019, alleged $28.5 million "loan agreement," and Virage SPV-2, LLC's subsequent and multiple UCC-1 filings allegedly advancing Pierce Bainbridge tens of millions through various other "loan agreements" all throughout and until November 2019, filed with California Secretary of State.

214.    Furthermore, and according to civil court records, Escamilla's fears of malfeasance occurring between Pierce, Pierce Bainbridge, and its litigation funder Virage appear to have been valid. Escamilla discovered Virage's founder Martin Shellist's has a history engaging in witness intimidation and financial wrongdoing related to Virage' lending activities. Escamilla uncovered evidence and information regarding Virage's founder Shellist's involvement in multiple Virage related entities that were accused of witness intimidation and significant wrongdoing regarding the manipulation of terms of "loan agreements" by a purported 30 to 40 Chicago area based law firms.[23] Not only are these allegations a matter of public records, various media outlets have reported the same.[24]

215.    According to an affidavit in civil court filings, Joel Androphy, his firm, and other Chicago area-based lawyers conducted a telephonic interview with federal law enforcement authorities regarding Virage related entities and its founder Shellist reporting that he allegedly engaged in financial wrongdoing regarding Virage related entities lending practices.

216.    The affidavits demonstrate that after one of the attorneys who was considering supplying information to Androphy on a confidential basis, Virage and Shellist were allegedly

[23] *See David H. Berg & Associates PC d/b/a Berg & Androphy and Joel Androphy v. Affiliated Solutions d/b/a Litcap, Virage Capital Partners, SPC, Virage Master Fund, LP, Series 2, Virage Master, LP, and Martin Shellist* civil case #2016, 50408.

[24] See https://www.law360.com/articles/953113/law-firm-accuses-litigation-funder-of-witness-intimidation

-49-

1  "tipped off" he was speaking with Androphy and his firm. Shellist was upset with the attorney

2  who was speaking with Androphy and his firm and are alleged to have threatened the witness.

3    217. Virage Master LP, and or Virage SPV, 1, LLC, and or Virage, SPV-2, LLC's undue

4  influence in this case cannot be in dispute. Former partners at Pierce Bainbridge have referred to

5  the litigation funding situation as a "house of cards" and accused Pierce of taking actions that were

6  determinantal to his clients at the behest of litigation funding companies including Defendants

7  Pravati and Virage. Public filings in multiple matters across the country have made it clear that

8  Virage has inserted undue influence on litigation matters to the detriment of Pierce's clients. For

9  example, Virage caused massive issues for Pierce Bainbridge clients involved in a class action

10  dispute regarding Boeing and pressured counsel to take unethical actions.[25]

11    218. In that case, a former Pierce Bainbridge attorney named Andrew Williamson, and

12  former Partner named Andrew Lorin, accused Pierce Bainbridge's outside counsel, Ed Altabet, of

13  attempting to intimidate and threaten Williamson. Williamson went on to say that Altabet was

14  exerting improper control over the case, as he was compensated by a Virage entity. Williamson's

15  statement shows that Virage has a documented history of indue influence over lawyers associated

16  with Pierce Bainbridge, including Pierce Bainbridge partner, Mr. David Hecht's actions.

17  Williamson stated in relevant part,

18    "I attempted to investigate the veracity of Mr. Hecht's statements before

19  involving the Court. *See* Exhibit 9 attached hereto (May 16, 2020 Email). From the outset of those efforts, **I received a threatening email from**

20  **Pierce Bainbridge's outside counsel, Ed Altabet,** in response to an inquiry regarding some of Mr. Hecht's on-the-record statements, which

21  further reinforced my concerns over the motivation behind those statements and my concerns over **who is actually controlling litigation for Pierce**

22  **Bainbridge.**

23    "I found it troubling that, instead of a factual response from the firm's CFO or COO (whom I had emailed), **I instead received a visceral response**

24  **from Mr. Altabet (who had previously represented to me that he has**

25  **ties to the firm's litigation funder, Virage Capital Management, LLC).** *See id.*

26

27

28

[25] Exhibit K – Declaration of Andrew Williamson

219.     Moreover, included unsealed court records, and Mr. Williamson's exhibits are "Direct Messages" from Pierce Bainbridge's Slack internal messaging system between Mr. Williamson and former Pierce Bainbridge Partner Andy Lorin, stating in relevant part,

> "There was a possibility that I would start a new firm to help service the Boeing case and serve as cocounsel to Yavar and Brian. But I think **Virage has screwed that up by alienating Y&B.**" …
>
> **"Virage is alienating a lot of people and Ed Altabet keeps threatening me in an effort to coerce me into taking unethical action**. It is unfortunate how this all fell apart.

220.     These affidavits, under oath and in a case that is unrelated to the underlying litigation, reinforces Escamilla and Greenway's allegations that Virage SPV-1, LLC, and or Virage SPV-2, LLC were improperly influencing Pierce Bainbridge with respect to case management. There is now documented evidence of Virage SPV-1, LLC, and or Virage SPV-2, LLC "intimidating", "threatening", and "alienating" former Pierce Bainbridge Partners and associates, at the same time, and allegedly exerting decision making authority over other Pierce Bainbridge's cases just like they did in this instance.

221.     Additional clients have testified that Pierce Bainbridge's litigation funder Virage SPV-1, LLC, and or Virage SPV-2, LLC's litigation funding personnel were present and in the room for opposing counsel's depositions of Pierce Bainbridge's own clients. These actions all point to sinister conduct on behalf of Virage, and Pierce Bainbridge.

222.     In November 2019, Selakovic's potential undue influence over Pierce and Pierce Bainbridge and Selakovic's dangerous connections to Group America's New York City area based Serbian Mobster Mileta Miljanic, and their powerful political ally, and Serbian President Alexander Vucic's, decades long relationship with Rudy Giuliani came full-circle when former New York City Mayor Rudy Giuliani, retained Pierce Bainbridge in connection with whether or not Giuliani broke any laws in connection with his activities in Ukraine, law enforcement officials told NBC News. A week or so after former New York City Mayor, Giuliani announced he hired Pierce Bainbridge, Virage Capital made a $21 million loan commitment to Pierce Bainbridge. Within months, the firm cratered, with dozens of partners and associates resigning from the firm according to an article published by Law360.com.

-51-

223.    Virage entities remains a black box when it comes to its funding.  According the UCC filings and court records, much of the investment into Virage funds, including those funding Pierce Bainbridge, come from a handful of undisclosed private investors.  That included untraceable assets originated from off-shore Cayman Island accounts.  According to an exhaustive U.S. government report conducted by the U.S. Department of State, the Cayman Islands area as a known haven for international major drug trafficking organizations and various other nefarious types of criminal enterprises who do not wish to disclose the source of their off-shore Cayman Island deposits or investments monies.

224.    Not surprisingly, after Pierce Bainbridge was able to cure Pravati's $9.1 million litigation funding default, through funds obtained from Virage SPV-1, LLC's $28.5 million "loan agreement", within of days of filing a false and materially misleading motion to withdraw. Subsequently a $200 million Pravati Investment Fund V Offshore LP was formed, in the Cayman Islands, according to SEC filings.

**I.      Pravati Capital, LLC's Past Interactions with The California Department of Business Oversight, Other Alleged False Civil Court Proceedings**

225.    Defendant Pravati has had its own run ins with the law showing that this defendant is not above skirting the rules.

226.    According to public records, on February 18, 2018, Pravati Capital, LLC, and Pravati's CEO Defendant Alexander Chucri, entered into a consent order with the California Department of Business Oversight (now named the California Department of Financial Projection and Innovation "DFPI") due to Pravati's alleged engagement in unlicensed lending activities in the State of California.  The consent order states in relevant part,

> "The Commissioner finds that, during the period of February 2015 to at least February 2016, Pravati Capital engaged in the business of a finance lender or broker in this state without first obtaining a license from the Commissioner, in violation of Financial Code 22100, subdivision (a). " ...

> **Desist and Refrain Order**: In accordance with Financial Code section 22107, Pravati Capital is ordered to desist and refrain from violating the CFL by engaging in the business of a finance lender or broker without a license of Financial Code section 22100

227.   Since that time, Pravati has demonstrated that it is not above filing false and misleading pleadings or above violating the order.  For example, in January 2021, Pravati filed a demurrer falsely claiming Pravati was not required to maintain a valid CFL license with the DFPI, which was untrue, and appears to violate California *Financial Code* § 22161(a)(6)(7), which states in relevant part: "(a)  a person subject to this division shall not do any of the following . . . (6) knowingly misrepresent, circumvent, or conceal, through subterfuge or device, any material aspect or information regarding a transaction to which the person is a party, or (7)  commit an act that constitutes fraud or dishonest dealings." Escamilla reported this to the DFPI in December of 2020.

**J.**     **Escamilla Discovers James Ryan Was Acting as Interim CEO of Vegalab, Inc, And Subsequently Requests to Obtain Copies of Greenway's Litigation Funding Paperwork from Greenway's Former Attorneys Pravati.**

228.   On or about January 25, 2020, Escamilla discovered that James Ryan was acting as the interim CEO of Vegalab, Inc. That is the same Vegalab, Inc. that Escamilla and Greenway previously held confidential reverse-merger discussions with and that James Ryan, Selakovic, and others fraudulently converted for their self-dealing gain.

229.   Had it not been for Defendants Pierce and Pierce Bainbridge attempting to fraudulently induce Escamilla to agree to consent to mutual release of James and Mike Ryan, and their law firm from Greenway's 2018 Florida suit, then later denying ever receiving evidence from Escamilla or Greenway demonstrating that an attorney client-relationship ever existed between James and Mike Ryan and Greenway Nutrients, Inc, the Plaintiffs would not have suffered damages and James Ryan would have not been able to serve as interim CEO of Vegalab Inc.

230.   After discovering that James Ryan was acting as the interim CEO of Vegalab, Inc, Escamilla emailed Pierce Bainbridge and Ward Damon requesting copies of Greenway's litigation funding paperwork that Pierce Bainbridge was contractually obligated to provide to Pravati. Escamilla specifically requested any representations or attorney opinions as to the estimated value of Greenway's multimillion dollar damage award potential against Ecowin and others.

231.   To that point, under Pierce Bainbridge's exclusive litigation funding agreement with Pravati, Pierce Bainbridge was contractually obligated to provide Pravati with an assessment

-53-

COMPLAINT FOR DAMAGES

1   and or estimated value of Greenway's Florida case' potential damage award. At the same time,

2   Greenway's lawsuit was ongoing, that also states in relevant part:

> "REPORTING: Within five (5) days after the end of each month during the term
> of this Agreement, LAW FIRM shall send a report to an attorney of PRAVATI'S
> choice detailing all the pledged Cases in the Portfolio of Cases and other Related
> Proceedings, which monthly report shall accurately identify the following
> information as of the end of the immediately preceding month: (a) the current
> status of each Case, including without limitation, the eligibility and approval of
> all Cases and Client claims submitted by LAW FIRM or otherwise on behalf of
> any Client, and (b) any other information regarding the Cases that PRAVATI may
> reasonably request from time to time." …

9   232.    On March 30, 2019, after numerous unsuccessful attempts to repeatedly acquire

10  copies of Greenway's litigation funding paperwork form Pierce and Pierce Bainbridge lawyers,

11  Escamilla emailed Defendant Chucri, to advise Chucri and Pravati Plaintiff recently discovered

12  that Greenway's former attorney James Ryan was now acting as the interim CEO of Vegalab, Inc.

13  and also provided Defendants Chucri, Abaie, and Pravati with copies of Greenway's April 18,

14  2019, uncontested motion to strike defendants pleadings for fraud on the court.

15  233.    Chucri responded to Escamilla and acknowledged he was aware of Greenway's

16  litigation funding application with Pravati, stating in relevant part: "Yes, I've been in the loop on

17  this for some time, as well as the original underwriting our team executed some time ago. Our

18  legal team and I turned this down, offhand I do not remember why we did.  We have an extensive

19  legal team that underwrites our investments, and we determine investment feasibility in house."

20  234.    On April 14, 2020, Escamilla emailed Defendants Chucri, Abaie, and Pravati, to

21  inquire if Pravati, had an interest in possibly extending litigation financing to Greenway based on

22  the Greenway's significant updated material evidence demonstrating Greenway's former attorney

23  James Ryan unlawfully acting as the interim CEO of Vegalab, Inc.

24  235.    That same day, Mr. Chucri responded to Escamilla by stating in relevant part: "We

25  underwrote this case, we decided to not fund, we have no further interest in discussions."

26  236.    Months later, after conducting further investigation, on September 23, 2020,

27  Escamilla once again emailed Defendants Chucri, Abaie, and Chucri, only this time, Escamilla

28  requested that Mr. Chucri, Mr. Abaie, or Pravati provide Greenway with copies of Greenway's

litigation funding paperwork.  Escamilla also requested any representations Pierce Bainbridge

-54-

provided to Pravati as to Greenway's potential damages during Greenway's Florida suit that Pierce Bainbridge was contractually obligated to report to Pravati monthly, and all throughout Pierce Bainbridge's representation of Greenway.

237. This time, Defendants Chucri, Abaie, and Pravati callously ignored the Plaintiff's request to receive copies of Greenway's litigation funding paperwork, and became inexcusably dismissive and belligerent by stating, "*GO AWAY PEST!*"[26]

238. It was at that time that Escamilla advised Chucri, Abaie, and Pravati, that their failure to provide Greenway with copies of the company's litigation funding paperwork would result in Escamilla and Greenway filing a formal complaint against Pravati with the DFPI for Pravati's alleged violations of California *Financial Code*, Section 22161 subdivision(s), (a)(6), and (7).

239. On September 28, 2020, Defendant Abaie, who also copied Pravati's CEO Defendant Chucri, and another Pravati attorney, sent Escamilla an unwarranted, coercive, fraudulent and misleading Cease and Desist email threatening Escamilla, who is a Mexican American small business owner who possesses no formal legal education, stating in relevant part,

> "If you think you are the first bad actor to try to blackmail us using threats to involve the California DBO, you had better think again" …

> "If you want a fight with us, you had better be ready to pry the confidential documents from my corpse." …

> **"Pravati found your case to be devoid of merit and to suffer from severe challenges with collectability**. Consequently, we rejected your funding application outright. I would be happy to tell any judge about the defects in your case,**

> "consider yourself warned."[27]

240. The correspondence intimated and confused Escamilla, because prior to this email, and during multiple communications between Escamilla and Abaie, there was never any discord. The emails were always courteous, professional, and cordial. Defendant's Abaie, also acknowledged in this was out of left field, stating in relevant part: "As you may recall, I served as

---

[26] Exhibit L – Email from Defendant Chucri to Plaintiff Escamilla dated September 28, 2020.
[27] See Exhibit M – Email from Defendant Chucri to Gustavo Escamilla dated September 28, 2020.

COMPLAINT FOR DAMAGES

1   the underwriter on Greenway's funding request and had direct communications with you. Until

2   recently, I believed Greenway and Pravati had respectfully parted ways."

3        241.    On September 29, 2020, the Escamilla send Defendants Pravati and Abaie an email

4   that contradicting Defendants Abaie's coercive and dishonest statements included in Abaie,

5   Chucri, and Pravati's September 28, 2019, email threatening email Escamilla. Escamilla also

6   accused Abaie and Pravati violating California *Financial Code*, Section 22161 subdivision(s),

7   (a)(6), and (7), stating in relevant part:

> "California Financial Code, Section 22161 subdivision (a),(6), prohibits any licensee, officer, or employee of said licensee, to knowingly misrepresent, circumvent, or conceal, through subterfuge or device, any material aspect or information regarding a transaction to which the person is a party. " ...

> "As you know, the only reason we hired Pravati's joint venture partner named Pierce Bainbridge was due to federal law enforcement officials with the United States Department of Homeland Security ("DHS") advising my business partner and me that the primary accused defendant is our civil case named David Dragan Selakovic (SELAKOVIC"), is the ringleader responsible for a massive multi-billion-dollar transnational counterfeit goods scheme entitled "Operation Software Slashers ("OSS")."

> "I advised you that DHS officials had informed us that our company Greenway Nutrients, Inc. ("GREENWAY") would need to acquire a favorable court ruling over Selakovic before DHS and the United States Department of Justice ("DOJ") would consider filing criminal charges against Selakovic and his longtime business partner named Steven Blackburn ("BLACKBURN"), and other unnamed criminal suspects in our case."

> "DHS officials also advised us that Selakovic and Blackburn are responsible for the theft of several billion dollars' worth of fake, counterfeit, or unauthorized versions from other California-based Silicon Valley-tech giants' products such as Adobe Systems and The Microsoft Corporation, to name a few."

> "DHS Officials also advised us that my company would be able to receive compensatory damages from the more than $20 MM that DHS and DOJ officials had successfully seized during civil asset forfeiture proceedings, which had pled guilty to criminal charges in connection with OSS. That entirely contradicts your misleading statement that you made to me on or about September 28, 2020, as to our lawsuit being devoid of any merit, which, as you knew then, like you know now, remains to be entirely untrue."

     242.    Further, on September 29, 2019, Plaintiff's reminded Mr. Abaie that Pierce

Bainbridge performed no discovery, took no depositions, failed to serve Selakovic, and failed to

1    prepare or present Greenway's motion for default judgment against Ecowin which resulted in
2    Greenway suffering millions of dollars in damages and receiving zero monetary recovery.

3         243.    Escamilla also reminded Defendants Chucri, Abaie, and Pravati that Pierce
4    Bainbridge and Ward Damon also failed to inquire if James and Mike Ryan, and their law firm,
5    maintained any professional liability insurance coverage before demanding that Escamilla agree
6    to consent to release the Ryan Brothers and their law firm from Greenway's 2018 Florida suit,
7    causing Greenway millions of dollars in financial losses.

8         244.    Upon information and belief, Pierce, Pierce Bainbridge, and Pravati assisted to aid
9    and abet each other and unethically protect each other's financial best interest in connection with
10   Pierce Bainbridge's and Pravati's equal 50/50 share of any successful monetary recovery involving
11   any of Pierce Bainbridge's cases.  Through their exclusive litigation funding agreement and equity
12   interests, Pravati and Pierce Bainbridge put their needs ahead of the Greenway's best interest and
13   aided and abetted each other to provide false and materially misleading statements to fraudulently
14   coerce, deceive, and threaten Escamilla.

15        245.    Moreover, Defendants Pierce, Pierce Bainbridge, Chucri, Abaie, and Pravati, have
16   continued to conceal critical material evidence central to Greenway's civil claims of redress, failed
17   to respond to, and continue to ignore the Escamilla's numerous requests for copies of Greenway's
18   litigation funding paperwork. These actions have aided and abetted Pierce and Pierce Bainbridge's
19   breach of fiduciary duties and have concealed any representations that Pierce Bainbridge was
20   contractually obligated to report to Pravati regarding Greenway's potential damage award value
21   against Ecowin and others during Greenway's Florida suit.

22   **K.    Escamilla Files A Complaint with The DFPI Against Pravati Capital, LLC**
23   **       And Virage Master LP, For Alleged Violations of California Financial Code,**
24   **       Section 22161 subdivision(s), (a)(6), and (7)**

25        246.    In December 2020, Escamilla on behalf of his company Greenway, filed a formal
26   complaint against Defendants Pravati Capital, LLC, after Abaie, Chucri, and Pravati.  The
27   complaint was related to the actions of Defendants and the communications they send to Escamilla
28

1   that served as an unwarranted, coercive, false, and materially misleading September 28, 2020,

2   email threatening Escamilla.

3       247.   Escamilla also alleged violations of California *Financial Code* § 22161 (a)(6), and

4   (7), and that Defendants, Abaie, Chucri, and Pravati, knowingly misrepresented, circumvented, or

5   concealed, through subterfuge or device, material aspects or information related to Greenway's

6   February 2019 litigation funding application process and due diligence transaction to which

7   Escamilla's company Greenway are parties, who committed an act that constitutes fraud or

8   dishonest dealings.

9       248.   DFPI officials acknowledged they opened a preliminary investigation and assigned

10   a DFPI case number to Escamilla's and Greenway's DFPI complaint at that time.

11       249.   On December 2, 2021, Plaintiff Escamilla emailed Pierce, Pierce Bainbridge, and

12   copied multiple named Ward Damon Partners, advising counsel of Escamilla's and Greenway's

13   recent August 2021, confirmation of Selakovic's dangerous connections to Group America's

14   massive drug trafficking organizations ringleader Mileta Miljanic stating in relevant part,

> "This email is being sent to you and others to memorialize and toll our recent August 2021 discovery of the primary Defendant in our civil case named David Dragan Selakovic's ("Selakovic") alleged substantial connections to Mileta Miljanic. The alleged New York Mob boss and ringleader of a brutal yet low-profile Serbian-American drug trafficking organization dubbed "Group America," a network with historical links to the Serbian secret police that multiple international law enforcement authorities accused of receiving protection from the Central Intelligence Agency ("CIA") or other U.S. intelligence agencies." …

> "As you know, Selakovic is the older brother of a high-ranking Serbian politician named Nikola Selakovic. Who serves as the acting Secretary to the President of Serbia named Alexander Vucic ("Vucic"), with ties to the U.S. sanctioned Serbian weapons dealer named Slobodan Tesic ("Tesic")," …

> "According to multiple international investigative news agencies, who claim "Group America" is one of the most successful transnational drug trafficking organizations accused of successfully smuggling tons of Cocaine for decades."
> …

> "Since on or about March 26, 2020, Greenway Nutrients, Inc. ("GREENWAY") have sought to obtain copies of a litigation funding memorandum and or attorney opinion letter that Greenway's former lead attorney named John Pierce and Pierce Bainbridge provided to Pravati Capital, LLC. During Pierce Bainbridge's and Ward, Damon, Posner, Pheterson & Bleau, PL, ("WARD DAMON") botched representation of Greenway." …

-58-

COMPLAINT FOR DAMAGES

"Your former clients are now seeking any representations you, Jonathan Sorkowitz, or Pierce Bainbridge were required to provide to Virage Capital Management, LP. ("VIRAGE") or any other Virage-related entities during Virage due diligence process to substantiate the value of Pierce Bainbridge's assets ad caseload, during your representation of Greenway.

250.     Escamilla's discoveries only heighted his fears of significant foul play occurring during Greenway's 2018 Florida suit, due to Group America's former ringleader being indicted for allegedly engaging in witness tampering in connection with former Gambino crime boss John Gotti's infamous criminal proceedings.

251.     Moreover, Plaintiff Escamilla advised Pierce, Pierce, Bainbridge, and Ward Damon of his recent discovery and review of SEC filings indicating Virage Master Fund, LP, that raised $73,800,000 from a handful of "undisclosed" private investors on March 7, 2019, which is the same day Pierce attempted to fraudulently induce and trick Escamilla under duress, to agree to consent to release James and Mike Ryan from Greenway's 2018 Florida suit.  Escamilla further advised that on March 29, 2019, the same day Pierce, Pierce Bainbridge, and Ward Damon lawyers filed a false and materially misleading motion to withdraw from Greenway's Florida suit, Virage Master, LP's alleged subsidiary or member corporation, Virage SPV-1, LLC, sent Pierce Bainbridge a "loan agreement" for a purported $28.5 million. According to UCC-1 filings, Pierce Bainbridge allegedly used this money to pay off Pravati's $9.1 million default judgment.

252.     On December 2, 2021, Pierce finally responded to his former client's email, however, Pierce failed answer or address any questions or provide his clients with any copies of their litigation funding paperwork from Virage as requested.  This paperwork would be the same information that Pierce Bainbridge was *required* to provide to Jonathan Katz, and his company KKC. Katz in turn would have presented the information to Virage Master, LP, while Greenway's 2018 Florida suit was still underway and included as part Jonathan Katz's and KKC's monetary valuation of Pierce Bainbridge's entire caseload. This information was used as underlying collateral to secure Pierce Bainbridge's substantial litigation funding deal with Virage SPV-1, LLC, for a purported $100 million.

253.     Instead, Pierce referred his former clients to his firms outside counsel Ed Altabet. This is the same Altabet former Pierce Bainbridge associate Andrew Williamson accused of

-59-

1 intimidation and the same Altabet that was exerting decision-making authority over Pierce
2 Bainbridge's Boeing class action case. Altabet was allegedly tied to Pierce Bainbridge's litigation
3 funder Virage Capital, who was accused of alienating other former Partners before their departure
4 from Pierce Bainbridge.

5     254.   Pierce indicated Altabet would respond to Escamilla's email and answer his
6 questions regarding Greenway's litigation funding paperwork used a collateral to fund Pierce
7 Banbridge's March 29, 2019, "loan agreement" with Virage SPV-1, LLC.  This was untrue.
8 Altabet never responded.

9     255.   On December 2, 2021, Escamilla responded to Pierce's email, that Pierce
10 Bainbridge outside counsel Altabet was also copied on, and questioned counsel whether Altabet
11 was being compensated by Virage Capital Management, LP. ("Virage") or any other Virage related
12 entity to represent Pierce and Pierce Bainbridge regarding Virage's security interest in Pierce
13 Bainbridge's past or remaining assets and caseload.

14     256.   Moreover, according to multiple lawsuits, filed against Pierce and Pierce
15 Bainbridge, Virage SPV-1, LLC or Virage SPV-2, LLC, sought to intervene to protect Virage
16 entities senior secured interests over Pierce Bainbridge's remaining assets and caseload.  Altabet,
17 has defended Pierce and his law firm(s) against numerous other civil suits filed by other cash
18 advance lenders even after Pierce Bainbridge allegedly defaulted.

19     257.   Altabet's representation includes litigation against Jonathan Katz, and his company
20 KKC's filed against Pierce and Pierce Bainbridge, where Mr. Altabet stated in relevant part:

21     "I am counsel to Pierce Bainbridge LLP (f/k/a Pierce Bainbridge Beck Price
22     Hecht LLP) ("Pierce Bainbridge") in connection with certain corporate and
litigation matters. In my capacity as counsel, I am fully familiar with and have
23     knowledge of the statements made herein."

24     "...Pierce Bainbridge suffered mass departures of its partners between the fall of
2019 through the spring of 2020. (See Jonathan Katz. Aff. ¶ 11)."

25     "Pierce Bainbridge was, at its height, a preeminent plaintiff-side law firm that
26     was comprised of many lawyers of exceptional talent and skill. Upon information
and belief, as Katz Kane is acutely aware, since its arbitral award is based upon
27     its purportedly arranging financing for Pierce Bainbridge by Virage SPV 1 LLC
and Virage SPV 2 LLC (collectively, "Virage"), the majority of the firm's cases
28     were structured on a contingency fee basis. (Katz Aff. ¶ 10 &12; Arb. Award at
2-3)."

"Upon information and belief, Virage filed UCC financing statements against Pierce Bainbridge over the course of 2019. (See Exhibit A)."

"Upon information and belief, Pierce Bainbridge's single largest creditor is Virage."

"Upon information and belief, Virage is a senior secured creditor of Pierce Bainbridge. (See Exhibit B). "

258.    Jonathan Katz's affidavit in that same litigation placed an estimated dollar figure on Pierce Bainbridge's overall firm civil case value, where Mr. Katz stated in relevant part:

"As set forth in the Arbitration Award, KKC and IAA helped Pierce Bainbridge raise and/or refinance approximately $100 million from Virage SPV 1, LLC ("SPV 1") and SPV2 in a series of financings."...

"As of mid-September 2019, Pierce Bainbridge's portfolio of contingency fee cases, as compiled by the firm and provided by the firm to Virage, had an estimated fee value of **$142,312,833** ("Estimated Fee Due to PB - LOW Based on Reasonable Settlement, Assuming No Dismissal") to **$542,446,500** ("Estimated Fee Due to PB - HIGH")." …

259.    The filings appear to demonstrate Altabet is aware that his client's supplied its former financial advisor Jonathan Katz and Virage with an appraisal or valuation of the firm's entire portfolio of cases.  That valuation necessarily included an appraisal or valuation of Greenway's 2018 Florida suit.  Pierce Bainbridge used the information related to Greenway as collateral to obtain millions of dollars in litigation funding for their self-dealing gain.

260.    Furthermore, Pierce and Altabet subsequently defended Pravati in a matter involving a dispute wherein Pierce Bainbridge was accused of allegedly stealing a high-profile client from a Philadelphia area-based lawyer named Bruce Chasan.  All of these parties were intimately involved with each other and had an interest in protecting their bottom line.

261.    This case was part of the threats used against Escamilla.  Abaie, and Chucri, referenced in their unwarranted, coercive, and threatening September 28, 2020, email sent to Escamilla stating in relevant part: "Go ask your friend Bruce Chasan about what happened when he made bogus threats against us."

262.    That email intimated Escamilla who is a Mexican American small business owner with no formal legal education.  Bruce Chasan and Escamilla had shared information regarding Pierce, Pierce Bainbridge, and Pravati's dealings with respect to their cases. This email was

1  aggravated by Escamilla's subsequent discovery that Pravati's former lawyer Altabet, with alleged

2  ties to Pierce Bainbridge's litigation funder Virage SPV-1, LLC, or other Virage entities, had

3  started to represent Pravati and Pierce Bainbridge after Pierce, Pierce Bainbridge, and Ward

4  Damon filed a false and materially misleading motion to withdraw from Greenway's Florida suit.

5      263.    On December 14, 2021, after receiving no response, Escamilla emailed Pierce, and

6  his law firm, Ward Damon named Partners, and Pravati's former lawyer, Altabet again in an

7  attempt to acquire copies of Greenway's litigation funding paperwork from either Altabet, Pierce,

8  Pierce Bainbridge, or Ward Damon lawyers, or any attorney opinions or valuations of Greenway's

9  2018 Florida case.

10     264.    Escamilla emailed Altabet and regarding their interference with and violation of

11  Escamilla and Greenway's civil rights to their property and due process under the Tom Bane Civil

12  Rights Act, according to California *Civil Code* § 52.1, and California Constitution, Article I,

13  Section 28(b), stating in relevant part,

>        "Dear Mr. Altabet, We never heard back from you" …

>        "Please be advised, in doing so, we allege, your client John Pierce ("Pierce") and
>        his former litigation funding partner named Virage SPV-1, LLC ("VSP-1") and
>        or Virage SPV-2, LLC ("VSP-2") of violating our civil rights under the Tom Bane
>        Civil Rights Act, according to California Civil Code § 52.1 ("The Bane Act"),
>        and California Constitution, Article I, Section 28(b).

>        "It is essential to note that before filing suit on behalf of our company, Greenway
>        Nutrients, Inc. ("Greenway") in the Southern District of Florida. We advised your
>        client Pierce and Pierce Bainbridge of our previously identified as a crime victim
>        involved in one of the United States Department of Homeland Security ("DHS")
>        and the United States Department of Justice's ("DOJ's") most substantial federal
>        criminal investigations and prosecutions of its kind. The United States Attorneys
>        Office is prosecuting it for the Western District of Missouri. *See Greenway
>        Nutrients, Inc. vs. Selakovic et al.*, case no. 9:18-cv-9 81104 [DE-102]. " …

>        "We also provided Pierce and Pierce Bainbridge with a copy of a civil rights
>        lawsuit Greenway, and I filed against DHS officials according to 42 U.S. Code
>        § 1983. For discriminating against me because I am a Mexican Small
>        businessman not represented by private legal counsel at that time. Depriving the
>        victims of any rights to our property, equal protection, or due process.
>        See *Gustavo Escamilla, et al. v. Department of Homeland Security, et al*. 2:17-
>        cv-07748 DE-1" …

>        "Furthermore, on August 6, 2018, I innocently emailed the DHS Agent in charge
>        of investigating Greenway's federal criminal complaint. We filed against the
>        primary bad actors and others in our civil case, requesting copies of any material

evidence DHS may be willing to share. Or acquired during DHS's criminal investigation of Greenway's criminal complaint under the Crime Victims Rights Act, according to 18 U.S. Code § 3771 ("CVRA"). " ...

"On August 6, 2018, a former Pierce Bainbridge Beck Price & Hecht, LLP ("Pierce Bainbridge") Partner named Jonathan Sorkowitz ("Sorkowitz") reprimanded the victims of alleged substantial criminal wrongdoing. For innocently requesting copies of any material evidence DHS may be willing to share or have acquired during the DHS's investigation of Greenway's criminal complaint" ...

"On March 27, 2019, your client John Pierce ("Pierce") sent his former clients Greenway Nutrients, Inc. ("Greenway") and me a **coercive, intimidating, and threatening email** stating in relevant part, He ("Pierce') did not ever want to see or hear from me ever, and **"this will not be a pleasant experience for you."** ...

"Because Pierce's former clients Greenway and I innocently requested an estimated civil damages award figure against Greenway's former raw product supplier, Ecowin Co. LTD ("Ecowin"), who had defaulted in our case. That Pierce, Pierce Bainbridge, and local Florida counsel FAILED and refused to provide to Greenway repeatedly." ...

"Upon information and belief, we assert that Selakovic or others affiliated with the high-profile New York mob boss connected Selakovic allegedly utilized VSP-1 and or VSP-2 or others affiliated with VSP-1 and or VSP-2, to pay off and or bribe former counsel to abandon Greenway's meritorious Florida lawsuit. In exchange for VSP-1 and or VSP-2 or others affiliated with VSP-1 and or VSP-2 promising to provide Pierce Bainbridge with proposed multi-tranche litigation funding deal worth up to $100 MM. "...

"Your client John Pierce and Pierce Bainbridge's March 27, 2019, intimidating, coercive, and threatening email caused the victims of substantial criminal wrongdoing to live under constant fear. And the severe threat of considerable violence." ...

"Because and according to multiple international investigative news organizations, the latter accused "Group America's" (including Selakovic's substantial alleged connections to "Group America's" ringleader) members of maintaining a well-established history of engaging in some of the most heinous acts of violence. Including dismembering enemies with chainsaws, assassinating senior authorities' officers, and cooperating with U.S. intelligence agencies." ...

"I am a Mexican American small businessman. John Pierce and Pierce Bainbridge's former clients/victims' civil rights have been violated and interfered with repeatedly under the Tom Bane Civil Rights Act, according to California "Civil Code § 52.1 and the California Constitution, Article I, Section 28(b). In conjunction with being unduly deprived of client property and information central to the victims, civil rights claims for damages, equal protection, or due process."

"Namely, any representations or documentation regarding Pierce and Pierce Bainbridge's monetary evaluation of Greenway's meritorious damages award against Greenway's former attorneys James and Mike Ryan. Or Greenway's

-63-
COMPLAINT FOR DAMAGES

former multimillion-dollar default judgment against Greenway's former supplier Ecowin, who had defaulted during Greenway's Florida civil lawsuit. And while Greenway's Florida case was still ongoing that Pierce, Pierce Bainbridge, and others were allegedly required to provide to VSP-1 during VSP-1's due diligence process of Pierce Bainbridge's assets and caseload. That regretfully Pierce, Pierce Bainbridge, and others interfered with and failed to provide to their former clients Greenway. " …

"Thank you, **Mr. Altabet; please be advised we do not wish to receive any threatening or intimidating email responses from you, or any of "Group America's" purported thugs, even though we do not know you, or have any problems with you or any of "Group America's" ringleaders. Therefore, please feel free to contact Greenway's and my crime victims and or civil rights attorneys identified below in the alternative."** …

265.    Within minutes of Escamilla sending his email request to Altabet, and Greenway's former lawyers, instead of contacting Escamilla's or Greenway's crime victims or civil rights attorneys to supply them with copies of Greenway's litigation funding paperwork from Virage, as requested, Pravati's former lawyer Altabet attempted to call victim Escamilla on his personal cell phone. Escamilla did not recognize the New City area phone number and subsequently conducted a reverse phone search, and discovered it was Ed Altabet who called.

266.    This call intimidated Escamilla because of Altabet's connections to Virage. Escamilla was accusing Greenway's former lawyers of being paid or bribed by Selakovic and other others affiliated with the high-profile politically and New York mob boss for Group America.

267.    Escamilla's valid fears of considerable threats of violence were exponentially heightened after receiving Altabet's ominous phone call, because shortly thereafter, James Ryan's brother, and Greenway Nutrients, Inc's former attorney, Tom Ryan, also tried to call Escamilla on his cell phone. Tom Ryan initially introduced Escamilla and Greenway to Selakovic, and never once advised or disclosed Escamilla or Greenway of Selakovic's dangerous Group America's massive transnational drug trafficking connections. Escamilla had not heard from or had any contact with Tom Ryan in *years*. There was no reason for this call, except to step up the pressure to stop Escamilla from enforcing his rights, which intimated Escamilla.

268.    Escamilla contacted the DFPI agent in charge of investigating Greenway's complaint and numerous DFPI attorneys that oversaw Defendant Pravati and Virage's DFPI

1   consent orders to provide them with a copy of Plaintiff Greenway's December 14, and 15, 2021,

2   correspondence with Altabet. Escamilla also alleged that Pierce and Altabet were being paid off

3   or bribed by Selakovic and or others affiliated with Selakovic, including Group America, whose

4   brutal yet low profile massive transnational drug trafficking enterprise maintains a well-established

5   history of being accused of engaging in intimidation, torture, dismembering enemies with

6   chainsaws, potential political assassinations, of senior public officials, and corruption.

7       269.   Escamilla provided the DFPI investigator with evidence of Escamilla making all

8   parties aware of their status as crime victims involved in DHS and DOJ's massive "Operation

9   Software Slashers" criminal investigation and prosecution. Escamilla relayed his fear of physical

10   harm from Pravati, and Virage as they were allegedly violating the victims' rights under The Tom

11   Bane Civil Rights Act, according to California *Civil Code* § 52.1 and according to California

12   Constitution, Article I, Section 28(b), that affords the victims of alleged criminal wrongdoing

13   unalienable victims' rights stating in relevant part:

> "More importantly, the complainants respectfully request that none of the
> information presented to the DFPI is provided to the opposing parties due to the
> alleged bad actor's substantial ties to a violent yet low profile Serbian- American
> drug trafficking organization. According to multiple investigative international
> agencies, they have a well-established history of engaging in heinous and violent
> acts that may wish to cause us physical harm, as described in the attachments and
> below" …

19       270.   Escamilla also made the DFPI investigator aware of Virage Master, LP, providing

20   the DFPI with false and materially information included in Virage Master, LP's May 2020, consent

21   order with the DFPI.  Virage appears to have failed to adequately advise the DFPI of the existence

22   of Virage SPV-1, LLC, who is not licensed to transact or engage in lending activities in the State

23   of California.  They further failed to advise DFPI that on March 29, 2019 Virage provided a

24   multimillion dollar "loan agreement" that Pierce Bainbridge allegedly used to pay off Pravati's

25   $9.1 million litigation funding default filed with the California Secretary of State.  The funding

26   also included another Virage entity that is not adequately licensed to engage in, transact, or conduct

27   lending activities in the state of California, named Virage SPV-2, LLC.  This claim is still being

28   investigated by DFPI.

271.    Escamilla's fears of foul play occurring during Greenway's 2019 lawsuit were further heightened by Virage's extensive involvement in media coverage surrounding the embattled Thomas Girardi, and the Girardi Keese Law Firm's bankruptcy proceedings. Virage's related financial disclosures indicate that Virage allegedly loaned Girardi's law firm approximately $10 million.  According to separate civil court filings, Virage sought to intervene in another California suit prior to Girardi's law firms' demise, Virage was allegedly willing to loan Girardi's law firm millions of dollars more. In exchange for Girardi relinquishing "financial control" over Girardi's law firm to Virage, which Girardi was unwilling to do.

272.    These fears were further reinforced by Virage's founder Shellist being accused of engaging in past allegations of malfeasance by over 30-40 Chicago Illinois area-based lawyers, The malfeasance demonstrates Virage is no stranger to exerting "financial control" over a law firm. Of course, Altabet, according to civil court filings, was allegedly tied to Pierce Bainbridge's litigation funder Virage SPV-1, LLC or other Virage entities, and was also accused of attempting to "intimidate" and "threaten" a former Pierce Bainbridge associate while appearing to attempt to improperly exert "decision-making authority" regarding a former Pierce Bainbridge's Partners involvement in the Boeing Southwest class action lawsuit.

273.    On information and belief, Selakovic or others affiliated with the politically and New York mob boss, improperly influenced or conspired with Virage founders and facilitated through Virage SPV-1, LLC as a pay-off or bribe to induce Pierce and Pierce Bainbridge to undermine and file and false and materially misleading motion to withdraw from Greenway's meritorious 2018 Florida lawsuit.  On information and belief, was done under the phony cover and guise of Virage SPV-1, LLC or other Virage related entities promising to provide Pierce Bainbridge with up to $100 million in a proposed multi-tranche litigation funding deal to legitimize otherwise illegitimate and fraudulent misconduct.

274.    Pierce and Pierce Bainbridge lawyers tried to and did prevent Escamilla from doing something he had the right to do under the law or to force Escamilla on behalf of his company Greenway, to do something that Greenway was not required to do under the law.

-66-

COMPLAINT FOR DAMAGES

Exhibit A - Page 73

275.    Pravati, on information and belief, were unjustly enriched and financially benefitted by Pierce Bainbridge's multimillion dollar March 29, 2019, "loan agreement" and financial windfall allegedly used to cure Pravati's $9.1 MM litigation funding default. Within days of Pierce Bainbridge and Ward Damon lawyers abandoning Greenway's meritorious 2018 Florida suit. The same day Pierce, Pierce Bainbridge, and Ward Damon lawyers filed their false and materially misleading March 29, 2019, motion to withdraw.

276.    Pravati, Abaie, and Chucri continued to withhold, conceal, refuse to respond to, or provide their former client and Greenway with any information regarding Pierce Bainbridge's monetary evaluation, attorney opinions, or assessments of Greenway's Florida case Pierce Bainbridge was contractually obligated to report to Pravati on a monthly basis who, instead acted in a threatening and hostile manner toward Escamilla related to his attempts to review litigation funding paperwork submitted on Greenway's behalf. Instead of cordial responses or providing documentation as requested, Escamilla was met with version distain that called in to question the very nature of the response.

277.    Pravati's senior legal counsel – Abaie – with Pravati's CEO Alexander Chucri and another attorney copied, went so far as to threaten Escamilla with violence relating to his requests. Specifically, Abaie stated "If you want a fight with us, you had better be ready to pry the confidential document from my corpse." He ended the same email with "consider yourself warned."[28]  Escamilla understood these statements – along with John Pierce's prior statements – scared and intimated Escamilla.

278.    Escamilla is now aware of Selakovic's substantial connections violent criminal enterprise whose well-publicized allegations of witness tampering, potential political assassinations, massive multi-years long multi-ton cocaine drug trafficking shipments, and a multi-year multimillion dollar transnational counterfeit goods scam dating back to 2000. He is further aware of the alleged protection of the Serbian government.  Escamilla indeed feared for his safety and continues to fear for his safety with respect to the filing of this lawsuit.

---

[28] Exhibit L.

279.   Even though Plaintiff Escamilla advised Pravati's former and Pierce Bainbridge's current outside counsel, Escamilla did not wish to receive any threatening communications from Altabet, or Group America's thugs, requesting Altabet to please contact Escamilla's crime victims or civil rights attorneys, Escamilla further received an ominous telephone call from Pravati's former lawyer, Altabet.

280.   The only purpose of Pravati's former Lawyer Ed Altabet's phone call was to intimidate and harass Escamilla further in hopes to attempt to dissuade him from exercising his and Greenway's right to bring this lawsuit.  That indeed intimidated and scared Escamilla because the severe threat of considerable violence occurring by Selakovic's dangerous and powerful Group America's thugs, whose vast transnational drug trafficking criminal enterprise, maintains a well-established history of carrying through on threats or acts of considerable of violence. Including torture, dismembering enemies with chainsaws, and alleged assassination of senior public officials.

### FIRST CAUSE OF ACTION

### CONSTRUCTIVE FRAUD (Civ. Code § 1573)

### (Greenway against All Defendants)

281.   Greenway repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

282.   Defendants Pierce, Pierce Bainbridge, and Ward Damon owed Plaintiff Greenway fiduciary duties.  As counsel of record for Greenway, these duties are undisputed.  As such, a confidential relationship existed at all relevant times herein between Plaintiffs and Pierce, Pierce Bainbridge, and Ward Damon. In that regard, Plaintiffs placed confidence in the fidelity and integrity of Pierce, Pierce Bainbridge, and Ward Damon in entrusting them with the responsibility to act competently, professionally, and with reasonable care to procure damages in Greenway's civil case.

283.   Pierce, Pierce Bainbridge, and Ward Damon acted on behalf of Greenway as counsel in Plaintiff's civil action Case No. 18-cv-81104-BB.

284.   As established above, Escamilla informed Peirce, Pierce Bainbridge, and Ward Damon that DHS officials had advised Escamilla, Selakovic, Blackburn, and Selakovic entities are

the alleged masterminds responsible for conducting a massive multimillion-dollar transnational counterfeit goods scam, with powerful power political connections to Serbian President Aleksander Vucic. Serbian President Aleksander Vucic served as the Minister of Information under former President Serbian President Slobodan Milošević, at the same time Mileta Miljanic, Group America's ringleader served as the personal bodyguard to Slobodan Milošević and Selakovic's younger brother Nikola Selakovic, served in several other Senior Level positions in the Government of Serbia, including Presidency Secretary of Serbian President Aleksander Vucic. Former New York City Mayor Rudy Giuliani, worked as paid consultant and advised the Serbian Government, and Aleksander Vucic. Within about a week or so of Former New York City Rudy Giuliani retaining John Pierce's law firm Pierce Bainbridge, Virage "loaned" Pierce Bainbridge $21 million. Coincidentally, Mileta Miljanic, Group America's ringleader also resides in in one of the five Burroughs of New York City, and within months, Pierce Bainbridge collapsed. DHS officials further advising them any prosecution of Selakovic would cause significant political strain on U.S./Serbia government relations.

285.   Pierce, Pierce Bainbridge, and Ward Damon agreed to represent Greenway in legal matters against Ecowin, Supreme Growers, LLC, Vegalab, Inc, the Ryan Brothers, and the Selakovic entities. As attorneys, and by the very nature of this representation, these defendants owed fiduciary duties to Greenway. By manufacturing a conflict with Greenway, ignoring evidence provided, failing to adequately pursue and defend Greenway's interests and fraudulently withdrawing as counsel, Pierce, Pierce Bainbridge, and Ward Damon indeed breached their fiduciary duties to Greenway.

286.   Defendants Chucri Pravati's CEO, and its Senior Legal Counsel, are litigation finance industry professionals, and Pravati, Virage Master, LP, and Virage SPV-1, LLC, are litigating finance entities with knowledge of the legal industry and the rights and responsibilities of lawyers with respect to their clients. Pravati, Chucri, Abaie, Virage Master, LP. and Virage SPV-1, LLC were aware that Pierce, Pierce Bainbridge, and Ward Damon owed fiduciary duties to Greenway. Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC, were aware that Pierce, Pierce Bainbridge, and Ward Damon breached their fiduciary duties to

1   Greenway by manufacturing a conflict with Greenway, ignoring evidence provided, failing to
2   adequately pursue and defendant Greenway's interests and fraudulently withdrawing as counsel.

3        287.   Pierce, Pierce Bainbridge, Ward Damon knew that James Ryan's brother Tom Ryan
4   drafted and prepared Greenway's and HPC's NCNDA. Tom Ryan had Escamilla sign before
5   Escamilla, Greenway, Tom, and Mike Ryan held any confidential reverse merger discussions with
6   Eric Hanson and Vegalab, Inc (then named HPC, Acquisitions, Inc). That unbeknownst to the
7   Plaintiff's at the time, within months, Eric Hanson, Vegalab, Inc, Ecowin, Selakovic, and
8   Selakovic's entities willfully violated. Even though Greenway's and HPC's NCNDA contractually
9   obligated all parties to keep Greenway Nutrients Inc's publicly traded entity formation strategy
10  and reverse discussions confidential.  Pierce, Pierce Bainbridge, and Ward Damon had in their
11  possession and knew of and/or willfully disregarded and concealed Greenway's and HPC's
12  NDNCA, to the Court in Greenway's defense.  They knew that Ecowin was actively involved in
13  participating with Greenway's former lawyer Mike Ryan, Selakovic, and Selakovic entities to
14  embezzle Greenway's confidential insider business information to take Vegalab, Inc, (then named
15  HPC, Acquisitions, Inc), instead and in place of Greenway.

16       288.   Despite having voluntarily accepted the trust and confidence reposed in them with
17  regard representing Greenway in its civil lawsuit, and in violation of this relationship of trust and
18  confidence as Greenway's attorneys, Plaintiffs are informed and believe, and on that basis allege,
19  that Pierce, Pierce Bainbridge, and Ward Damon abused the trust and confidence of Plaintiffs by,
20  among other things: 1) Manufactured a dispute between Pierce, Pierce Bainbridge, and Ward
21  Damon and Greenway by ignoring substantial evidence provided by Escamilla regarding the
22  merits of Greenway's claims against the Ryan Brothers; 2) Failed to vigorously oppose a motion
23  to dismiss filed by Greenway's former attorney, particularly with respect to the Selakovic
24  defendants resulting Selakovic and his alter ego companies being dismissed from the action; 3)
25  Failed to even oppose James Ryan's motion for clarification resulting in the dismissal of the last
26  remaining Selakovic entity in the case; and 4) Filed a false and misleading motion to withdraw as
27  counsel.

28

-70-
COMPLAINT FOR DAMAGES

289.     On February 14, 2019, the Florida court ruled in Greenway's favor on the October 1, 2018, motion to dismiss, finding that the lawsuit could continue against The Ryan Brothers, Vegalab, Inc. and Ecowin.

290.     Pierce, Pierce Bainbridge, and Ward Damon intentionally mislead Greenway and Escamilla by failing to disclose outside forces were influencing their decision in the litigation. Due to the relationship of the parties – and Pierce, Pierce Bainbridge, and Ward Damon's fiduciary duties owed to Greenway – Greenway and Escamilla justifiably relied on Pierce, Pierce Bainbridge, and Ward Damon's false representations.

291.     Pierce, Pierce Bainbridge and Ward Damon subsequently failed to follow through on their promise to provide Greenway with an expert witness, then turned around and falsely claimed Escamilla and Greenway failed to them with any evidence to prove Greenway's damages against Ecowin. This was also untrue because Plaintiff's presented substantial evidence to counsel demonstrating Ecowin supplied Vegalab, Inc, and Selakovic's entities, with copious amounts of its highly concentrated products to an entity operated by Blackburn and controlled by Selakovic, who, in turn, jointly and unlawfully benefitted from the unlawful sales of tens of millions in retail product value of Greenway's products bearing Greenway's trademark, back to Greenway's customers, and others, and counterfeit, knock-off, or competing versions of Greenway's products.

292.     During Greenway's numerous communications with Abaie and Pravati throughout its litigation funding application and due diligence process with Pravati, Escamilla advised and disclosed Greenway's and Ecowin's exclusive distribution agreement, and Greenway's and HPC's NDNCA to Defendants Abaie, Chucri, and Pravati. And Pravati's CEO Chucri, and Pravati's Senior Legal Counsel Abaie acknowledged there were part of the underwriting team that reviewed Greenway's litigation funding application with Pravati, during subsequent email exchanges.

293.     Pravati, Chucri, Abaie, Virage Master, LP and Virage SPV-1, LLC were aware that Pierce, Pierce Bainbridge, and Ward Damon owed fiduciary duties to Greenway. Defendants Pravati, Chucri, Abaie, Virage Master, LP. and Virage SPV-1, LLC, were aware that Pierce, Pierce Bainbridge, and Ward Damon breached their fiduciary duties to Greenway by manufacturing a conflict with Greenway, ignoring evidence provided, failing to adequately pursue and defendant

1   Greenway's interests and fraudulently withdrawing as counsel. Pierce, Pierce Bainbridge, and

2   Ward Damon had in their possession and knew of and/or willfully disregarded and concealed

3   Greenway's and HPC's NDNCA, before the Ryan brothers, Escamilla, Greenway Nutrients, Inc.,

4   and Vegalab, Inc, held any confidential discussions to take Greenway Nutrients, Inc's business

5   model public through a OTCB reverse merger deal with Vegalab, Inc.

6       294.    Pravati, Churci, Abaei, Virage Master, LP and Virage SPV-1, LLC sought to

7   undermine Greenway's relationship with Pierce, Pierce Bainbridge, and Ward Damon through

8   deceptive tactics. As evidenced in other matters, Pravati, Churci, Abaei, Virage Master, LP and

9   Virage SPV-1, LLC, through their financial muscle, improperly influenced Pierce and Pierce

10  Bainbridge to the determent of their clients.  The same thing happened to Greenway.

11      295.    Pravati was in a special position to improperly influence Pierce and Pierce

12  Bainbridge with respect to Greenway.  Pravati and its associated individual defendants had

13  reviewed the substantial evidence provided by Escamilla when he sought litigation funding from

14  the company.  Pravati had further inside information when it consulted with Pierce and Pierce

15  Bainbridge regarding Greenway's likelihood of success. Pravati knew that Greenway had a

16  meritorious case against the remaining defendants.  Pravati intentionally concealed that it already

17  had a vested interested in Greenway's litigation due to its agreement to leverage Pierce

18  Bainbridge's entire case load.  Pravati further intentionally concealed that it would improperly

19  influence Pierce, Pierce Bainbridge, and Ward Damon to drop Greenway's meritorious case for

20  due to their association with nefarious outside forces.

21      296.    Virage Master, LP and Virage SPV-1, LLC were in a similar special position to

22  evaluate Greenway's claims.  In order to obtain a nearly $100 million funding deal with Virage,

23  Pierce and Pierce Bainbridge were required to open their entire caseload to Virage for review.

24  Virage would have had access to and known that Greenway had a meritorious case against the

25  Ryan Brothers and Ecowin at the time of review.  They nevertheless improperly influenced Pierce,

26  Pierce Bainbridge and Ward Damon to abandon Greenway.

27      297.    Pierce, Pierce Bainbridge, and Ward Damon completely mismanaged Greenway's

28  case, failed to adequately oppose Vegalab, Inc's motion for clarification and failed a multimillion-

-72-

1    dollar motion for default judgement against Ecowin, or a notice of joint liability against the James
2    Ryan, Mike Ryan, or their law firm, before filing a false and materially motion to dismiss. Pravati,
3    Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC's, active encouragement and assistance
4    in Pierce, Pierce Bainbridge, and Ward Damon's breach of their fiduciary duties to Greenway was
5    a substantial factor in causing Greenway's harm.

6        298.    As a direct and proximate result of Pierce, Pierce Bainbridge, and Ward Damon's
7    concealment, fraud, and deceit, Greenway has suffered damages. The amount of these damages
8    has not been precisely determined and the damages are continuing to accrue exceeding $25 million
9    related to the fraud.

10       299.    Greenway further seeks punitive damages to deter Pierce, Pierce Bainbridge, Ward
11   Damon, Pravati, Churci, Abaei, Virage Master, LP and Virage SPV-1, LLC from continuing their
12   fraudulent, malicious, oppressive and greatly disingenuous business practices.  In committing the
13   above-described acts, Pierce, Pierce Bainbridge, Ward Damon, Pravati, Churci, Abaei, Virage
14   Master, LP and Virage SPV-1, LLC acted with fraud, oppression, and malice as described in detail
15   herein and incorporated by reference Pierce, Pierce Bainbridge, Ward Damon, Pravati, Churci,
16   Abaei, Virage Master, LP and Virage SPV-1, LLC's actions were intended only to injure
17   Greenway.  The facts described herein were despicable and done with a willful and knowing
18   disregard for Greenway's rights. Given Pierce, Pierce Bainbridge, Ward Damon, Pravati, Churci,
19   Abaei, Virage Master, LP and Virage SPV-1, LLC's willful, wanton, reckless, and malicious
20   conduct and their high degree of moral culpability, punitive damages are appropriate and
21   warranted, and must be awarded these law firms and their counterparts from continuing to commit
22   fraud on the public at large.

23                          **SECOND CAUSE OF ACTION**

24                            **Breach of Fiduciary Duty**

25           **(Greenway against Pierce, Pierce Bainbridge and Ward Damon)**

26       300.    Greenway repeats and realleges each and every allegation contained in the
27   preceding paragraphs as if fully set forth herein.

28

-73-

COMPLAINT FOR DAMAGES

301.    Defendants Pierce, Pierce Bainbridge, and Ward Damon owed Plaintiff Greenway fiduciary duties.  As counsel of record for Greenway, these duties are undisputed.  Pierce, Pierce Bainbridge, and Ward Damon agreed to act as Greenway's counsel in a civil action against the Ryan Brothers, Selakovic, and his various alter ego companies.   As such, a confidential relationship existed at all relevant times herein between Plaintiffs and Pierce, Pierce Bainbridge, and Ward Damon. In that regard, Plaintiffs placed confidence in the fidelity and integrity of Pierce, Pierce Bainbridge, and Ward Damon in entrusting them with the responsibility to act competently, professionally, and with reasonable care to procure damages in Greenway's civil case.

302.    Pierce, Pierce Bainbridge, and Ward Damon acted on behalf of Greenway as counsel in Plaintiff's civil action Case No. 18-cv-81104-BB.

303.    Pierce, Pierce Bainbridge, and Ward Damon knew Ecowin, Mike Ryan, and Selakovic's entities embezzled Greenway's plans to take Vegalab, Inc public for their self-dealing gain.  As set forth above, Pierce, Pierce Bainbridge, and Ward Damon, knew the Plaintiff's hired Tom and Mike Ryan, the brothers and a member and equal shareholder in Florida entities formed to engage in the practice of law with James Ryan, to assist Escamilla to draft and prepare a PPM. The information provided included Greenway's product information, a rebranding and distribution agreement for Greenway's organic pesticide product, a Letter of Intent with an organic fertilizer company to manufacture products to be sold under Greenway's brand name line of products, Greenway's logo's and trademark information, forward strategies, plans, and business model, with the intent to take Greenway's business model public later and offered to sell non-registered securities in the State of California, Colorado, and across the United States.

304.    On February 14, 2019, the Florida court ruled in Greenway's favor on the October 1, 2018, motion to dismiss, finding that the lawsuit could continue against The Ryan Brothers, Vegalab, Inc. and Ecowin.

305.    Pierce, Pierce Bainbridge, and Ward Damon intentionally mislead Greenway and Escamilla by failing to disclose outside forces were influencing their decision in the litigation. Due to the relationship of the parties – and Pierce, Pierce Bainbridge, and Ward Damon's fiduciary

-74-

1  duties owed to Greenway – Greenway and Escamilla justifiably relied on Pierce, Pierce
2  Bainbridge, and Ward Damon's false representations.

3        306.   Pierce, Pierce Bainbridge, and Ward Damon knew that outside forces, including
4  pressure from Defendants Pravati and Virage, as well as the Ryan Brothers and possibly other even
5  more nefarious organizations, were influencing the decision making of Pierce, Pierce Bainbridge,
6  and Ward Damon with respect to their representation of Greenway.

7        307.   Despite having voluntarily accepted the trust and confidence reposed in them with
8  regard representing Greenway in its civil lawsuit, and in violation of this relationship of trust and
9  confidence as Greenway's attorneys, Plaintiffs are informed and believe, and on that basis allege,
10 that Pierce, Pierce Bainbridge, and Ward Damon abused the trust and confidence of Plaintiffs by,
11 among other things: 1) Manufactured a dispute between Pierce, Pierce Bainbridge, and Ward
12 Damon and Greenway by ignoring substantial evidence provided by Escamilla regarding the
13 merits of Greenway's claims against the Ryan Brothers; 2) Failed to vigorously oppose a motion
14 to dismiss filed by Greenway's former attorney, particularly with respect to the Selakovic
15 defendants resulting Selakovic and his alter ego companies being dismissed from the action; 3)
16 Failed to even oppose James Ryan's motion for clarification resulting in the dismissal of the last
17 remaining Selakovic entity in the case; and 4) Filed a false and misleading motion to withdraw as
18 counsel.

19       308.   Pierce and Pierce Bainbridge also failed to follow through on their promise to
20 provide Greenway with an expert witness, then turned around and falsely claimed Escamilla failed
21 to provide Pierce, Pierce Bainbridge, and Ward Damon with any evidence to prove Greenway's
22 damages against Ecowin. This was also untrue because Plaintiffs presented substantial evidence
23 to counsel demonstrating Ecowin supplied Vegalab, Inc, and Selakovic's entities, with copious
24 amounts of its highly concentrated products to an entity operated by Blackburn and controlled by
25 Selakovic, who, in turn, jointly and unlawfully benefitted from the unlawful sales of tens of
26 millions in retail product value of Greenway's products bearing Greenway's trademark, back to
27 Greenway's customers, and others, and counterfeit, knock-off, or competing versions of
28 Greenway's products.

309.   Pierce, Pierce Bainbridge, and Ward Damon completely mismanaged Greenway's case, failed to adequately oppose Vegalab, Inc's motion for clarification and failed a multimillion-dollar motion for default judgement against Ecowin, or a notice of joint liability against the James Ryan, Mike Ryan, or their law firm, before filing a false and materially motion to dismiss. Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC's, active encouragement and assistance in Pierce, Pierce Bainbridge, and Ward Damon's breach of their fiduciary duties to Greenway was a substantial factor in causing Greenway's harm.

310.   As a direct and proximate result of Pierce, Pierce Bainbridge, and Ward Damon's breach of their fiduciary duties, Greenway has suffered damages. The amount of these damages has not been precisely determined and the damages are continuing to accrue exceeding $25 million related to the fraud.

311.   Greenway further seeks punitive damages to deter Pierce, Pierce Bainbridge, and Ward Damon from continuing their fraudulent, malicious, oppressive and greatly disingenuous business practices.  In committing the above-described acts, Pierce, Pierce Bainbridge, and Ward Damon acted with fraud, oppression, and malice as described in detail herein and incorporated by reference Pierce, Pierce Bainbridge, and Ward Damon's actions were intended only to injure Greenway.  The facts described herein were despicable and done with a willful and knowing disregard for Greenway's rights. Given Pierce, Pierce Bainbridge, and Ward Damon's willful, wanton, reckless, and malicious conduct and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded these law firms and their counterparts from continuing to commit fraud on the public at large.

## THIRD CAUSE OF ACTION

### Conspiracy

### (Greenway and Escamilla against Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC)

312.   Greenway and Escamilla repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

313.   Defendants Pierce, Pierce Bainbridge, and Ward Damon owed Plaintiff Greenway fiduciary duties.  As counsel of record for Greenway, these duties are undisputed.  Pierce, Pierce Bainbridge, and Ward Damon breached their fiduciary duties to Plaintiffs by, among other things: 1) Manufacturing a dispute between Pierce, Pierce Bainbridge, and Ward Damon and Greenway by ignoring substantial evidence provided by Escamilla regarding the merits of Greenway's claims against the Ryan Brothers; 2) Failing to vigorously oppose a motion to dismiss filed by Greenway's former attorney, particularly with respect to the Selakovic defendants resulting Selakovic and his alter ego companies being dismissed from the action; 3) Failing to even oppose James Ryan's motion for clarification resulting in the dismissal of the last remaining Selakovic entity in the case; and 4) Filing a false and misleading motion to withdraw as counsel.

314.   Pierce and Pierce Bainbridge also failed to follow through on their promise to provide Greenway with an expert witness, then turned around and falsely claimed Escamilla failed to provide Pierce, Pierce Bainbridge, and Ward Damon with any evidence to prove Greenway's damages against Ecowin. This was also untrue because Plaintiffs presented substantial evidence to counsel demonstrating Ecowin supplied Vegalab, Inc, and Selakovic's entities, with copious amounts of its highly concentrated products to an entity operated by Blackburn and controlled by Selakovic, who, in turn, jointly and unlawfully benefitted from the unlawful sales of tens of millions in retail product value of Greenway's products bearing Greenway's trademark, back to Greenway's customers, and others, and counterfeit, knock-off, or competing versions of Greenway's products.

315.   Defendants Chucri Pravati's CEO, and its Senior Legal Counsel, are litigation finance industry professionals, and Pravati, Virage Master, LP, and Virage SPV-1, LLC, are litigating finance entities with knowledge of the legal industry and the rights and responsibilities of lawyers with respect to their clients.  Pravati, Chucri, Abaie, Virage Master, LP. and Virage SPV-1, LLC were aware that Pierce, Pierce Bainbridge, and Ward Damon owed fiduciary duties to Greenway.  Defendants Pravati, Chucri. Abaie, Virage Master, LP. and Virage SPV-1, LLC, were aware that Pierce, Pierce Bainbridge, and Ward Damon breached their fiduciary duties to

1  Greenway by manufacturing a conflict with Greenway, ignoring evidence provided, failing to
2  adequately pursue and defendant Greenway's interests and fraudulently withdrawing as counsel.

3      316.    Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC,
4  were aware Defendants Pierce, Pierce Bainbridge, and Ward Damon intended to breach their
5  fiduciary duties to Greenway.

6      317.    Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC
7  intended that Defendants Pierce, Pierce Bainbridge, and Ward Damon intended to breach their
8  fiduciary duties to Greenway.

9      318.    Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC
10  took active steps to influence Defendants Pierce, Pierce Bainbridge and Ward Damon into
11  breaching the fiduciary duties to Greenway.

12      319.    On March 28, 2019, Pierce, Pierce Bainbridge, and Ward Damon, failed to file a
13  Motion for Default Final Judgment as to Ecowin, or Notice of Joint Liability as to James Ryan,
14  Mike Ryan, and the Ryan brother's law firm potential joint liability.  Instead, on March 29, 2019,
15  Pierce, Pierce Bainbridge, and Ward Damon filed a false and materially motion to withdraw.

16      320.    The same day Virage Master, LP, and or Virage SPV-1, LLC, sent Pierce
17  Bainbridge a $28.5 million "loan agreement" on information and belief used to cure Pravati's $9.1
18  million litigation funding default within days of their withdrawal.

19      321.    On information and belief, the Serbian Mafia, through its control of Virage, used
20  its substantial influence, connections with the Serbian American mafia, and other tactics to
21  encourage Defendants Pierce, Pierce Bainbridge and Ward Damon's fraudulent behavior.

22      322.    As a direct and proximate result of that actions of Defendants Pravati, Chucri,
23  Abaie, Virage Master, LP, and Virage SPV-1, LLC, Plaintiffs have suffered damages. The amount
24  of these damages has not been precisely determined and the damages are continuing to accrue
25  exceeding $25 million related to the fraud.

26      323.    Greenway and Escamilla further seek punitive damages to deter Defendants As a
27  direct and proximate result of Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage
28  SPV-1, LLC from continuing their fraudulent, malicious, oppressive and greatly disingenuous

business practices.  In committing the above-described acts, Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC acted with fraud, oppression, and malice as described in detail herein and incorporated by reference Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC's actions were intended only to injure Greenway.  The facts described herein were despicable and done with a willful and knowing disregard for Greenway's rights. Given Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC's willful, wanton, reckless, and malicious conduct and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded these businesses and their counterparts from continuing to commit fraud on the public at large.

## FOURTH CAUSE OF ACTION

### Aiding and Abetting Fraud

### (Greenway and Escamilla against Pravati, Chucri, Abaie, Virage Master, LP, and Virage-SPV-1, LLC)

324.    Greenway and Escamilla repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

325.    Defendants Pierce, Pierce Bainbridge, and Ward Damon owed Plaintiff Greenway fiduciary duties.  As counsel of record for Greenway, these duties are undisputed.  Pierce, Pierce Bainbridge, and Ward Damon committed fraud when they breached their fiduciary duties to Plaintiffs by, among other things: 1) Manufacturing a dispute between Pierce, Pierce Bainbridge, and Ward Damon and Greenway by ignoring substantial evidence provided by Escamilla regarding the merits of Greenway's claims against the Ryan Brothers; 2) Failing to vigorously oppose a motion to dismiss filed by Greenway's former attorney, particularly with respect to the Selakovic defendants resulting Selakovic and his alter ego companies being dismissed from the action; 3) Failing to even oppose James Ryan's motion for clarification resulting in the dismissal of the last remaining Selakovic entity in the case; and 4) Filing a false and misleading motion to withdraw as counsel.

326.    Pierce and Pierce Bainbridge also failed to follow through on their promise to provide Greenway with an expert witness, then turned around and falsely claimed Escamilla failed

-79-

to provide Pierce, Pierce Bainbridge, and Ward Damon with any evidence to prove Greenway's damages against Ecowin. This was also untrue because Plaintiffs presented substantial evidence to counsel demonstrating Ecowin supplied Vegalab, Inc, and Selakovic's entities, with copious amounts of its highly concentrated products to an entity operated by Blackburn and controlled by Selakovic, who, in turn, jointly and unlawfully benefitted from the unlawful sales of tens of millions in retail product value of Greenway's products bearing Greenway's trademark, back to Greenway's customers, and others, and counterfeit, knock-off, or competing versions of Greenway's products.

327. Pierce, Pierce Bainbridge, and Ward Damon intentionally mislead Greenway and Escamilla by failing to disclose outside forces were influencing their decision in the litigation. Due to the relationship of the parties – and Pierce, Pierce Bainbridge, and Ward Damon's fiduciary duties owed to Greenway – Greenway and Escamilla justifiably relied on Pierce, Pierce Bainbridge, and Ward Damon's false representations. Had Greenway and Escamilla known that Pierce, Pierce Bainbridge, and Ward Damon were influenced by outside actors, including Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC, Greenway and Escamilla would never have engaged the firms as counsel in this litigation.

328. Defendants Chucri Pravati's CEO, and its Senior Legal Counsel, are litigation finance industry professionals, and Pravati, Virage Master, LP, and Virage SPV-1, LLC, are litigating finance entities with knowledge of the legal industry and the rights and responsibilities of lawyers with respect to their clients. Pravati, Chucri, Abaie, Virage Master, LP. and Virage SPV-1, LLC were aware that Pierce, Pierce Bainbridge, and Ward Damon owed fiduciary duties to Greenway. Defendants Pravati, Chucri. Abaie, Virage Master, LP. and Virage SPV-1, LLC, were aware that Pierce, Pierce Bainbridge, and Ward Damon breached their fiduciary duties to Greenway by manufacturing a conflict with Greenway, ignoring evidence provided, failing to adequately pursue and defendant Greenway's interests and fraudulently withdrawing as counsel.

329. Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC were aware Defendants Pierce, Pierce Bainbridge, and Ward Damon intended to commit fraud and breach their fiduciary duties to Greenway.

330.    Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC intended that Defendants Pierce, Pierce Bainbridge, and Ward Damon commit fraud and act to the detriment of Greenway and Escamilla.

331.    Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC gave substantial assistance and encouragement to Pierce, Pierce Bainbridge, and Ward Damon to assist in committing the fraud. Specifically, Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC provided funds to Pierce, Pierce Bainbridge, that financially benefitted Ward Damon by helping to fund their respective business practices. The funds had strings attached. In the case of Greenway, Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC were instrumental in influencing Pierce, Pierce Bainbridge, and Ward Damon into completely disregarding their responsibilities to Greenway.

332.    According to civil filings, in late January 2019, Pierce and Pierce Bainbridge engaged Jonathan Katz, and his New Yok City based firm KKC to conduct exhaustive due diligence on Pierce Bainbridge's entire portfolio of cases, that included Greenway's Florida case. The intent was to seek further litigation funding. The exhaustive review of Pierce Bainbridge's case load would have included Greenway's client files an all of the information related to their valid lawsuit against Ecowin and the Ryan Brothers. Pierce Bainbridge's massive March 29, 2019, multi-tranche litigation funding deal with Virage Master, LP, and or Virage SPV-1, LLC, or other Virage entities worth up to a purported $100 million.

333.    On March 28, 2019, Pierce, Pierce Bainbridge, and Ward Damon, failed to file a Motion for Default Final Judgment as to Ecowin, or Notice of Joint Liability as to James Ryan, Mike Ryan, and the Ryan brother's law firm potential joint liability. Instead, on March 29, 2019, Pierce, Pierce Bainbridge, and Ward Damon filed a false and materially motion to withdraw.

334.    The same day Virage Master, LP, and or Virage SPV-1, LLC, sent Pierce Bainbridge a $28.5 million "loan agreement" on information and belief used to cure Pravati's $9.1 million litigation funding default within days of their withdrawal.

335. On information and belief Virage Master, LP, and or Virage SPV-1, LLC used its substantial influence, connections with the Serbian American mafia, and other tactics to encourage Defendants Pierce, Pierce Bainbridge and Ward Damon's fraudulent behavior.

336. As a direct and proximate result of Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC, Plaintiffs have suffered damages. The amount of these damages has not been precisely determined and the damages are continuing to accrue exceeding $25 million related to the fraud.

337. Greenway and Escamilla further seek punitive damages to deter Defendants. As a direct and proximate result of Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC from continuing their fraudulent, malicious, oppressive and greatly disingenuous business practices. In committing the above-described acts, Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC acted with fraud, oppression, and malice as described in detail herein and incorporated by reference Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC's actions were intended only to injure Greenway. The facts described herein were despicable and done with a willful and knowing disregard for Greenway's rights. Given Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC's willful, wanton, reckless, and malicious conduct and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded these businesses and their counterparts from continuing to commit fraud on the public at large.

## **FIFTH CAUSE OF ACTION**

### **Aiding and Abetting Fraud**

### **(Greenway against Pierce, Pierce Bainbridge, and Ward Damon)**

338. Greenway repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

339. Defendants Pierce, Pierce Bainbridge, and Ward Damon owed Plaintiff Greenway fiduciary duties. As counsel of record for Greenway, these duties are undisputed. As such, a confidential relationship existed at all relevant times herein between Plaintiffs and Pierce, Pierce Bainbridge, and Ward Damon. In that regard, Plaintiffs placed confidence in the fidelity and

-82-

1    integrity of Pierce, Pierce Bainbridge, and Ward Damon in entrusting them with the responsibility

2    to act competently, professionally, and with reasonable care to procure damages in Greenway's

3    civil case.

4    340.    The Ryan Brothers and Selakovic entities clearly defrauded Greenway at every

5    turn. As alleged extensively above, the Selakovic entities sold and manufactured counterfeit goods

6    that used Greenway's trademark.   At each and every turn, the Selakovic entities undercut and

7    unmined Greenway's ability to make a profit.  Further, the Ryan Brothers assisted Selakovic in his

8    endeavors by providing confidential information to Selakovic that was either protected by a non-

9    disclosure agreement, a protected trade secret, or protected by the attorney-client privilege.  Any

10   representation made the Ryan Brothers and Selakovic were fraudulent as applied to Greenway,

11   because the statements were never intended to be true.  Further, they intended that Greenway rely

12   on the statements in order for the bad actors to gain Greenway's trust.  Greenway was harmed as

13   a result of the fraudulent statements.

14   341.    Pierce, Pierce Bainbridge and Ward Damon were aware of the ongoing fraud,

15   particularly with respect to the Ryan Brothers, the Selakovic entities, and Ecowin.   They knew

16   that the Ryan Brothers and the Selakovic entities were committing the fraud against Greenway

17   because they had the evidence.

18   342.    As established above, DHS officials advised Escamilla that Selakovic, Blackburn,

19   and Selakovic entities are the alleged masterminds responsible for conducting a massive

20   multimillion-dollar transnational counterfeit goods scam, with powerful power political

21   connections to Serbian President Aleksander Vucic.  Serbian President Aleksander Vucic served

22   as the Minister of Information under former President Serbian President Slobodan Milošević, at

23   the same time Mileta Miljanic, Group America's ringleader served as the personal bodyguard to

24   Slobodan Milošević. And Selakovic's younger brother Nikola Selakovic, served in several other

25   Senior Level positions in the Government of Serbia, including Presidency Secretary of Serbian

26   President Aleksander Vucic. Former New York City Mayor Rudy Giuliani, worked as paid

27   consultant and advised the Serbian Government, and Aleksander Vucic.

28

343.   Peirce, Pierce Bainbridge and Ward Damon gave substantial assistance and encouragement to the Ryan Brothers and the Selakovic entities to continue the fraud. Specifically, Peirce, Pierce Bainbridge and Ward Damon failed to act in the best interest of Greenway when representing Plaintiff in litigation against the Ryan Brothers and the Selakovic. Peirce, Pierce Bainbridge and Ward Damon's actions were intentional and designed to assist in continuing the tort against Greenway.

344.   Greenway was harmed by Peirce, Pierce Bainbridge and Ward Damon's actions. As a direct and proximate result of Defendants Peirce, Pierce Bainbridge and Ward Damon's actions, Plaintiffs have suffered damages. The amount of these damages has not been precisely determined and the damages are continuing to accrue exceeding $25 million related to the fraud.

345.   Greenway further seeks punitive damages to deter Defendants Peirce, Pierce Bainbridge and Ward Damon from continuing their fraudulent, malicious, oppressive and greatly disingenuous business practices. In committing the above-described acts, Defendants Peirce, Pierce Bainbridge and Ward Damon acted with fraud, oppression, and malice as described in detail herein and incorporated by reference Defendants Peirce, Pierce Bainbridge and Ward Damon's actions were intended only to injure Greenway. The facts described herein were despicable and done with a willful and knowing disregard for Greenway's rights. Given Defendants Peirce, Pierce Bainbridge and Ward Damon's willful, wanton, reckless, and malicious conduct and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded these law firms and their counterparts from continuing to commit fraud on the public at large.

### SIXTH CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty

### (Greenway against Pravati, Chucri, Abaie, Virage Master, LP. and Virage SPV-1, LLC)

346.   Greenway repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

347.   Defendants Pierce, Pierce Bainbridge, and Ward Damon owed Plaintiff Greenway fiduciary duties. As counsel of record for Greenway, these duties are undisputed. As such, a confidential relationship existed at all relevant times herein between Plaintiffs and Pierce, Pierce

-84-

1   Bainbridge, and Ward Damon. In that regard, Plaintiffs placed confidence in the fidelity and

2   integrity of Pierce, Pierce Bainbridge, and Ward Damon in entrusting them with the responsibility

3   to act competently, professionally, and with reasonable care to procure damages in Greenway's

4   civil case.

5        348.   Pierce, Pierce Bainbridge, and Ward Damon agreed to represent Greenway in legal

6   matters against Ecowin, Supreme Growers, LLC, Vegalab, Inc, the Ryan Brothers, and the

7   Selakovic entities. As attorneys, and by the very nature of this representation, these defendants

8   owed fiduciary duties to Greenway.  By manufacturing a conflict with Greenway, ignoring

9   evidence provided, failing to adequately pursue and defend Greenway's interests and fraudulently

10   withdrawing as counsel, Pierce, Pierce Bainbridge, and Ward Damon indeed breached their

11   fiduciary duties to Greenway.

12       349.   Defendants Chucri Pravati's CEO, and its Senior Legal Counsel, are litigation

13   finance industry professionals, and Pravati, Virage Master, LP, and Virage SPV-1, LLC are

14   litigating finance entities with knowledge of the legal industry and the rights and responsibilities

15   of lawyers with respect to their clients. Pravati, Chucri, Abaie, Virage Master, LP. and Virage

16   SPV-1, LLC were aware that Pierce, Pierce Bainbridge, and Ward Damon owed fiduciary duties

17   to Greenway. Defendants Pravati, Chucri. Abaie, Virage Master, LP. and Virage SPV-1, LLC

18   were aware that Pierce, Pierce Bainbridge, and Ward Damon breached their fiduciary duties to

19   Greenway by manufacturing a conflict with Greenway, ignoring evidence provided, failing to

20   adequately pursue and defendant Greenway's interests and fraudulently withdrawing as counsel.

21       350.   Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC

22   were not only aware of Pierce, Pierce Bainbridge, and Ward Damon's breach of fiduciary duties

23   owed to Greenway, Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC actively

24   assisted and encouraged Pierce, Pierce Bainbridge, and Ward Damon's breach.  As the financial

25   backing and majority creditor of co-defendants, Pravati, Chucri, Abaie, Virage Master, LP, and

26   Virage SPV-1, LLC actively pulled the strings with respect to Pierce, Pierce Bainbridge, and Ward

27   Damon's actions as they related to Greenway. Agents from Pravati, Chucri, Abaie, Virage Master,

28

1  LP, and Virage SPV-1, LLC actively participated in the management (or mismanagement) of

2  Greenway's legal action against the Ryan Brothers and the Selakovic defendants.

3      351.   Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC played an

4  active role in aiding and abetting the breach of fiduciary duties in part by providing litigation

5  funding to Pierce, Pierce Bainbridge, that financially benefitted Ward Damon that had strings

6  attached.

7      352.   Pierce, Pierce Bainbridge, and Ward Damon's most puzzling choices directly

8  correspond to the actions of Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC.

9      353.   During his representation of Greenway, unbeknownst to Escamilla, Pierce and his

10  firm were in default to Pravati to the tune of $9.1 million.  Pravati had access to the confidential

11  case files related to Greenway's litigation based on Escamilla's attempt to obtain litigation

12  financing as explained in detail above.  Pravati had also consulted with Pierce Bainbridge

13  regarding the relative merits of Greenway's case as part of the due diligence. At this time,

14  Greenway had survived the Ryan Brothers' attempt to be dismissed form the litigation. The court

15  ruled in Greenway's favor with respect to continuing the litigation against the Ryan Brothers and

16  allowed Greenway to pursue a default judgment against Ecowin, a company that defrauded

17  Greenway from tens of millions of dollars.

18      354.   Yet, at that time, Pierce, Pierce Bainbridge and Ward Damon were in the process

19  of manufacturing a conflict with Greenway related to their ability to continue the litigation. On or

20  about March 27, 2019, and before abandoning Greenway's Florida suit, Escamilla emailed Pierce,

21  Sorkowitz, and Pierce Bainbridge, advising counsel that Greenway would not consent to Pierce's

22  repeated attempts to dismiss the Ryan Brothers from its litigation.  On March 28, 2019, Pierce,

23  Pierce Bainbridge, and Ward Damon, failed to file a motion for default judgment as to Ecowin.

24  Instead, on March 29, 2019, Pierce, Pierce Bainbridge, and Ward Damon filed a false and

25  materially motion to withdraw.

26      355.   Conspicuously, on the very same day that Pierce Bainbridge filed their motion to

27  withdraw as counsel for Greenway, March 29, 2019, Defendant Virage executed a $28.5 million

28  loan agreement to Pierce Bainbridge to assist the firm in paying off the $9.1 million default from

1  Pravati. This was simply the initial tranche of funds for a much larger investment. However, the

2  fund, VSPV-1, LLC was not licensed in the state of California and thus restricted from engaging

3  in lending activities. Defendant Pravati has similarly been disciplined by the Department of

4  Business Oversight for it's illegal, unlicensed, and predatory lending practices.

5  356.  Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC influenced

6  Pierce, Pierce Bainbridge, and Ward Damon to act against the interests of Greenway and sabotage

7  its meritorious litigation against the Ryan Brothers and Ecowin. The relationship between Pierce

8  Bainbridge and Virage Master, LP, and Virage SPV-1, LLC would deepen and include reportedly

9  $100 million in loans from Virage to Pierce Bainbridge.

10  357.  The sheer size of the loans and the unexplainable actions of Pierce Bainbridge

11  shows that Pravati, Chucri, Abaie, Virage Master, LP, and/or Virage SPV-1, LLC had an outsized

12  influence on the actions of the firm. Further, public filings, such as those related to the Boeing

13  litigation and others referenced above show that Pravati, Chucri, Abaie, Virage Master, LP, and/or

14  Virage SPV-1, LLC were actively involved in influencing the outcomes of other litigation matters

15  and actively working to breach the fiduciary duties owed to Pierce Bainbridge clients. The same

16  happened here.

17  358.  Pierce, Pierce Bainbridge, and Ward Damon completely mismanaged Greenway's

18  case, failed to adequately oppose Vegalab, Inc's motion for clarification. And failed to file a

19  motion for default judgment against Ecowin or notice of joint liability as to the Ryan brothers and

20  their law firm's potential liability, before filing a false and materially motion to dismiss. Pravati,

21  Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC's, active encouragement and assistance

22  in Pierce, Pierce Bainbridge, and Ward Damon's breach of their fiduciary duties to Greenway was

23  a substantial factor in causing Greenway's harm. The amount of these damages has not been

24  precisely determined and the damages are continuing to accrue exceeding $25 million related to

25  the fraud.

26  359.  Greenway further seeks punitive damages to deter Defendants Pravati, Chucri,

27  Abaie, Virage Master, LP, and Virage SPV-1, LLC from continuing their fraudulent, malicious,

28  oppressive and greatly disingenuous business practices. In committing the above-described acts,

-87-

COMPLAINT FOR DAMAGES

1  Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC acted with fraud,

2  oppression, and malice as described in detail herein and incorporated by reference Defendants

3  Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC's actions were intended only

4  to injure Greenway.  The facts described herein were despicable and done with a willful and

5  knowing disregard for Greenway's rights. Given Defendants Pravati, Chucri, Abaie, Virage

6  Master, LP, and Virage SPV-1, LLC's willful, wanton, reckless, and malicious conduct and their

7  high degree of moral culpability, punitive damages are appropriate and warranted, and must be

8  awarded these litigation funds and their counterparts from continuing to commit fraud on the

9  public at large.

10  ### SEVENTH CAUSE OF ACTION

11  **Unfair Business Practices – Cal. Bus. & Prof. Code §§ 17200 et seq.**

12  **(Greenway and Escamilla against Defendants Pravati, Chucri, Abaie, Virage**

13  **Master, LP, and Virage SPV-1, LLC)**

14  360.    Greenway and Escamilla repeat and reallege each and every allegation contained

15  in the preceding paragraphs as if fully set forth herein.

16  361.    California Business and Professions Code § 17200 et seq. prohibits any unlawful,

17  unfair or fraudulent business act or practice.  Further, the California Civil Financial Code §

18  22161(a)(6-7) states it is improper for a financial institution or lender such as Pravati, its CEO

19  Chucri, or its Senior Legal Counsel Abaie, Virage Master, LP, or Virage SPV-1, LLC to

20  "knowingly misrepresent, circumvent, or conceal, through subterfuge, or device, any material

21  aspect or information regarding a transaction to which [they] are a party" or "commit an act" that

22  constitutes fraud or dishonest dealings."

23  362.    Defendants Pierce, Pierce Bainbridge, and Ward Damon owed Plaintiff Greenway

24  fiduciary duties.  As counsel of record for Greenway, these duties are undisputed.  As such, a

25  confidential relationship existed at all relevant times herein between Plaintiffs and Pierce, Pierce

26  Bainbridge, and Ward Damon. In that regard, Plaintiffs placed confidence in the fidelity and

27  integrity of Pierce, Pierce Bainbridge, and Ward Damon in entrusting them with the responsibility

28

-88-

1   to act competently, professionally, and with reasonable care to procure damages in Greenway's

2   civil case.

3       363.    Pierce, Pierce Bainbridge, and Ward Damon agreed to represent Greenway in legal

4   matters against Ecowin, Supreme Growers, LLC, Vegalab, Inc, the Ryan Brothers, and the

5   Selakovic entities. As attorneys, and by the very nature of this representation, these defendants

6   owed fiduciary duties to Greenway.  By manufacturing a conflict with Greenway, ignoring

7   evidence provided, failing to adequately pursue and defend Greenway's interests and fraudulently

8   withdrawing as counsel, Pierce, Pierce Bainbridge, and Ward Damon indeed breached their

9   fiduciary duties to Greenway.

10      364.    Defendants Chucri Pravati's CEO, and its Senior Legal Counsel, are litigation

11  finance industry professionals, and Pravati, Virage Master, LP, and Virage SPV-1, LLC are

12  litigating finance entities with knowledge of the legal industry and the rights and responsibilities

13  of lawyers with respect to their clients.  Pravati, Chucri, Abaie, Virage Master, LP. and Virage

14  SPV-1, LLC were aware that Pierce, Pierce Bainbridge, and Ward Damon owed fiduciary duties

15  to Greenway.  Defendants Pravati, Chucri. Abaie, Virage Master, LP. and Virage SPV-1, LLC

16  were aware that Pierce, Pierce Bainbridge, and Ward Damon breached their fiduciary duties to

17  Greenway by manufacturing a conflict with Greenway, ignoring evidence provided, failing to

18  adequately pursue and defendant Greenway's interests and fraudulently withdrawing as counsel.

19      365.    Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC

20  were not only aware of Pierce, Pierce Bainbridge, and Ward Damon's breach of fiduciary duties

21  owed to Greenway, Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC actively

22  assisted and encouraged Pierce, Pierce Bainbridge, and Ward Damon's breach.  As the financial

23  backing and majority creditor of co-defendants, Pravati, Chucri, Abaie, Virage Master, LP, and

24  Virage SPV-1, LLC actively pulled the strings with respect to Pierce, Pierce Bainbridge, and Ward

25  Damon's actions as they related to Greenway. Agents from Pravati, Chucri, Abaie, Virage Master,

26  LP, and Virage SPV-1, LLC actively participated in the management (or mismanagement) of

27  Greenway's legal action against the Ryan Brothers and the Selakovic defendants.

28

366.     Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC played an active role in aiding and abetting the breach of fiduciary duties in part by providing litigation funding to Pierce, Pierce Bainbridge, that financially benefitted Ward Damon that had strings attached.

367.     Pierce, Pierce Bainbridge, and Ward Damon's most puzzling choices directly correspond to the actions of Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC.

368.     During his representation of Greenway, unbeknownst to Escamilla, Pierce and his firm were in default to Pravati to the tune of $9.1 million. Pravati had access to the confidential case files related to Greenway's litigation based on Escamilla's attempt to obtain litigation financing as explained in detail above. Pravati had also consulted with Pierce Bainbridge regarding the relative merits of Greenway's case as part of the due diligence. At this time, Greenway had survived the Ryan Brothers' attempt to be dismissed form the litigation. The court ruled in Greenway's favor with respect to continuing the litigation against the Ryan Brothers and allowed Greenway to pursue a default judgment against Ecowin, a company that defrauded Greenway from tens of millions of dollars.

369.     Yet, at that time, Pierce, Pierce Bainbridge and Ward Damon were in the process of manufacturing a conflict with Greenway related to their ability to continue the litigation. On or about March 27, 2019, and before abandoning Greenway's Florida suit, Escamilla emailed Pierce, Sorkowitz, and Pierce Bainbridge, advising counsel that Greenway would not consent to Pierce's repeated attempts to dismiss the Ryan Brothers from its litigation. On March 28, 2019, Pierce, Pierce Bainbridge, and Ward Damon, failed to file a motion for default judgment as to Ecowin. Instead, on March 29, 2019, Pierce, Pierce Bainbridge, and Ward Damon filed a false and materially motion to withdraw.

370.     On the very same day that Pierce Bainbridge filed their motion to withdraw as counsel for Greenway, March 29, 2019, Defendant Virage executed a $28.5 million loan agreement to Pierce Bainbridge to assist the firm in paying off the $9.1 million default from Pravati. This was simply the initial tranche of funds for a much larger investment. However, the fund, Virage SPV-1, LLC was not licensed in the state of California and thus restricted from

-90-

1   engaging in lending activities.  Defendant Pravati has similarly been disciplined by the Department
2   of Business Oversight for it's illegal, unlicensed, and predatory lending practices.

3       371.    Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC influenced
4   Pierce, Pierce Bainbridge, and Ward Damon to act against the interests of Greenway and sabotage
5   its meritorious litigation against the Ryan Brothers and Ecowin.  The relationship between Pierce
6   Bainbridge and Virage Master, LP, and Virage SPV-1, LLC would deepen and include reportedly
7   worth up to $100 million in loans from Virage to Pierce Bainbridge.

8       372.    The sheer size of the loans and the unexplainable actions of Pierce Bainbridge
9   shows that Pravati, Chucri, Abaie, Virage Master, LP, and/or Virage SPV-1, LLC had an outsized
10  influence on the actions of the firm.  Further, public filings, such as those related to the Boeing
11  litigation and others referenced above show that Pravati, Chucri, Abaie, Virage Master, LP, and/or
12  Virage SPV-1, LLC were actively involved in influencing the outcomes of other litigation matters
13  and actively working to breach the fiduciary duties owed to Pierce Bainbridge clients.  The same
14  happened here.

15      373.    As alleged above, Defendants Pravati, Chucri, Abaie, Virage Master, LP, and/or
16  Virage SPV-1, LLC improperly and illegally provided Defendants Pierce and Pierce Bainbridge
17  with litigation funding potentially leveraging Greenway's litigation without the consent of
18  Greenway or Escamilla.  Further, Pravati, Chucri, Abaie, Virage Master, LP, and/or Virage SPV-
19  1, LLC were improperly involved in the management and strategy of Pierce and Pierce
20  Bainbridge's caseload, including Greenway's litigation against the Ryan Brothers and Selakovic
21  entities.

22      374.    Pravati, Chucri, Abaie, Virage Master, LP, and/or Virage SPV-1, LLC further
23  knowingly misrepresented, circumvented, and concealed through subterfuge material information
24  regarding their involvement in Greenway's litigation – and Pierce Bainbridge's withdrawal as
25  counsel – through fraud and dishonestly. Pravati, Chucri, Abaie, Virage Master, LP, and/or Virage
26  SPV-1, LLC knowingly concealed evidence and or lied to Escamilla regarding the reasoning for
27  declining funding for Greenway's litigation and subsequent subterfuge or Greenway's claims.

28

375.    Pravati, Chucri, Abaie, Virage Master, LP, and/or Virage SPV-1, LLC's actions, misleading statements, concealment of material evidence and outright lies constitute fraudulent business practice because, among other things, they aided and abetted Pierce, Pierce Bainbridge and Ward Damon's breach of fiduciary duties owed to Greenway, defrauded the court, and otherwise irreparably harmed Greenway.  Pravati, Chucri, Abaie, Virage Master, LP, and/or Virage SPV-1, LLC knowingly engaged in unfair business practices when they improperly influenced Pierce, Pierce Bainbridge and Ward Damon to the detriment of Greenway

376.    Pierce, Pierce Bainbridge, and Ward Damon completely mismanaged Greenway's case, failed to adequately oppose Vegalab, Inc's motion for clarification. And failed to file a motion for default judgment against Ecowin or notice of joint liability as to the Ryan brothers and their law firm's potential liability, before filing a false and materially motion to dismiss. Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC's, active encouragement and assistance in Pierce, Pierce Bainbridge, and Ward Damon's breach of their fiduciary duties to Greenway was a substantial factor in causing Greenway and Escamilla's harm.  The amount of these damages has not been precisely determined and the damages are continuing to accrue exceeding $25 million related to the fraud.

377.    Greenway and Escamilla further seek punitive damages to deter Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC from continuing their fraudulent, malicious, oppressive and greatly disingenuous business practices.  In committing the above-described acts, Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC acted with fraud, oppression, and malice as described in detail herein and incorporated by reference Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC's actions were intended only to injure Greenway.  The facts described herein were despicable and done with a willful and knowing disregard for Greenway and Escamilla's rights. Given Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC's willful, wanton, reckless, and malicious conduct and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded these litigation funds and their counterparts from continuing to commit fraud on the public at large.

## EIGHTH CAUSE OF ACTION

### Tom Bane Civil Rights Act – Civ. Code § 52.1

### (Escamilla Against All Defendants)

378.   Escamilla repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

379.   As established above, Group America, including Selakovic and his associated entities, are a violent criminal enterprise.  As alleged above, Group America had substantial connections and influence over the Ryan Brothers and ultimately, Pierce, Pierce Bainbridge, Ward Damon, Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC.  These entities were either controlled or heavily influenced by Group America, violent criminal enterprise.

380.   Defendants Pierce, Pierce Bainbridge, and Ward Damon owed Plaintiff Greenway fiduciary duties.  As counsel of record for Greenway, these duties are undisputed.  As such, a confidential relationship existed at all relevant times herein between Plaintiffs and Pierce, Pierce Bainbridge, and Ward Damon. In that regard, Plaintiffs placed confidence in the fidelity and integrity of Pierce, Pierce Bainbridge, and Ward Damon in entrusting them with the responsibility to act competently, professionally, and with reasonable care to procure damages in Greenway's civil case.

381.   As established above, DHS officials advised Escamilla that Selakovic and Blackburn are the alleged masterminds responsible for conducting a massive multimillion-dollar transnational counterfeit goods scam, with powerful power political connections to Serbian President Aleksander Vucic.  Serbian President Aleksander Vucic served as the Minister of Information under former President Serbian President Slobodan Milošević, at the same time Mileta Miljanic, Group America's ringleader served as the personal bodyguard to Slobodan Milošević. Selakovic's younger brother Nikola Selakovic, served in several other Senior Level positions in the Government of Serbia, including Presidency Secretary of Serbian President Aleksander Vucic. These key players are indeed tied to Defendants.  For example, former New York City Mayor Rudy Giuliani, who worked as paid consultant and advised the Serbian Government, and Aleksander Vucic was a client and close confidant of Pierce. Within about a week or so of Former

New York City Rudy Giuliani retaining Pierce Bainbridge, the Virage defendants "loaned" Pierce Bainbridge $21 million. After which, Group America and Mileta Miljanic, had their hooks in Pierce Bainbridge and within months, Pierce Bainbridge collapsed.

382.     As laid out extensively above, Pierce, Pierce Bainbridge and Ward Damon orchestrated a false, misleading, and despicable attempt withdraw as counsel for Greenway. They filed motions full of lies and false statements. Peirce and Peirce Bainbridge concocted and created a dispute with Escamilla, hoping he would fire them on behalf of Greenway. Nevertheless, they acted as subterfuge to destroy Greenway's claims and deprive Greenway of its rights under the law. During the process, Defendants sought to make sure Escamilla never attempted to exercise any of his constitutional rights through threats of violence, intimidation, and mob tactics.

383.     Pierce used intimidating and violent language during his attempts to withdraw as counsel for Greenway, including stating that things such as, "This will not be a pleasant experience for you." Given Pierce's new association with Group America – through his association with Rudy Giuliani, Pravati, and the Virage defendants, this threat was not simply hyperbolic in nature. Pierce's statements were intended to prevent Greenway and Escamilla from pursuing legal remedies which are protected under the law. These statements were related to Defendant Pierce, Pierce Bainbridge, and Ward Damon's representation. As the titular leader of the litigation team, Pierce's statements are attributed to all Defendants related to the representation.

384.     A few days before receiving Pierce Bainbridge's $28.5 million "loan agreement" from Virage Master LP and or Virage SPV-1, LLC, Pierce belittled, demeaned, and threatened in an email Pierce sent to Escamilla. Stating, "I am closing a massive deal this week," "I assure you further threats will not receive such a warm response," and "I am not in the mood for your ten thousand word (sic) emails with multiple fonts bolded with underlines and italics. It is juvenile." The email was in response to Escamilla's communication seeking status and estimated damages figure regarding Ecowin's default judgment.

385.     Further, on March 27, 2019, Pierce used unwarranted, abusive, intimidating, and violent language during his representation immediately before withdrawing as counsel for Greenway, and threatened Escamilla stating in relevant part, "Now leave me alone until you force

-94-
COMPLAINT FOR DAMAGES

1    me to be deposed and testify at trial. Otherwise, I do want to see you, or hear your name even. This
2    will not be a pleasant experience for you."

3        386.    Given Pierce's new association with Group America, this threat was not simply
4    hyperbolic in nature. Pierce's statements were intended to prevent Greenway and Escamilla from
5    pursuing legal remedies which are protected under the law. These statements were related to
6    Defendant Pierce, Pierce Bainbridge, and Ward Damon's representation. As the titular leader of
7    the litigation team, Pierce's statements are attributed to all Defendants related to the representation.

8        387.    Pravati's senior legal counsel – Ian Abaie – went so far as to threaten Escamilla
9    with violence relating to his requests. Specifically, Abaie stated "If you want a fight with us, you
10   had better be ready to pry the confidential document from my corpse." He ended the same email
11   with "consider yourself warned." Escamilla understood these statements – along with John
12   Pierce's prior statements – to be threats of violence.

13       388.    During Escamilla's numerous communications with Pravati's CEO Chucri that
14   ultimately devolved into Pravati's CEO September 23, 2020, belligerent email Chucri sent Pravati's
15   former client Greenway, callously advising Escamilla to "GO AWAY PEST!"

16       389.    Escamilla requested its property and information back in connection with
17   Greenway's litigation funding application and due diligence process with Pravati, during which
18   Chucri and Abaie were part of the underwriting team. Escamilla requested communications
19   regarding any representations, assessments, attorney opinions, or monetary valuations of
20   Greenway's case from Pierce Bainbridge.

21       390.    Further, on December 14, 2021, Escamilla emailed Pierce, Pierce Bainbridge, Ward
22   Damon, and Pravati's former lawyer Ed Altabet advising the parties after Pierce advised Escamilla
23   that Altabet would answer questions regarding Escamilla's December 2, 2021, email request
24   seeking information regarding Greenway's 2018 Florida suit, and any monetary valuations, and
25   other information Pierce Bainbridge was required to provide to the Virage entities.

26       391.    Escamilla has further received ominous telephone calls from counsel who
27   represents both Virage and Pierce Bainbridge in response to a litigation notice sent by Escamilla.
28   Of course, both the lawyer and these defendants are heavily connected to a violent criminal gang.

-95-

COMPLAINT FOR DAMAGES

The only purpose of this phone call was to intimidate and harass Escamilla in hopes to attempt to dissuade him from exercising his right to bring this lawsuit. According to court records filed by a former Pierce Bainbridge associate, Altabet has a history of attempting to "intimidate" dissenter and allegedly "threatened" him. At the same time, a former Pierce Bainbridge Partner, accused "Virage" of "alienating" other former Pierce Bainbridge Partners through their conduct.

392. These actions from persons and entities associated with a violent criminal enterprise were intended to intimidate and deprive Escamilla and Greenway from bringing the instant lawsuit.

393. Escamilla was intimidated and understood each of these actions to be a credible threat of violence against him. Escamilla knew of Selakovic's substantial connections with Group America's New York City based Serbian mob-boss and ringleader Mileta Miljanic, whose vast transnational drug trafficking criminal enterprise maintains a well-established history of engaging of carrying through on threats or acts of considerable violence, including torture, dismembering enemies with chainsaws, and potential assassinations of senior public officials.

394. Escamilla is entitled to damages for each violation pursuant to statute. Section 52 permits such relief as actual damages, statutory damages (including civil penalties), exemplary damages, and attorney's fees. (Civ. Code § 52.)

395. Further, Escamilla has been harmed by Defendants' threats of violence, harassment and intimidation. Defendants' actions were a substantial factor in causing Plaintiffs' harm.

## NINTH CAUSE OF ACTION

### Aiding and Abetting Securities Fraud

### (Plaintiffs against All Defendants)

396. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

397. As alleged in great detail above, Greenway was involved in negotiations with HPC to complete a reverse merger involving the two companies. After Greenway and Escamilla held extensive negotiations, discussed proposed business models, and executed formal NDA agreements, Greenway's attorneys, the Ryan Brothers, took the confidential information to

-96-

COMPLAINT FOR DAMAGES

1  Selakovic and his associated entities.  Selakovic, through these fraudulent transactions, used his
2  own entities to undercut Greenway, perform the reverse merger in violation of *California Corp.*
3  *Code* §§ 25501, 25401, et seq.  Selakovic and the Ryan Brothers' actions harmed Plaintiffs to the
4  tune of millions of dollars.

5  398.  Defendants were aware that Selakovic and the Ryan Brothers had committed fraud
6  against Plaintiffs.  Escamilla meticulously documented the wrongdoing and provided ample
7  evidence to Defendants regarding the fraudulent actions taken against Plaintiffs.  In fact,
8  Defendants Pierce, Pierce Bainbridge, and Ward Damon were engaged specifically to remedy the
9  securities fraud being committed against Greenway.  Pravati and Virage Defendant reviewed and
10  had access to all of the information regarding the fraud.

11  399.  Defendants gave substantial assistance and encouragement to Selakovic and the
12  Ryan Brothers in continuing to commit securities fraud with respect to Plaintiffs.  When Plaintiff
13  initiated the litigation with Pierce, Pierce Bainbridge, and Ward Damon, the goal was to sue the
14  entities engaged in the fraud.  As alleged in great detail above, Pierce, Pierce Bainbridge, and Ward
15  Damon utterly failed in these duties. They failed to properly oppose a 12(b)(6) motion to dismiss,
16  which allowed the primary defendants related to the fraud to be dismissed from the case.  Further,
17  Pierce, Pierce Bainbridge, and Ward Damon failed to oppose the motion for clarification, which
18  removed the entity that actually merged with HPC out of the case, furthering and assisting the
19  fraud.

20  400.  Defendants Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC
21  were not only aware of Pierce, Pierce Bainbridge, and Ward Damon's breach of their duties owed
22  to Greenway with respect to the securities fraud, Pravati, Chucri, Abaie, Virage Master, LP, and
23  Virage SPV-1, LLC actively assisted and encouraged Pierce, Pierce Bainbridge, and Ward
24  Damon's breach.  As the financial backing and majority creditor of co-defendants, Pravati, Chucri,
25  Abaie, Virage Master, LP, and Virage SPV-1, LLC actively pulled the strings with respect to
26  Pierce, Pierce Bainbridge, and Ward Damon's actions as they related to Greenway.  Agents from
27  Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC actively participated in the
28  management (or mismanagement) of Greenway's legal action against the Ryan Brothers and the

-97-

1   Selakovic defendants through means of concealment, misrepresentations or omissions of material
2   fact.  Because of their material assistance, Pravati Chucri, Abaie, Virage Master, LP, and Virage
3   SPV-1, LLC, Pierce, Pierce Bainbridge, and Ward Damon were indeed aiding and abetting James
4   Ryan, Mike Ryan, Ecowin, and Vegalab, Inc to violate California law.

5       401.    Pierce, Pierce Bainbridge, and Ward Damon's most puzzling choices directly
6   correspond to the actions of Pravati, Chucri, Abaie, Virage Master, LP, and Virage SPV-1, LLC.

7       402.    Defendants' conduct was a substantial factor in causing harm to Plaintiffs.  Without
8   Defendants' actions, Greenway would have been able pursue remedies to rectify the securities
9   fraud committed against Plaintiffs.  Instead, Defendants failed to adequately pursue Plaintiffs'
10  interests and left Plaintiffs, once again, without remedies.

11      403.    Plaintiff further seeks punitive damages to deter Defendants from continuing their
12  fraudulent, malicious, oppressive and greatly disingenuous business practices.  In committing the
13  above-described acts, Defendants acted with fraud, oppression, and malice as described in detail
14  herein and incorporated by reference Defendants' actions were intended only to injure Plaintiff.
15  The facts described herein were despicable and done with a willful and knowing disregard for
16  Greenway's rights. Given Defendants' willful, wanton, reckless, and malicious conduct and their
17  high degree of moral culpability, punitive damages are appropriate and warranted, and must be
18  awarded these litigation funds and their counterparts from continuing to commit fraud on the
19  public at large.

20                          **DECLARATORY JUDGMENT**

21      404.    Greenway repeats and realleges each and every allegation contained in the
22  preceding paragraphs as if fully set forth herein.

23      405.    There is substantial controversy and current dispute between the parties having
24  adverse legal interest of sufficient immediacy and reality to warrant the issuance of a declaratory
25  judgement. The dispute, therefore, between Plaintiffs and Defendants is a justiciable controversy
26  appropriate for declaratory judgement under the California Code of Civil Procedure § 1060, et seq.

27      406.    There is a current controversy and pending dispute regarding the validity of the
28  Arbitration Agreement.

407.     Plaintiff takes the position that the Arbitration Clause is invalid and void for a number of reasons alleged herein.

408.     The Agreement does contain an arbitration clause.  However, the clause is void. The clause, 15.1.6, states that the arbitration clause must be specifically initialed by the client. Further, applicable state law renders the clause void based on Greenways' decision not to execute the portion of the contract related to the arbitration clause.

409.     According to Business & Professions Code section 6147(a)(b), which states, in pertinent part: (a) An attorney who contracts to represent a client on a contingency fee basis shall, at the time the contract is entered into, provide a duplicate copy of the contract, signed by both the attorney and the client, or the client's guardian or representative, to the plaintiff, or to the client's guardian or representative. The contract shall be in writing and shall include, but is not limited to, all of the following: and (b) Failure to comply with any provision of this section renders the agreement voidable at the option of the plaintiff." Greenway wishes to void the arbitration clause.

410.     Additionally, in Marcus & Millichap Real Estate Investment Brokerage Co. v. Hock Investment Co. (1998) 68 Cal.App.4th 83, 88-89. relying on standard rules of contract interpretation, the court of appeal determined that the contract, itself, "contemplated that the arbitration of disputes provision would be effective only if both buyers and sellers assented to that provision by initialing it. Since the sellers did not initial that provision, it did not become effective." (Id. at 92, emphasis added.)  Here, Greenway did not initial the provision and thus the clause is void.

411.     Defendants dispute that the Arbitration Clause is invalid. Defendants Pierce and Peirce Bainbridge – though lawyers in the State of California – believe that although Greenway and Escamilla specifically refused to initial clause 15, they should be held to the clause regardless.

412.     The allegations herein constitute actual justiciable controversy.

413.     Plaintiff seeks an order invalidating the Arbitration Clause.

/ / /

/ / /

/ / /

-99-
COMPLAINT FOR DAMAGES

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1.      That Plaintiffs be awarded all other damages arising in any manner from Defendants' acts and omissions as described hereinabove;

2.      That Plaintiffs be awarded reasonable litigation expenses, costs, and attorneys' fees;

3.      That Plaintiffs be awarded punitive damages;

4.      That Plaintiffs be awarded presumed damages;

5.      Plaintiff be awarded prejudgment interest;

6.      Such other and further relief as equity and justice may require.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED this 21st day of March, 2022.

GERARD FOX LAW, P.C.

Gerard P. Fox
*Attorneys for Plaintiffs*
Gustavo Escamilla and Greenway Nutrients Inc.

-100-

COMPLAINT FOR DAMAGES

Exhibit A - Page 107

# EXHIBIT B

Electronically FILED by Superior Court of California, County of Los Angeles on 03/21/2022 06:02 PM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Monroe,Deputy Clerk

Case 2:22-cv-03322-MWF-AFM   Document 1-1   Filed 05/16/22   Page 109 of 148   Page ID #:116

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
JOHN MARK PIERCE, an individual; PIERCE BAINBRIDGE, PC, a California professional corporation; WARD DAMON POSNER PHETERSON AND BLEAU, P.L., a Florida limited liability company; PRAVATI CAPITAL, LLC, a Delaware limited liability company; IAN ABAIE, an individual; ALEX CHUCRI, an individual; VIRAGE MASTER LP, Delaware limited partnership; VIRAGE SPV 1 LLC, a Delaware limited liability company; and DOES 1-25, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
 GREENWAY NUTRIENTS, INC., a Colorado Corporation, and GUSTAVO ESCAMILLA

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* | STANLEY MOSK COURTHOUSE<br>111 NORTH HILL STREET<br>LOS ANGELES, CALIFORNIA 90012 | CASE NUMBER:<br>*(Número del Caso):*<br>22STCV09854 |
|---|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
**GERARD P. FOX, GERARD FOX LAW P.C., 1880 CENTURY PARK EAST, SUITE 1410, LOS ANGELES, CA 90067; (P) 310-441-0500**

Sherri R. Carter Executive Officer / Clerk of Court

| DATE:<br>*(Fecha)* | 03/21/2022 | Clerk, by<br>*(Secretario)* | C. Monroe | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)

   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Exhibit D Page 109

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

# EXHIBIT C

Exhibit C - Page 110

Electronically FILED by Superior Court of California, County of Los Angeles on 03/21/2022 06:02 PM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Monroe,Deputy Clerk

Case 2:22-cv-03322-MWF-AFM Document 1-1 Filed 05/16/22 Page 111 of 148 Page ID #:118

**CM**

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Gerard P. Fox (SBN 151649);
GERARD FOX LAW P.C., 1880 Century Park East, Suite 1410, Los Angeles, CA 90067

| | |
|---|---|
| TELEPHONE NO.: 310-441-0500 | FAX NO. (Optional): 310-441-4447 |

E-MAIL ADDRESS: gfox@gerardfoxlaw.com

ATTORNEY FOR (Name): Plaintiffs, Gustavo Escamilla and Greenway Nurtrients Inc.

**SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS AN ELES**

STREET ADDRESS: 111 North Hill Street

MAILING ADDRESS: same

CITY AND ZIP CODE: Los Angeles, California 90012

BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Greenway Nutrients Inc., et al. v. John Mark Pierce, an individual; et. al.

| **CIVIL CASE COVER S EET** | | | CASE NUMBER: |
|---|---|---|---|
| [x] U d  [ ] L d | C C D | | 22STCV09854 |
| (Amount demanded exceeds $25,000) | (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: |
| | | | DEPT.: |

Items 1 6 below must be completed (see instructions on page 2).

1. Check box below for the case type that best describes this case:

| **A T r** | **C r** | **Pr C C r r C L** |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | **(C R C r r )** |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03) |
| **O r PI PD D (P r l r Pr r** | [ ] Other collections (09) | [ ] Construction defect (10) |
| **D r D ) T r** | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Other contract (37) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | **R Pr r** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse condemnation (14) | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Wrongful eviction (33) | |
| **N PI PD D (O r) T r** | [ ] Other real property (26) | **E r J d** |
| [ ] Business tort/unfair business practice (07) | **U D r** | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | [ ] Commercial (31) | **M C C** |
| [ ] Defamation (13) | [ ] Residential (32) | [ ] RICO (27) |
| [x] Fraud (16) | [ ] Drugs (38) | [ ] Other complaint (not specified above) (42) |
| [ ] Intellectual property (19) | **J d R** | **M C P** |
| [ ] Professional negligence (25) | [ ] Asset forfeiture (05) | [ ] Partnership and corporate governance (21) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Petition re: arbitration award (11) | [ ] Other petition (not specified above) (43) |
| **E** | [ ] Writ of mandate (02) | |
| [ ] Wrongful termination (36) | [ ] Other judicial review (39) | |
| [ ] Other employment (15) | | |

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action (specify): 10
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You ma use form CM-015.)
Date: March 21, 2022

Gerard P. Fox, Esq.
(TYPE OR PRINT NAME)                                   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Exhibit C - Page 111

| | | |
|---|---|---|
| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev.September 1, 2021] | **CIVIL CASE COVER S EET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courts.ca.gov |

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) (if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
Product Liability (not asbestos or toxic environmental) (24)
Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) (not civil harassment) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice (not medical or legal)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)
    Contract/Warranty Breach–Seller Plaintiff (not fraud or negligence)
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage (not provisionally complex) (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property (not eminent domain, landlord tenant, or foreclosure)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims (arising from provisionally complex case type listed above) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment (non-domestic relations)
    Sister State Judgment
    Administrative Agency Award (not unpaid taxes)
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (not specified above) (42)
    Declaratory Relief Only
    Injunctive Relief Only (non-harassment)
    Mechanics Lien
    Other Commercial Complaint Case (non-tort non-complex)
    Other Civil Complaint (non-tort non-complex)

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition (not specified above) (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

| SHORT TITLE: Greenway Nutrients, Inc., et. al. v. John Mark Pierce, an individual; et. al. | CASE NUMBER |
|---|---|

## *CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION*
## *(CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)*

| T r r r d r L R | L A S r r C r |
|---|---|

S :

S :

S :

### Applicable Reasons for Choosing Court Filing Location (Column C)

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.

2. Permissive filing in central district.

3. Location where cause of action arose.

4. Mandatory personal injury filing in North District.

5. Location where performance required or defendant resides.

6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.

8. Location wherein defendant/respondent functions wholly.

9. Location where one or more of the parties reside.

10. Location of Labor Commissioner Office.

| | **A**<br>Civil Case Cover Sheet Category No. | **Type of Action**<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 1, 11 |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

LASC CIV 109 Rev. 12/18

For Mandatory Use

*CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION*

Exhibit E, Page 113

Local Rule 2.3

Page 1 of 4

| SHORT TITLE: Greenway Nutrients, Inc., et. al. v. John Mark Pierce, an individual; et. al. | CASE NUMBER |
|---|---|

| **A**<br>Civil Case Cover Sheet<br>Category No. | Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | | |
| Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| Fraud (16) | ☑ A6013  Fraud (no contract) | 1, 2, 3 |
| Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
|  | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | | |
| Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
|  | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | | |
| Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
|  | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
|  | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
|  | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
|  | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
|  | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
|  | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
|  | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | | |
| Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2, 6 |
| Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
|  | ☐ A6032  Quiet Title | 2, 6 |
|  | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | | |
| Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

LASC CIV 109 Rev. 12/18

For Mandatory Use

***CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION***

Exhibit E - Page 114

Local Rule 2.3

Page 2 of 4

| SHORT TITLE: | Greenway Nutrients, Inc., et. al. v. John Mark Pierce, an individual; et. al. | CASE NUMBER | |

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **Type of Action**<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment With Damages | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment With Damages | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 12/18

For Mandatory Use

***CIVIL CASE COVER S   EET ADDENDUM
AND STATEMENT OF LOCATION***

Exhibit E - Page 115

Local Rule 2.3

Page 3 of 4

| SHORT TITLE: Greenway Nutrients, Inc., et. al. v. John Mark Pierce, an individual; et. al. | CASE NUMBER |
|---|---|

*S* : **Statement of Reason and Address**

| REASON: | ADDRESS: |
|---|---|
| ☐ 1. ☑ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7.  ☐ 8.  ☐ 9. ☐ 10. ☐ 11. | 355 S GRAND AVE 44TH FL |

| CITY: LOS ANGELES | STATE: CA | ZIP CODE: 90071 |
|---|---|---|

*S* : **Certification of Assignment:**

CENTRAL

Dated: March 21, 2022

*(SIGNATURE OF ATTORNEY/FILING PARTY)*

**PLEASE AVE T E FOLLO IN ITEMS COMPLETED AND READY TO E FILED IN ORDER TO PROPERLY COMMENCE YOUR NE COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER S EET ADDENDUM AND STATEMENT OF LOCATION**

Exhibit C - Page 116

Local Rule 2.3
Page 4 of 4

# EXHIBIT D

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>03/21/2022<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ C. Monroe _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>22STCV09854 |

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | William F. Fahey | 69 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 03/22/2022
 (Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By C. Monroe , Deputy Clerk

**NOTICE OF CASE ASSIGNMENT — UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

# EXHIBIT E

# Superior Court of California, County of Los Angeles

---

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

### What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

### Advantages of ADR

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:**  ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR

1. **Negotiation**: Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation**: In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all.  Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may <u>not</u> be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

---

**How to Arrange Mediation in Los Angeles County**

Mediation for **civil cases** is voluntary and parties may select any mediator they wish. Options include:

    a. **The Civil Mediation Vendor Resource List**
       If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

- **ADR Services, Inc.** Case Manager Elizabeth Sanchez, elizabeth@adrservices.com (949) 863-9800
- **JAMS, Inc.** Assistant Manager Reggie Joseph, RJoseph@jamsadr.com (310) 309-6209
- **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

**These organizations cannot accept every case and they may decline cases at their discretion**. They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

**NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate or small claims cases.**

    b. **Los Angeles County Dispute Resolution Programs**
       https://hrc.lacounty.gov/wp-content/uploads/2020/05/DRP-Fact-Sheet-23October19-Current-as-of-October-2019-1.pdf

       Day of trial mediation programs have been paused until further notice.

       **Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.

    c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration**: Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC)**: MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/C10047.aspx

Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/C10109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

# EXHIBIT F

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

MAY 0 3 2019

Sherri R. Carter, Executive Officer/Clerk

By_____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE LOS ANGELES SUPERIOR COURT )
— MANDATORY ELECTRONIC FILING )
FOR CIVIL )
)
)
)
_____ )

FIRST AMENDED GENERAL ORDER

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

   a) **"Bookmark"**   A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

   b) **"Efiling Portal"**   The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"**   A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

   d) **"Electronic Filing"**   Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

e) **"Electronic Filing Service Provider"**   An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**   For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**   An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**   A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

   a) Trial Court Records

   Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

   b) Represented Litigants

   Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

   c) Public Notice

   The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d)  Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3)  EXEMPT LITIGANTS

a)  Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b)  Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4)  EXEMPT FILINGS

a)  The following documents shall not be filed electronically:

i)    Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

ii)   Bonds/Undertaking documents;

iii)  Trial and Evidentiary Hearing Exhibits

iv)   Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

v)    Documents submitted conditionally under seal.  The actual motion or application shall be electronically filed.  A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b)  Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form.  The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image**.**

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4).  Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked.  Examples include, but are not limited to, the following:

   i) Depositions;

   ii) Declarations;

   iii) Exhibits (including exhibits to declarations);

   iv) Transcripts (including excerpts within transcripts);

   v) Points and Authorities;

   vi) Citations; and

   vii) Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

h)  Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i)  Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j)  Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7)  ELECTRONIC FILING SCHEDULE

a)  Filed Date

i)  Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing.  Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted.    (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii)  Notwithstanding any other provision of this order, if a digital document is not filed in due course because of:  (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8)  EX PARTE APPLICATIONS

a)  Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day before the ex parte hearing.

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing.  A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled.  If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

   i) Any printed document required pursuant to a Standing or General Order;

   ii) Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

   iii) Pleadings and motions that include points and authorities;

   iv) Demurrers;

   v) Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

   vi) Motions for Summary Judgment/Adjudication; and

   vii) Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents.  Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver.  (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and  California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

1  11) SIGNATURES ON ELECTRONIC FILING

2      For purposes of this General Order, all electronic filings must be in compliance with California

3  Rules of Court, rule 2.257.  This General Order applies to documents filed within the Civil

4  Division of the Los Angeles County Superior Court.

5

6      This First Amended General Order supersedes any previous order related to electronic filing,

7  and is effective immediately, and is to remain in effect until otherwise ordered by the Civil

8  Supervising Judge and/or Presiding Judge.

9

10  DATED:  May 3, 2019



KEVIN C. BRAZILE
Presiding Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT G

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California County of Los Angeles**



**Los Angeles County Bar Association Litigation Section**

**Los Angeles County Bar Association Labor and Employment Law Section**



**Consumer Attorneys Association of Los Angeles**



**Southern California Defense Counsel**



**Association of Business Trial Lawyers**



**California Employment Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties.  The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application.  These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

**◆Los Angeles County Bar Association Litigation Section◆**

**◆ Los Angeles County Bar Association Labor and Employment Law Section◆**

**◆Consumer Attorneys Association of Los Angeles◆**

**◆Southern California Defense Counsel◆**

**◆Association of Business Trial Lawyers◆**

**◆California Employment Lawyers Association◆**

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY:

STATE BAR NUMBER

Reserved for Clerk's File Stamp

TELEPHONE NO.:                    FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

**STIPULATION – EARLY ORGANIZATIONAL MEETING**

CASE NUMBER:

---

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise?  If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve.  Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable?  Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation.  (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core."  In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case.  Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

LACIV 229 (Rev 02/15)
LASC Approved 04/11
For Optional Use

**STIPULATION – EARLY ORGANIZATIONAL MEETING**

Page 1 of 2

Exhibit G - Page 133

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lacourt.org* under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the  complaint, and _____ for  the  cross-
   (INSERT DATE)                                           (INSERT DATE)
complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case.  The parties shall attach the Joint Status Report to the  Case  Management  Conference  statement,  and  file  the  documents  when  the  CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____        ➤ _____
         (TYPE OR PRINT NAME)                              (ATTORNEY FOR PLAINTIFF)
Date:

_____        ➤ _____
         (TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)
Date:

_____        ➤ _____
         (TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)
Date:

_____        ➤ _____
         (TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)
Date:

_____        ➤ _____
         (TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)
Date:

_____        ➤ _____
         (TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)
Date:

_____        ➤ _____
         (TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

| LACIV 229 (Rev 02/15) | **STIPULATION – EARLY ORGANIZATIONAL MEETING** | Page 2 of 2 |
| LASC Approved 04/11 | | |

[ Print ]      [ Save ]                                                      [ Clear ]

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – DISCOVERY RESOLUTION** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

    iii.   Be filed within two (2) court days of receipt of the Request; and

    iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied.  If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

Page 2 of 3
Exhibit G - Page 136

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

| Print | Save |   | Clear |
|---|---|---|---|

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

Page 3 of 3

Exhibit G - Page 137

NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY:

STATE BAR NUMBER

Reserved for Clerk's File Stamp

TELEPHONE NO.:                              FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

## INFORMAL DISCOVERY CONFERENCE
(pursuant to the Discovery Resolution Stipulation of the parties)

CASE NUMBER:

1. This document relates to:

    ☐    Request for Informal Discovery Conference
    ☐    Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

LACIV 094 (new)
LASC Approved 04/11
For Optional Use

## INFORMAL DISCOVERY CONFERENCE
(pursuant to the Discovery Resolution Stipulation of the parties)

[ Print ]          [ Save ]                              [ Clear ]

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR PLAINTIFF)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

**THE COURT SO ORDERS.**

Date: _____

_____
JUDICIAL OFFICER

[ Print ]     [ Save ]     [ Clear ]

**FILED**

LOS ANGELES SUPERIOR COURT

MAY 1 1 2011

JOHN A. CLARKE, CLERK

*N. Navarro*

BY NANCY NAVARRO, DEPUTY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| General Order Re<br>Use of Voluntary Efficient Litigation<br>Stipulations | ORDER PURSUANT TO CCP 1054(a),<br>EXTENDING TIME TO RESPOND BY<br>30 DAYS WHEN PARTIES AGREE<br>TO EARLY ORGANIZATIONAL<br>MEETING STIPULATION |

Whereas the Los Angeles Superior Court and the Executive Committee of the Litigation Section of the Los Angeles County Bar Association have cooperated in drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for use in general jurisdiction civil litigation in Los Angeles County;

Whereas the Los Angeles County Bar Association Litigation Section; the Los Angeles County Bar Association Labor and Employment Law Section; the Consumer Attorneys Association of Los Angeles; the Association of Southern California Defense Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California Employment Lawyers Association all "endorse the goal of promoting efficiency in litigation, and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases;"

-1-

ORDER PURSUANT TO CCP 1054(a)

Whereas the Early Organizational Meeting Stipulation is intended to encourage cooperation among the parties at an early stage in litigation in order to achieve litigation efficiencies;

Whereas it is intended that use of the Early Organizational Meeting Stipulation will promote economic case resolution and judicial efficiency;

Whereas, in order to promote a meaningful discussion of pleading issues at the Early Organizational Meeting and potentially to reduce the need for motions to challenge the pleadings, it is necessary to allow additional time to conduct the Early Organizational Meeting before the time to respond to a complaint or cross complaint has expired;

Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in which an action is pending to extend for not more than 30 days the time to respond to a pleading "upon good cause shown";

Now, therefore, this Court hereby finds that there is good cause to extend for 30 days the time to respond to a complaint or to a cross complaint in any action in which the parties have entered into the Early Organizational Meeting Stipulation.  This finding of good cause is based on the anticipated judicial efficiency and benefits of economic case resolution that the Early Organizational Meeting Stipulation is intended to promote.

IT IS HEREBY ORDERED that, in any case in which the parties have entered into an Early Organizational Meeting Stipulation, the time for a defending party to respond to a complaint or cross complaint shall be extended by the 30 days permitted

-2-

ORDER PURSUANT TO CCP 1054(a)

1  by Code of Civil Procedure section 1054(a) without further need of a specific court

2  order.

4  DATED: May 11, 2011

Carolyn B. Kuhl, Supervising Judge of the
Civil Departments, Los Angeles Superior Court

-3-

ORDER PURSUANT TO CCP 1054(a)

# EXHIBIT H

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

03/25/2022

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____L. Bituin_____ Deputy

COURTHOUSE ADDRESS:
Stanley Mosk Courthouse
111 North Hill Street, Los Angeles, CA 90012

PLAINTIFF:
Greenway Nutrients, Inc., a Colorado Corporation  et al

DEFENDANT:
John Mark Pierce et al

## NOTICE OF CASE MANAGEMENT CONFERENCE

CASE NUMBER:
22STCV09854

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

| Date: 08/19/2022 | Time: 8:30 AM | Dept.: 69 |
|---|---|---|

NOTICE TO DEFENDANT:   THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT  FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to LASC, Local Rule 3.37, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code section 68608, subdivision (b), and California Rules of Court, rule 2.2 et seq.

William Fahey

Dated:  03/25/2022                                    William F. Fahey / Judge
                                                              Judicial Officer

---

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

☑ by depositing in the United States mail at the courthouse in __Los Angeles__, California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

☐ by personally giving the party notice upon filing of the complaint.

Gerard P. Fox
1880 Century Park East
Suite 1410
Century City, CA 90067

Sherri R. Carter, Executive Officer / Clerk of Court

Dated:  03/25/2022                                    By  L. Bituin
                                                              Deputy Clerk

LACIV 132 (Rev. 07/13)
LASC Approved 10-03
For Optional Use

**NOTICE OF
CASE MANAGEMENT CONFERENCE**

Cal. Rules of Court, rules 3.720-3.730
LASC Local Rules, Chapter V@^^

Exhibit H - Page 145

# EXHIBIT I

Exhibit I - Page 146

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

03/25/2022

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ L. Bituin _____ Deputy

COURTHOUSE ADDRESS:

Stanley Mosk Courthouse

111 North Hill Street, Los Angeles, CA 90012

PLAINTIFF(S):

Greenway Nutrients, Inc., a Colorado Corporation  et al

DEFENDANT(S):

John Mark Pierce et al

**ORDER TO SHOW CAUSE HEARING**

CASE NUMBER:

22STCV09854

To the party / attorney of record:

You are ordered to appear for an Order to Show Cause Hearing on 07/19/2022 at 8:30 AM in department 69 of this court, Stanley Mosk Courthouse ,
and show cause why sanctions should not be imposed for:

[✔]    Failure to file proof of service.

Failure to comply or appear may result in sanctions pursuant to one or more of the following:  California Rules of Court, rule 2.30 and rule 3.1340; Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.310, 583.360, 583.410, 583.420, 583.430; and Government Code section 68608.

[✔]    To avoid a mandatory appearance all required documents must be filed at least 5 days prior to the date of the hearing.



**William Fahey**

Dated: 03/25/2022

William F. Fahey / Judge

Judicial Officer

**ORDER TO SHOW CAUSE HEARING**

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>03/25/2022<br><br>Sherri R. Carter, Executive Officer / Clerk of Court<br><br>By: _____ L. Bituin _____ Deputy |
| PLAINTIFF/PETITIONER:<br>Greenway Nutrients, Inc., a Colorado Corporation  et al | |
| DEFENDANT/RESPONDENT:<br>John Mark Pierce et al | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>22STCV09854 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Order to Show Cause Failure to File Proof of Service upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Gerard P. Fox
Gerard Fox Law P.C.
1880 Century Park East
Suite 1410
Century City, CA  90067

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: <u>03/25/2022</u>　　　　　By: <u>L. Bituin</u>
　　　　　　　　　　　　　　　　　　Deputy Clerk

**CERTIFICATE OF MAILING**
Exhibit I - Page 148